AFFIDAVIT

of
David E. Bartlett
regarding
Picongen Wireless, Inc.

State of Colorado
County of Broomfield

BEFORE ME, the undersigned Notary, _Jennifer Lomeli_, on this 2nd day of January 2013, personally appeared **David E. Bartlett**, known to me to be a credible person and of lawful age, who being by me first duly sworn, on his oath, deposes and says:

1. I was a member of the Board of Directors of Picongen Wireless, Inc. ("Picongen") at all relevant times described in this Affidavit.

2. By approximately March, 2012, Picongen had completed a laboratory demonstration unit for its initial product, comprised of hardware components and proprietary software, based on Picongen's patents.

3. Mr. Sai Manapragada, Picongen's President and Chief Technology Officer, was in charge of presenting and demonstrating the demonstration unit to Picongen's Board of Directors, potential investors and others.

4. I arranged to meet with Mr. Manaprgada in Picongen's laboratory (located in the garage of Mr. Manapragada's residence) at 10:00 a.m. on April 4, 2012 to see a comprehensive demonstration of the demonstration unit.

5. I arrived at the laboratory at the agreed time but Mr. Manapragada was approximately 45 minutes late in joining me.

6. Mr. Manapragada took approximately an additional 30 minutes to set up the demonstration, despite that we had previously scheduled and confirmed our meeting.

7. Mr. Manapragada then conducted the demonstration and the demonstration unit (on April 4, 2012) worked properly.

8. There was little time remaining for discussion following the demonstration, but we briefly discussed the status of the demonstration unit and agreed that the demonstration unit was ready to show to potential investors, corporate partners and others.

*[signature]*

David E. Bartlett
455 Golden Eagle Drive
Broomfield, Colorado 80020

State of Colorado
County of Broomfield

Subscribed and sworn to (or affirmed) before me on this 2nd day of January 2013, by David E. Bartlett, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: *[signature]*

My Commission Expires: 11/16/13

*[Notary Seal: Jennifer Lomeli, Notary Public, State of Colorado]*

# AFFIDAVIT
## of
## Dale Kluesing
## regarding
## Picongen Wireless, Inc.

**State of Alabama**
**County of Lee**

BEFORE ME, the undersigned Notary, __Hope Judd__, on this _1_ day of January, 2013, personally appeared **Dale Kluesing**, known to me to be a credible person and of lawful age, who being by me first duly sworn, on his oath, deposes and says:

1. I was the Chief Executive Officer and Chairman of the Board of Directors of Picongen Wireless, Inc. ("Picongen") at all relevant times described in this Affidavit. I am experienced in high-tech business management, including financing issues.

2. Picongen was formed in 2007 to develop and commercialize a new technology for transmitting high-definition video wirelessly, using multiple conventional Wi-Fi links in parallel. As part of this strategy, we filed provisional patent applications in May and June of 2007, and began to look for a patent attorney and for financing.

3. By the beginning of 2008 we had gotten commitments for enough financing to pay for development and productization expenses plus quality patent application work, but had not yet closed. I contacted Robert Groover, a patent attorney based in the Dallas area, and told him that we had "bar dates" coming up, and had financing commitments but had not yet closed. I asked him if he would be willing to work on these applications with cash payment in July. He agreed to this, and promptly began work. This was a major project.

4. Subsequently some of our investors backed out from their planned investments, and our planned financing fell through. I had to tell Groover that we would not be able to pay him in July of 2008. He said he would complete the filings anyway, but wanted the patent properties to be security for payment of his fees. I agreed to this. (I may have agreed to this earlier, but I'm not sure.)

5. With great difficulty, we were able to pay the patent filing fees for the five US applications, and for two of the PCT applications.

6. I continued fundraising through all this period, but found it very difficult. I was told repeatedly that we would have a $6 million valuation as soon as we had a proof of concept demonstration to show investors. That valuation would have made it easy to raise enough money to pay Groover, pay debts, and pay operating expenses for further development.

