Patrick M. Costello, Esq. - Bar No. 117205
VECTIS LAW GROUP
PMB# 551, 270 Redwood Shores Pkwy
Redwood City, California 94065
Telephone: (650) 320-1688
Facsimile: (650) 320-1687
E-mail: pcostello@vectislawgroup.com

Attorneys for Sai Manapragada,
Creditor and Equity Security Holder

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No.: 12-48131 RLE 7 |
| Picongen Wireless Inc., | Chapter 7 |
| Debtor. | |
| | Date: February 13, 2013 |
| | Time: 2:00 p.m. |
| | Place: Courtroom 201 |
| | |
| | The Honorable Roger L. Efremsky, |
| | United States Bankruptcy Judge |

**DECLARATION OF PATRICK COSTELLO RE MOTION TO CONVERT**
**CHAPTER 7 CASE TO A CASE UNDER CHAPTER 11**

I, Patrick Costello, declare:

1. I am an attorney duly admitted to practice on the State of California and before this Court and am the attorney for Sai Manapragada ("Manapragada"), a creditor and equity security holder of Picongen Wireless Inc. ("Debtor"). I have personal knowledge of the matters stated herein, except for matters stated on information and belief, and as to such matters I believe them to be true for the reasons set forth herein.

2. I make this declaration in reply to various matters alleged in the Trustee's Opposition to Someone's Motion to Convert Case From Chapter 7 to Chapter 11 (Docket No.46) (the "Opposition") filed on behalf of Paul Mandorf ("Trustee"), the Chapter 7 Trustee in the above-captioned case.

## CO-OPERATION WITH THE TRUSTEE

3. The Opposition suggests that my clients have failed to comply with a duty to cooperate with the Trustee. Nothing could be further from the truth: my clients have been responsive to the Trustee's various information requests since the inception of this case. The simple fact of the matter is that the Trustee is now insisting that my clients be responsible and produce property of the Debtor that the Trustee has always understood was not under their control. My clients have repeatedly advised the Trustee as to the parties whom he should contact with respect to such property, but the Trustee has either chosen not to pursue those lines of inquiry or has been unsuccessful in doing so.

4. I attach hereto as <u>Exhibit A</u> a copy of my letter dated June 19, 2012 addressed to Dale Kluesing ("Kluesing") and David Bartlett ("Bartlett"), respectively the CEO and general counsel of the Debtor, on behalf of Manapragada. In additional to being officers of the Company, Kluesing and Bartlett held a majority of then outstanding shares of the Debtor's stock. The thrust of the letter was that the Debtor's financial condition was dire, and that if Kluesing and Bartlett would not agree to an equity infusion that would substantially dilute their equity percentages, the three remaining directors would vote to commence a voluntary Chapter 7 petition. The three remaining directors willing to vote for the voluntary Chapter 7 petition were Manapragada, Sharat Kumar Yempati ("Yempati") and Ankit Sahu ("Sahu).

5. In describing the Debtor's financial condition as known to Manapragada, I identified certain unpaid claims, but expressly stated:

> "The Company may have creditors and liabilities in additional to those identified above, but Mr. Manapragada is unable to assess such additional liabilities without access to the books and records of the Company in <u>your</u> possession." (emphasis added)

6. In my letter, I referred to the franchise tax liability due to Delaware. Based on the online public records of the Delaware Secretary of State at the time, a copy of which is attached as

Exhibit B, that franchise tax liability was $407,223.00. This information is available online, and I assume that the Trustee would review it as basic due diligence for any corporate Chapter 7 case wherein he is a trustee.

7. Kluesing and Bartlett responded to my June 19 letter by using their majority of shares to oust Manapragada, Sahu and Yempati as directors and assume exclusive management control over the Debtor and its assets.

8. On October 3, 2012, I filed an involuntary Chapter 7 petition against the Debtor on behalf of Manapragada, Ronald Moeckel ("Moeckel"), Ankit Sahu, and Max Lightfoot ("Lightfoot") (Docket No.1), a copy of which is attached as Exhibit C.

9. After providing Messrs. Kluesing and Bartlett with copies of the involuntary petition and summons, they agreed to stipulate to relief inasmuch as they really did not perceive much value in the Debtor or its assets. Accordingly, the parties entered into a simple Stipulation for entry of an order for relief (Docket No.5), a copy of which is attached as Exhibit D.

10. From the outset, the petitioning creditors have sought to provide full cooperation to the Trustee and provide all information available to them:

- As evidenced by the email exchanges attached as Exhibit E, immediately upon his appointment, the Trustee contacted me on October 31, 2012 to request some background on the case. By my response dated November 1, I provided a background and pointed out that Kluesing and Bartlett remained in control of the Debtor and its books and record and had little incentive to generate the schedules. I provided the names and contact information for Kluesing and Bartlett and suggested that it might take "some nudging" and/or work to solve the schedules and matrix problems.