7. Getting to a proof-of-concept demonstration became our main goal. I was able to get bits of interim financing to pay patent fees and buy minimal supplies, but the

financing we got was far less than would have been needed to ramp up a full productization program. We limped along in this mode through most of 2009 and 2010.

8. Groover continued to send us monthly invoices, and we did not object to any of them. In the Fall of 2010 Groover complained again about the large unpaid balance on his invoices, and told me that if he continued work he wanted us to pay him currently, and to reaffirm that the patent properties themselves would stand security for the amounts owed to Groover. I agreed to this.

9. By approximately mid-August, 2011, Picongen had obtained adequate funding to complete a laboratory demonstration of its technology. This demonstration required some expensive hardware and some proprietary software.

10. Mr. Sai Manapragada, Picongen's President and Chief Technology Officer, represented to me in August 2011 that the demonstration unit would be completed and ready to demonstrate in approximately three months.

11. Picongen then loaned $25,000 to Mr. Manapragada, based on a written load document, to complete the demonstration unit. Picongen had made a similar loan earlier, bringing the total loans to Mr. Manapragada up to a total of at least $50,000.

12. Mr. Manapragada, who was in charge of completing the demonstration unit, had promised several different completion dates several times. I had emphasized that getting a proof of concept demonstration was crucial to getting new investment money.

13. On approximately March 15, 2012, I told Mr. Manapragada that Picongen had exhausted all of its available development funds, whereupon he responded that the demonstration unit would be completed within two weeks, and that it would be suitable for viewing by Picongen board members and investors.

14. The initial demonstration occurred on March 31, 2012 with the following individuals attending: Mr. Manapragada, myself, Ankit Sahu (investor), Marc Seaver Page (engineering consultant), Suba Garlapati (business consultant), and Eugene Chen (business consultant). The demonstration and presentation of the demonstration unit on March 31, 2012 worked properly. That is, high-definition video was transmitted wirelessly, using multi Wi-Fi links in parallel.

15. Mr. Manapragada also told me that Jay Avula (another potential investor) had seen successful demonstrations several times.

16. The demonstration unit was also scheduled to be demonstrated to Mr. David Bartlett, a member of Picongen's Board of Directors, on April 4, 2012, but I was not present at this demonstration.

17. Another investor demonstration was scheduled for May 11, 2012 with Entropic Communications, Inc., a potential investment partner, represented by Mr. David Barr and Mr. Anton Monk. (I believe that Mr. Barr and Mr. Monk had flown up specifically

to attend this demonstration.
   a) Mr. Manapragada was there to conduct the demonstration, and I myself was also present.
   b) When the demonstration was supposed to begin, Mr. Manapragada announced loudly, while directing his voice to an area outside the laboratory, that the demonstration would now begin. At this point all power to the laboratory was lost.
   c) Mr. Manapragada explained that a vacuum sweeper had been turned on causing the power outage.
   d) Power was restored, but after that Mr. Manapragada continued to tinker with the demonstration unit for approximately one hour, without successfully running the demonstration unit.
   e) Mr. Barr and Mr. Monk left the laboratory without seeing a working demonstration unit.
   f) Mr. Manapragada explained to me that the power problem had damaged WiFi cards contained in the demonstration unit, but Mr. Manapragada recanted this explanation after I pointed out that the WiFi cards were of a type that could not be affected by power abnormalities.
   g) Mr. Manapragada subsequently provided a different explanation, stating that the software in the demonstration had become unstable and that he could not guarantee that any future demo would work.

18. From my observation and my experience in high-tech development and management, I believe that all three of these explanations for the failure are very implausible. This failure not only killed the investment deal I was trying to negotiate, but made it impossible to pursue other investments from major companies.