- By email dated November 5, 2012, a copy of which is attached as Exhibit F, I

provided the Trustee's attorney with a report on patents which the petitioning creditors were interested in acquiring.

- On November 5, 2012, the Trustee's counsel and I had a series of email exchanges, a copy of which is attached as Exhibit G, wherein I disabused him of his erroneous understanding that filing a UCC-1 financing statement in California was effective to perfect a security interest in the intangible property of a Delaware corporation.

- On November 7, 2012, the Debtor filed its schedules of assets and liabilities signed under penalty of perjury by Kluesing as the Debtor's CEO (Docket No.11), a copy of which is attached hereto as Exhibit H. While deficient in certain respects, the detail included in the schedules evidence that the schedules were prepared with access to the Debtor's books and records, establishing that Kluesing had access to such books and records.

- On November 8, the Trustee wrote to ask me whether my clients were aware of any disclosures or omission that they believed to be material. I provided a preliminary response the same day and a more detailed response from Manapragada the following day. These exchanges are attached as Exhibit I. At no point in those communications did the Trustee suggest that my clients had access to the Debtor's books and records.

- On November 15, 2012, the Trustee's counsel sent me an email, a copy of which is attached as Exhibit J, concerning factual issues concerning the validity of secured claims. In that communication, Mr. Katz confirmed that he was looking to David Bartlett, on behalf of the Debtor, to provide information and documentation for information in the schedules.

11. Through this whole process, neither the Trustee nor his counsel once ask me or my

clients concerning the location of the Debtor's books and records, and it was clear to me that the Trustee and Mr. Katz knew and understood that Kluesing and Bartlett had control of and access to those books and records.

12. The Debtor's 341 examination was scheduled for the meeting of creditors on December 12, 2012. My legal assistant, Catherine Lee, attended the meeting of creditors. I am informed and believe and state thereon that neither Kluesing nor Bartlett appeared at the meeting for the Debtor. The Trustee did recognize one attorney and ask whether his client would attend: my legal assistant assumed the attorney represented either the Debtor or Kluesing or Bartlett. The Trustee concluded the Section 341 meeting and examination without any actual examination of a responsible person for the Debtor or any answers concerning location of or access to the Debtor's books and records. Apparently the Trustee was at that point satisfied with his knowledge and access to the Debtor's books and records. Further, on the same date, the Trustee filed his Request for Notice of Possible Dividends. Again, the Trustee was presumably comfortable enough at that point with his knowledge of and access to the Debtor's books and records to determine that a dividend was likely, even with a bid of $60,000 for substantially all of the Debtor's assets.

13. Shortly prior to the January 22 hearing, Moeckel agreed to convert his existing note debt to equity. This conversion was sufficient to result in Manapragada, Moeckel, Sahu and Lightfoot holding a majority of outstanding shares of the Debtor's stock, and these four shareholders then gained control of the board in the same manner as Kluesing and Bartlett had done some six months earlier. While this change effected a change in management, it did not result in a change of possession and control of the Debtor's books and records: the books and records remained in control of Kluesing and Bartlett.

14. The first time that the Trustee ever suggested that my clients had a duty to provide the Trustee with access to books and records which the Trustee knew to be in the possession and control of Kluesing/Bartlett was on January 31, 2013, a date after the Trustee apparently began

experiencing trouble in closing the sale to Sigma Group, Inc. on the "as is, where is" terms authorized by the Court. Through a series emails communications by both myself and Robert Simmons, my clients promptly advised Mr. Katz that the equipment was located in Manapragada's garage and was available for pick-up, that newly installed management did not have the Debtor's books and records, and that the Trustee should look to Kluesing and Bartlett for such records. These email communications are attached hereto as <u>Exhibit K</u>. No change had occurred in possession of the Debtor's books and records in the prior three months of the Trustee's tenure: it was only after encountering difficulties in closing the sale to Sigma that the Trustee sought to claim that my clients rather than Kluesing and/or Bartlett had a duty to deliver the Debtor's books and records.

**OFFER TO PURCHASE AND DISCLOSURE OF INTERESTS**

15. My clients have disclosed their interest in acquiring the assets at every juncture. In my letter of June 19, 2012 to Kluesing and Bartlett, I indicated that if Kluesing and Bartlett would not agree to a dilutive transaction and a Chapter 7 petition was prosecuted, Manapragada would seek to acquire the assets. In my first communication with the Trustee concerning the background of the case, I indicated that "certain of the petitioning creditors are forming a company to make a bid to purchase the technology…". *See* Exhibit E.