19. That SAME DAY, May 11, 2012, I received a letter from the legal counsel of Mr. Ron Moeckel, a member of Picongen's Board of Directors.
    a) In that letter (appended below), Mr. Moeckel demanded that Picongen exchange 40% of Picongen's ownership for cancellation of the promissory note to him, and that a significant percentage of the remaining 60% should be provided to Mr. Manapragada.
    b) Subsequently, Oscar Escobar (Mr. Moeckel's attorney) told me that Mr. Manapragada was fully in contact during the development of Mr. Moeckel's demand/offer, and that Mr. Manapragada was well aware of both the demand offer and the letter prior to the failed Entropic Communications demonstration.

20. Also on that SAME DAY, only hours after the failed demonstration, I received an email from Mr. Manapragada, which is attached. This email shows a timestamp of May 11 2012, at 8:58pm. This email demonstrates that Mr. Manapragada had already been involved in negotiating a deal with Mr. Avura. The terms of this proposed deal, as this email shows, would have reduced my equity ownership from 43% to 5%, while greatly increasing Mr. Manapragada's equity ownership. I did not and do not believe that the deal proposed by Mr. Manapragada was in the best interests of the company, but obviously it would have been very beneficial to Mr. Manapragada himself.

21. On June 18, 2012, I received a letter from Mr. Manapragada, on Picongen letterhead and signed by Mr. Manapragada as President of Picongen wherein he demanded that we accept "his" offer. This letter was referring back to the May 11 letter from

Moeckel.

22. Subsequently, I learned from communications from Mr. Manapragada that he intended to control at least 51% of the ownership of Picongen, and that Mr. Avula (declaration 7 above) was willing to invest $2,000,000 in Picongen but only on the conditions that Mr. Manapragada controlled at least 51% of the ownership of Picongen and that all other stockholders holding in the aggregate approximately 53% of the ownership of Picongen were reduced to an aggregate of approximately ownership of 5% of Picongen.

23. On approximately June 18, 2012, I received communications from Mr. Manapragada and Mr. Manapragada's counsel with an ultimatum that we either accept his demand for at least 51% of the ownership of Picongen or he would call a meeting of the Board of Directors and force Picongen into bankruptcy.

24. Subsequently, stockholders holding a majority of the outstanding shares of Picongen determined that Mr. Manapragada was acting in his own personal interest and against the interests of Picongen and its stockholders, and therefore removed Mr. Manapragada from the position of President of and a member of Picongen's Board of Directors.

25. I have resigned from all association with Picongen, and none of the above purports to speak on behalf of the company, nor of the Trustee.

26. All statements made of knowledge are true, and all statements made on knowledge and belief are believed to be true.


_____
Dale Kluesing
2275 Springwood Drive
Auburn AL 36830

January 2, 2013

State of Alabama
County of Lee

Subscribed and sworn to (or affirmed) before me on this 2 day of January, 20 13, by Dale Kluesing, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature _Hope Judd_ (Seal)

HOPE JUDD
MY COMMISSION EXPIRES
JANUARY 13, 2016

## PROMISSORY NOTE

$25,000.00

Date of Issuance

May 5, 2010

This Promissory Note amends, restates and replaces that certain Promissory Note issued by Sai Manapragada ("Borrower") dated May 5, 2010.

FOR VALUE RECEIVED, Borrower, a Director and Officer of Picongen Wireless, Inc. a Delaware corporation (the "Company"), hereby promises to pay the Company, the principal sum of Twenty Five Thousand Dollars and No Cents ($25,000.00), together with interest thereon from the date of this promissory note ("Note"). Interest shall accrue at a rate that is the lesser of twelve percent (12%) per annum or the maximum legally permissible rate for these types of instruments, and shall be paid monthly. All of the principal and all accrued interest shall be due and payable by Borrower on demand by the Company at the date that is twenty-four (24) months after the Date of Issuance (the "Maturity Date").

Payment. All payments, whether at the Maturity Date or otherwise, shall be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the holder hereof may from time to time designate in writing to Borrower. Payment shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable and any remainder applied to principal. Prepayment of principal, together with accrued interest, may not be made without the Company's consent, which will not be unreasonably withheld, delayed or conditioned. However, Borrower and Company agree that all amounts outstanding under this Note shall be paid out of any proceeds otherwise to be received by Borrower from any sale or similar disposition of the Company or the Company's assets, including any corporate finance transaction, licensing of the Company's intellectual properties or the like, or any sale or other disposition by Borrower of any capital stock of the Company held by Borrower. Borrower hereby waives demand, notice, presentment, protest and notice of dishonor.