16. On November 7, 2012, I sent to Mr. Katz via email, the initial offer of xStream Wireless Works, Inc. ("xStream") to purchase the Debtor's assets, a copy of which is attached hereto as <u>Exhibit L</u>. That initial offer made written disclosure that:

- Manapragada was currently the 100% owner of xStream and that he was a former director and a significant shareholder and creditor; and
- that it was contemplated that the other petitioning creditors would become shareholders in xStream.

17. The Trustee did not accept xStream's initial offer and made a counterproposal, a copy of which is attached as Exhibit M. Given the concern over the status of the patents, xStream elected to accept the terms of the Trustee's counteroffer and I drafted a binding termsheet to facilitate promptly moving forward with the required Court authorization. A copy of the final binding Termsheet is attached as Exhibit N. The terms of the binding agreement contained terms designed to make the transaction easy for the Trustee to close:

- The Purchased Assets did not include the books and records. xStream did not include the books and records because (i) inasmuch as it was a straight asset sale, xStream did not need them, (ii) Kluesing and Bartlett had the books and records and xStream did not want the "hassle" of dealing with Kluesing or Bartlett on the matter; and (iii) the Trustee would presumably need the books and records to determine the dividend and was in a better position to deal with Kluesing and Bartlett.

- The sale was "as is, where is" with no delivery requirements. xStream could do this because the equipment assets were housed in Manapragada's garage. The lack of delivery of the notes presented a minor risk, but the likelihood that the notes could be enforced by an actual holder in due course seemed highly improbable. Finally, the files concerning the patents would likely be in possession of Mr. Groover, and xStream would have to make demand on Mr. Groover and obtain the records in accordance with applicable law or otherwise recreate the files. In either case, xStream deemed it better to address that issue post-sale.

**THE CHAPTER 11 CONVERSION MOTION**

18. Shortly before January 22, 2013 hearing, certain of the petitioning creditors engaged new counsel and concluded that if Moeckel converted his debt to equity, the petitioning creditors would control a majority of the Debtor's stock and could regain control of the board and proceed

with a Chapter 11 case. Because this decision was reached only a few days before the hearing with virtually no time to engage new counsel, the petitioning creditors -- the newly installed board of directors of the Debtor -- requested that I represent them at least in connection with the motion to convert the case to Chapter 11 (the "Chapter 11 Conversion Motion"). Given the time exigencies and the alignment of interests between this new board of directors and my prior representation, I agreed to do so provided I would do so only as special counsel engaged for the limited purpose of filing and arguing why the sale could not proceed forward until the Chapter 11 Conversion Motion was determined. By an email communication to Mr. Katz dated January 17, 2013, a copy of which is attached as Exhibit O, I explained the change in the board of directors and the decision to pursue a Chapter 11 reorganization and that I had been pressed into service as special counsel for the limited purpose of filing the Chapter 11 Conversion Motion appearing at the hearing to seek a cancellation or postponement of the auction.

19. The Opposition states various matters with respect to my conduct that are simply erroneous:

- The Opposition states I challenge "the rights to books and records, without any standing to do so". In fact, all I have done is point out that the authorized terms of the sale do not include books and records and because the terms are "as is, where is"; there is no basis for Sigma to now insist on delivery of the books and records as a condition to close.

- The Opposition further alleges that my representation of xStream as a debtor and my role as special counsel for the Debtor in connection with the Chapter 11 Conversion Motion constitutes a conflict of interest. This is erroneous. The interests of xStream and the Debtor were in complete alignment and are not adverse. xStream fully supported the Chapter 11 Conversion Motion and the cancellation or postponement

of any auction so that the Chapter 11 Conversion Motion would not be prejudiced. At the same time, the Debtor certainly had no interest or stake in preventing xStream from bidding if an auction was to proceed. Indeed, both the Debtor and the bankruptcy estate had every interest in having xStream participate in the auction to promote a competitive bidding situation. Given the significant increase in the purchase price resulting from xStream's participation in the auction, it is evident that xStream's participation was favorable to the bankruptcy estate and the Debtor. The Trustee's argument that I would not be approved to serve as counsel for the debtor-in-possession is simply a red herring: in my January 17 email to Mr. Katz, I explained that my limited role as special counsel to file the Chapter 11 Conversion Motion and appear at the hearing to explain why the auction should be postponed or cancelled. Thereafter, the Debtor would be represented by separate counsel.

- The Opposition states that the Court conducted a substantial examination of myself concerning the conduct of myself and Manapragada. This is simply inaccurate. In point of fact, when I requested an opportunity to be heard, the Court denied my request because I had deferred to Mr. Simons to present the argument on the grounds for postponing the auction.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 11th day of February, 2013 at Palo Alto, California.

/s/ Patrick M. Costello
Patrick M. Costello