Amendments and Waivers; Resolutions of Dispute; Notice. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice shall be conducted in accordance with the reasonable good faith judgment of the Company.

Successors and Assigns. This Note applies to, inures to the benefit of, and binds the successors and assigns of the parties hereto; provided, however, that Borrower may not assign its obligations under this Note without the written consent of the Company. Any transfer of this Note will be effective only by surrender of this Note to the Company and reissuance of a new note to the transferee. The Company and any subsequent holder of this Note receives this Note subject to the foregoing terms and conditions, and agrees to comply with the foregoing terms and conditions for the benefit of the Company and Borrower and any other such subsequent holders.

Expenses. Borrower hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including reasonable attorneys' fees and legal expenses, incurred by the holder of this Note ("Costs") in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise. Borrower agrees that any delay on the part of the holder in exercising any rights hereunder will not operate as a waiver of such rights. The holder of this Note shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by the party or parties waiving such rights or remedies.

Governing Law. This Note shall be governed by and construed under the laws of the State of California as applied to other instruments made by California residents to be performed entirely within the State of California.

Approval. The Company hereby represents that its board of directors, in the exercise of its fiduciary duty, has approved the Company's loan to Borrower and the consequential execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financial condition and prospects. In addition, Borrower hereby represents that it intends to use the principal of this Note primarily for payments in respect of retaining Borrower's principal residence, and not for any other personal, family or household purpose.

BORROWER

_[signature]_ 07/31/2011

Name: Sai Manapragada

## PROMISSORY NOTE

$25,000

Date of Issuance

July 30, 2011

FOR VALUE RECEIVED, Sai Manapragada ("Borrower"), a Director and Officer of Picongen Wireless, Inc. a Delaware corporation (the "Company"), hereby promises to pay the Company, the principal sum of Twenty Five Thousand Dollars and No Cents ($25,000.00), together with interest thereon from the date of this promissory note ("Note"). Interest shall accrue at a rate that is the lesser of twelve percent (12%) per annum or the maximum legally permissible rate for these types of instruments, and shall be paid monthly. All of the principal and all accrued interest shall be due and payable by Borrower on demand by the Company at the date that is twelve (12) months after the Date of Issuance (the "Maturity Date").

Payment. All payments, whether at the Maturity Date or otherwise, shall be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the holder hereof may from time to time designate in writing to Borrower. Payment shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable and any remainder applied to principal. Prepayment of principal, together with accrued interest, may not be made without the Company's consent, which will not be unreasonably withheld, delayed or conditioned. . However, Borrower and Company agree that all amounts outstanding under this Note shall be paid out of any proceeds otherwise to be received by Borrower from any sale or similar disposition of the Company or the Company's assets, including any corporate finance transaction, licensing of the Company's intellectual properties or the like, or any sale or other disposition by Borrower of any capital stock of the Company held by Borrower. Borrower hereby waives demand, notice, presentment, protest and notice of dishonor.

Amendments and Waivers; Resolutions of Dispute; Notice. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice shall be conducted in accordance with the reasonable good faith judgment of the Company.

Successors and Assigns. This Note applies to, inures to the benefit of, and binds the successors and assigns of the parties hereto; provided, however, that Borrower may not assign its obligations under this Note without the written consent of the Company. Any transfer of this Note may be effected only by surrender of this Note to the Company and reissuance of a new note to the transferee. The Company and any subsequent holder of this Note receives this Note subject to the foregoing terms and conditions, and agrees to comply with the foregoing terms and conditions for the benefit of the Company and Borrower and any other such subsequent holders.

Expenses. Borrower hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including reasonable attorneys' fees and legal expenses, incurred by the holder of this Note ("Costs") in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise. Borrower agrees that any delay on the part of the holder in exercising any rights hereunder will not operate as a waiver of such rights. The holder of this Note shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by the party or parties waiving such rights or remedies.

Governing Law. This Note shall be governed by and construed under the laws of the State of California as applied to other instruments made by California residents to be performed entirely within the State of California.

Approval. The Company hereby represents that its board of directors, in the exercise of its fiduciary duty, has approved the Company's loan to Borrower and the consequential execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financial condition and prospects. In addition, Borrower hereby discloses and represents that it intends to use the principal of this Note primarily for payments in respect of personal, family or household purposes.

BORROWER

_____ 07/31/2011
Name: Sai Manapragada

# Dale Kluesing

| | |
|---|---|
| **From:** | Sai Manapragada [saimanapragada@yahoo.com] |
| **Sent:** | Friday, May 11, 2012 8:58 PM |
| **To:** | Dale Kluesing |
| **Cc:** | Sai Manapragada |
| **Subject:** | Proposal for Jay and Suba |

Dale,

Based on our conversation, here is the summary bullets points you wanted m to write down based on what you agreed as a suitable proposal for Jay. We'll use them as talking points when we talk to Jay.

* $750 K for purchase of existing outstanding shares
* $320 K for assuming the current debt
* At least 5% for Dale in Newco with accelerated vesting
* Guarantee of a minimum 6 month contract for Dale with at least $100 K per annum salary in Newco

Please forward this to Suba as he wants this to come from you directly so he knows you are on board with this. Ask him for a written offer from Jay. Let him get back with a written offer and we can discuss.

Cheers!
Psychuck.

Sent from Psychuck's iPhone

# NIESAR & VESTAL LLP
ATTORNEYS AT LAW

90 NEW MONTGOMERY STREET, 9TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
TELEPHONE (415) 882-5300
FACSIMILE (415) 882-5400
www.nvlawllp.com

File No. 4272.00

May 11, 2012

**Via U.S. Mail and Email:** dkluesing@mindspring.com; saimanapragada@yahoo.com; dave@debartlett.com; ysharatkumar@yahoo.com

Picongen Wireless Inc.
1502 Hicks Avenue
San Jose, CA 95125
Attn: Chief Executive Officer and Board of Directors

    Re: Note and Warrant Purchase Agreement dated March 19, 2010 and Promissory Note dated March 19, 2010

Dear Messrs. Kluesing, Manapragada, Bartlett and Kumar Yempati:

    We represent Mr. Ronald Moeckel with regard to his various investments in Picongen Wireless Inc. (the "**Company**"). In such capacity we have been requested to contact the Company's Board of Directors with respect to the Note and Warrant Purchase Agreement dated March 19, 2010 (the "**Purchase Agreement**") and the Promissory Note also dated March 19, 2010 (the "**Note**"). As you are surely aware, the Note's principal amount of one hundred fifty thousand dollars ($150,000) and accrued but unpaid interest thereon is due and payable to our client by the Company on demand any time after March 19, 2012. The purpose of this letter is to formally make such demand.

    Notwithstanding the foregoing, we hereby invite the Company's Board of Directors to meet with us on Friday, May 18, 2012 at a mutually convenient time at our offices in San Francisco, California. Messrs. Kluesing and Bartlett are welcome to attend the meeting telephonically. The purpose of the meeting will be to discuss the prompt payment of the amounts due under the Purchase Agreement and the Note. In the event that the Company is not presently able to pay the amounts due, we will invite the Board of Directors to consider the terms of our client's proposed equity restructuring and bridge financing of the Company (the "**Plan**"), as outlined below. The purpose of the Plan is to make the Company more appealing and increase the likelihood of raising the significant new capital necessary to realize its business plan.

    The terms of the Plan will generally consist of the following:

- Conversion of our client's debt into shares of the Company's capital stock such that following such conversion our client will own forty percent (40%) of the Company's issued and outstanding capital stock. The Plan contemplates that all of the Company's convertible debt (for a total of approximately three hundred thousand dollars ($300,000)

be converted into a forty percent (40%) equity stake in the Company. Such conversion would, of course, be subject to approval of the Plan by such other debt holders;

- The remaining sixty percent (60%) of the Company's issued and outstanding capital stock may be distributed among the remaining shareholders (e.g., Dale Kluesing, Sharat Kumar Yempati, Anil Annam, David Bartlett) as such shareholders may determine, provided, however, that Sai Manapragada shall retain a significant portion of that sixty percent (60%). This significant allocation to Mr. Manapragada will reflect his ongoing critical role in the development of the Company's technology; and

- Our client will make an additional new money investment in the Company in the form of either debt or equity financing, to be determined. Such new investment shall be sufficient to bring the Company current with its payment obligations and shall be subject to acceptable use of proceeds.

In the event that the Company is unable to pay the amounts due to our client pursuant to the Purchase Agreement and Note, and the Board of Directors of the Company is unwilling to accept the terms of the Plan outlined above, our client has authorized us to proceed immediately thereafter with a collection action against the Company for the principal amount due on the Note, together with accrued and unpaid interest thereon. In addition, if we are forced to proceed with such collection action, we will also seek to collect our attorneys' fees and costs incurred in collecting the amounts owed, as provided in Section 9.6 of the Purchase Agreement and Section 5 of the Note.

Please confirm via reply email no later than Tuesday, May 15, 2012 that you are available for a meeting (or conference call) to be held on Friday, May 18, 2012. We propose a start time of 2:00pm (Pacific Coast Time) for the Friday meeting, but please let us know if you prefer a different time. Your prompt attention to this matter should facilitate resolution of this matter without the necessity of formal legal proceedings.

Respectfully yours,

Gerald V. Niesar

cc: David Bartlett
16045 Jackson Oaks Drive
Morgan Hill, CA 95037



June 18, 2012

**<u>Via Electronic Mail and First Class Mail</u>**

Alvin Dale Kluesing
2275 Springwood Drive
Auburn AL 36830
(Email: dkluesing@mindspring.com)

David E. Bartlett, Esq.
61 Faith Lane
Tracy, CA 95377-1140
dave@debartlett.com

**Re: <u>Picongen Wireless, Inc.</u>**

Dear Dale and David,

      As you know, the financial condition of the company is dire. The Company has no funds to pay engineers or other expenses and consequently, no means to execute a business plan or realize the business opportunity. If this situation persists, I see no reason to delay the inevitable: a final liquidation and wind-up of the Company through a Chapter 7 bankruptcy petition.

      I believe that I have identified an investor that is prepared to invest sufficient funds in the Company to allow it to execute on a business plan, but only on terms that require a significant dilutive "cram-down" of your existing equity and rights. I believe I can convince this investor to provide the following consideration to you on account of your existing claims against and equity interests in the Company:

### Dale

- a cash payment of $200,000.00 on close of the recapitalization
- a 5% equity interest in the recapitalized company with no anti-dilution protections

### David

- a cash payment of $50,000.00 on close of the recapitalization
- a 1.25% equity interest in the recapitalized company with no anti-dilution protections

      I appreciate that these terms are less than you might have wished, but they are substantially better than you could expect to receive in a Chapter 7 liquidation, and I have pressed the potential investor to provide some return to existing equity interests in order to effect a quick and uncontroversial recapitalization. And you should note that I am proposing that you


**Sai Manapragada**
**President & CTO**

receive a cash payment on recapitalization: it is a difficult sell to have "new money" allow its money to be paid out to existing equity, but I believe I can achieve these terms if we can move forward quickly.

I do not have a firm commitment from the potential investor on the proposed terms although I am fairly confident that I can achieve them if we do not delay: I need to know if each of you will accept the above terms before I go out on a limb and press these terms with the investor.

Please let me know no later than June 25 whether you are willing to accept such terms for such a recapitalization.

Very Truly Yours,

*[signature]*

**Sai Manapragada**
President & CTO,
Picongen Wireless Inc.,
Mailing Address:
27457 Green Hazel Road
Hayward, CA 94544
(Email: saimanapragada@yahoo.com)



VECTIS LAW GROUP

PATRICK M. COSTELLO
Attorney at Law

2225 E. BAYSHORE ROAD, SUITE 200
PALO ALTO, CA 94303-3220

MAILING ADDRESS:
PMB# 551, 270 REDWOOD SHORES PKWY
REDWOOD CITY, CA 94065

Phone: 650 320 1688
Facsimile: 650 320 1687
Mobile: 650 269 1898
pcostello@vectislawgroup.com

June 19, 2012

**Via Electronic Mail and First Class Mail**

Alvin Dale Kluesing
2275 Springwood Drive
Auburn, AL 36830
(E-mail: dkluesing@mindspring.com)

David Bartlett, Esq.
61 Faith Lane
Tracy, CA 95377-1140
(E-mail: dave@debartlett.com)

Re: **Picongen Wireless, Inc.**

Dear Messrs. Kluesing and Bartlett:

I am bankruptcy counsel for Mr. Sai Manapragada, the President of Picongen Wireless, Inc. (the "Company"). I have been engaged by Mr. Manapragada to advise him concerning, among other matters, the initiation of Chapter 7 relief for the Company.

### The Financial Condition and Prospects of the Company

As I assume you appreciate, the Company's present financial condition is dire. The Company has no funds to execute on a business plan and owes substantial accrued and unpaid compensation to Messrs. Kluesing and Manapragada. The Company is indebted to Ronald Moeckel under a note or notes in the principal amount of at least $150,000.00: these notes are now past due and Mr. Moeckel has made demand for payment. The Company is further also seriously delinquent on its tax obligations to the State of Delaware. The Company has no apparent ability to satisfy any of these liabilities, much less execute on a business plan. The Company may have creditors and liabilities in addition to those identified above, but Mr. Manapragada is unable to assess such additional liabilities without access to the books and records of the Company in your the possession.

Mr. Manapragada believes that the current intellectual property of the Company could have significant value if developed according to an adequately funded business plan, but that any such business plan requires a substantial additional equity investment in the Company. Any such additional equity investment would no doubt require a substantial dilution of your equity in the Company.

I understand that Mr. Manapragada has discussed the possibility of additional equity investments with you, but the dilutive effect of such potential transactions has to date proven unacceptable to you. Given your unwillingness to accept the terms of such a dilutive transaction, it appears that the Company has no realistic prospect of capitalizing on its current intellectual property and should seek to liquidate through a bankruptcy proceeding before the value of the Company's assets dissipates entirely.

Mr. Manapragada is prepared to support a Chapter 7 petition by the Company to be filed no later than July 15, 2012 unless the Company's board and majority of shareholders accept the dilutive terms likely to be required by a "new money" investor. Mr. Manapragada has spoken with fellow directors Ronald Moeckel and Kumar Yempati, and he believes that a majority of directors are prepared to authorize the filing of a Chapter 7 petition on behalf of the Company if you continue to reject the terms necessary to secure an additional adequate equity investment. A Chapter 7 filing will, of course, likely mean a total loss for all existing equity holders, but such loss is candidly attributable to your refusal to agree to a dilutive transaction.

### Alternatives

The current state of affairs is unacceptable: the Company cannot execute on any business plan because it lacks the funds to do so while the value of its assets steadily dissipates. From Mr. Managrapada's perspective, the choices for proceeding forward are:

1. You agree to the terms for new equity funding notwithstanding that such terms may significantly dilute of your current equity position; or

2. The Company files for Chapter 7 relief before the value of its intangible property dissipates entirely.

If you have other alternatives to preserve the value of the Company, please feel free to present them to Mr. Manapragada. But if you cannot quickly present any viable alternative, Mr. Manapragada intends to call a meeting of the board of directors for the purpose of authorizing him to initiate a Chapter 7 proceeding.