1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    (OAKLAND DIVISION)

4  In re:

5  PICONGEN WIRELESS, INC.,         Case No. 12-48131

6                                   Chapter 7

7                                   Oakland, California
                                    January 22, 2013
8                                   10:03 a.m.
           Debtor.
9  _____/

10

                   TRANSCRIPT OF PROCEEDINGS
11     TRUSTEE'S MOTION TO SELL PROPERTY FREE AND CLEAR;
           OPPOSITION FILED BY ROBERT GROOVER, III
12
           BEFORE THE HONORABLE ROGER L. EFREMSKY
13              UNITED STATES BANKRUPTCY JUDGE

14
   APPEARANCES:
15

16  For the Debtor:         VECTIS LAW GROUP
                            BY: PATRICK M. COSTELLO, ESQ.
17                          2225 E. Bayshore Blvd. Suite 200
                            Palo Alto, California 94303
18

19  Chapter 7 Trustee:      PAUL MANSDORF, ESQ.
                            1563 Solano Avenue #703
20                          Berkeley, California 94707

21
   For the Trustee:         PINNACLE LAW GROUP
22                          BY: JEREMY W. KATZ, ESQ.
                            425 California Street, Suite 1800
23                          San Francisco, California 94104

24

25

```
 1  APPEARANCES (CONTINUED):

 2
    For the Equity Holders:  BARLOW, GARSEK & SIMON, LLP
 3                           ROBERT A. SIMON, ESQ.
                             3815 Lisbon Street
 4                           Fort Worth, Texas 76107

 5
    For the Sigma Group:     KORNFIELD, NYBERG, BENDES & KUHNER
 6                           BY: ERIC A. NYBERG, ESQ.
                             2970 Broadway, Suite 225
 7                           Oakland, California 94612

 8
    In pro se:               ROBERT O. GROOVER, III, ESQ.
 9                           14801 Quorum Drive, Suite 500
                             Dallas, Texas 75254
10

11  Equity Holder:           DAVID E. BARTLETT, ESQ.

12

13  Court Recorder:          ERIN WALTERS
                             United States Bankruptcy Court
14                           1300 Clay Street
                             Oakland, California 94612
15

16
    Transcription Service:   Jo McCall
17                           Electronic Court
                             Recording/Transcribing
18                           2868 E. Clifton Court
                             Gilbert, AZ 85295
19                           Telephone: (480) 361-3790

20

21

22

23

24

25
```

```
1                        I N D E X
```

| Creditors' Witnesses: | Direct | Cross |
|---|---|---|
| Bigala, Mahesh | | |
| By Mr. Nyberg | 13 | |
| By Mr. Simon | | 17 |
| Manapragada, Sai | | |
| By Mr. Simon | 33 | |
| Bt Mr. Nyberg | | 41 |

P R O C E E D I N G S

January 22, 2013                    10:03 a.m.

-oOo-

THE CLERK: All rise.  This is the United States Bankruptcy Court, Northern District of California, with The Honorable Roger L. Efremsky presiding.

THE COURT: Please be seated.

THE CLERK: Calling Bankruptcy Case No. 12-48131, Picongen Wireless, Inc.  The parties can state their appearance for the record.

MR. KATZ: Good morning, Your Honor, Jeremy Katz for the Trustee who is also present.

THE COURT: Good morning.

MR. COSTELLO: Good morning, Your Honor, Patrick Costello, Vectis Law Group, for this hearing as special counsel for the Debtor, Picongen Wireless, for purposes of filing the Motion to Convert to Chapter 11.  With me here in court is Mr. Robert Simon of the Dallas firm of Barlow, Garsek & Simon, who will be representing the Debtor's equity security holders.

MR. SIMON: Robert Simon, Your Honor, for the Debtor's equity security holders.

THE COURT: And who are the Debtor's equity security holders?

MR. SIMON: They are, Your Honor, Sai Manapragada,

1  Ronald Moeckel, Sharat Kumar Yempati, Ankit Sahu, and Max

2  Lightfoot.

3          THE COURT: Okay.

4          MR. SIMON: And also the --

5          THE COURT: Are those the total equity --

6          MR. SIMON:  -- Averett Family Trust, Your

7  Honor --

8          THE COURT: Okay.

9          MR. SIMON:  -- whom I don't actually specifically

10 represent, but they are here themselves.

11         THE COURT: Are there any other equity holders?

12    (Voices from the audience): Yes, David Bartlett and

13 Dale Kluesing.

14         MR. BARTLETT: David Bartlett.

15         THE COURT: Okay.  Are you representing -- are

16 they part of the group?

17         MR. SIMON: Your Honor, I don't specifically

18 represent them, but Mr. Bartlett is here, and --

19         THE COURT: Okay.  Well which -- have you

20 consulted with all the equity holders?

21         MR. SIMON: Yes, Your Honor.

22         THE COURT: Well, if you've consulted with them,

23 are they on board with this?

24         MR. SIMON: Yes, Your Honor.

25         THE COURT: Okay.

1          MR. SIMON: Every one of them.

2          THE COURT: All right.

3          MR. NYBERG: Good morning, Your Honor, Eric Nyberg

4    on behalf of Sigma Group, Inc., one of the prospective

5    bidders and Mahesh Bigala from Sigma Group, Inc. is also

6    present in court.

7          THE COURT: All right.

8          MR. GROOVER: Good morning.  Robert Groover, pro

9    se.

10          THE COURT: All right.  Good morning, sir.  Mr.

11   Katz?

12          MR. KATZ: Thank you.  Let me start by giving the

13   Court an update of what happened since we were here just a

14   day shy of two weeks ago.  On the 9th, we had a hearing, and

15   the Court will recall that it was a motion to sell free and

16   clear.  At the end of the hearing, the Court overruled the

17   objection of the objecting party, Mr. Groover, and

18   authorized the sale free and clear, and we continued the

19   hearing to today to hold an auction to see who the winning

20   bidder would be.  And an order to the effect of overruling

21   the objection and approving the sale free and clear was

22   entered on January 16th.

23          Since the January 9th hearing, one of the things

24   that the Trustee had asked in court and subsequently in an

25   e-mail to Mr. Costello requested that XStream provide the

1  Trustee with proof of ability to perform, and asked how
2  much money XStream had spent in maintaining the patents.
3  None of those figures have been provided as of this moment.
4  In addition, the Debtor has filed a motion to convert the
5  case to a Chapter 11.

6          Mr. Costello today and in the moving papers,
7  apparently as special counsel for the Debtor, has asked the
8  Trustee to either cancel or postpone today's auction
9  pending a hearing on the motion to convert, which is
10  scheduled right now for February 13th.  Sigma Group has
11  informed the Trustee that it wants to proceed with the
12  auction.  The Trustee has informed the parties that the
13  Trustee is going to ask the Court and intends to proceed
14  with the auction today if that's permitted, and last but
15  certainly not least, I've been informed that subsequent to
16  the hearing on the 9th, and prior to today, XStream Wireless
17  has contacted the principal or the CEO of the proposed
18  buyer, Mr. Bigala, who's in court, asking him why they
19  wanted to purchase the assets, that the assets were not
20  worth anything; they couldn't do anything with them; and I
21  will leave it at that.  If the Court has any questions.

22          THE COURT: All right.  I just want to recap the
23  facts for this involuntary, as I understand them.  Mr.
24  Costello, representing Mr. Sai Manapragada, wrote a letter
25  on June 19th, 2012 to Messrs. Kluesing and Bartlett,

1  basically saying, we're out of money.  If we're going to

2  get any new cash into Picongen Wireless, Inc. to develop

3  our technology, you're going to have to dilute your

4  interest in the company, to which -- and the letter goes

5  into specific detail that the company has no funds to

6  execute on a business Plan and owes substantial accrued and

7  unpaid compensation to Messrs. Kluesing and Manapragada.

8  The company is indebted to Ronald Moeckel under a note and

9  notes in the principal amount of at least 150,000, and

10  these notes are now past due and Mr. Moeckel has made

11  demand for payment.  And the company is also further

12  seriously delinquent on its tax obligations to the State or

13  Delaware, and the company has no apparent ability to

14  satisfy any of these liabilities, much less execute on a

15  business Plan.

16          There were two alternatives proposed in the

17  letter to Mr. Kluesing and Mr. Bartlett:

18          "One, you agree to terms of new equity funding,

19          notwithstanding that such terms may significantly

20          dilute your current equity position or the

21          company files for Chapter 7 relief before the

22          value of its intangible property dissipates

23          entirely."

24  Mr. Kluesing as the chief executive officer of Picongen on

25  June 30th, 2012 wrote back to Mr. Manapragada and said:

1           "The stockholders of the company holding a
2           majority of the outstanding shares of the company
3           determined that it was their fiduciary
4           responsibility to take certain corporate actions
5           to protect the best interests of the company and
6           all of the company stockholders, not merely one
7           or two, and to provide the company the
8           opportunity to capitalize on its technological
9           developments for the benefit of the company's
10          constituents."
11      Then on October 3rd, 2012, Mr. Costello, a member
12  of the Vectis Law Group, now purports to represent Ronald
13  Moeckel, a creditor of Picongen, Ankit Sahu, a creditor of
14  the corporation, Max Lightfoot, a creditor of the
15  corporation, and Mr. Manapragada.  The involuntary was
16  filed.  There was no opposition and the case stay went in
17  as a Chapter 7.
18      Then there was a motion to sell the subject --
19  virtually all of the assets of the company.  I won't go
20  into the details.  They're set forth in the motion that was
21  originally set for January 9th, came on for hearing, and
22  then continued to this date.  At the initial hearing, there
23  was an overbidder who came in who sought to purchase the
24  property, and I'm referring to Mr. Nyberg's client, Sigma
25  Group's bid.  Then two days later, there was a motion to

1  convert the case, again filed by Mr. Costello representing

2  the Vectis Law Group, now purporting to represent Picongen

3  Wireless, Inc.  Mr. Costello, you seem to be wearing a lot

4  of hats here.

5       MR. COSTELLO: Your Honor, my initial client was

6  Mr. Manapragada.

7       THE COURT: Individually.

8       MR. COSTELLO: Individually.  And what happened in

9  the interim between the hearing is that there was a

10 significant change in circumstance.  Mr. Moeckel elected to

11 convert his note to shares as he was entitled to do, which

12 changed --

13      THE COURT: And when did he do this?

14      MR. COSTELLO: It would have been subsequent to

15 the initial hearing.

16      THE COURT: Okay.  Some time after the 9th.

17      MR. COSTELLO: Some time after the 9th.  He

18 determined to convert to equity, which gave Mr. Manapragada

19 and Mr. Moeckel and their closely associated shareholders a

20 controlling interest in the company.  They now control a

21 majority of the equity, and with that change in equity,

22 there was also a change in approach to the bankruptcy case.

23 And given the timing, the new equity and new management

24 requested that I file the motion on behalf of the Debtor on

25 an emergency basis, and I've done that as special counsel

1  for the limited purposes of filing the motion.

2          THE COURT: Well, the point is, you're

3  acknowledging that you initially were representing Mr. --

4          MR. COSTELLO: Manapragada, yes.

5          THE COURT:  -- Manapragada, individually, then

6  represented the four individuals, putting the corporation

7  into an involuntary and now purport to be representing

8  Picongen Wireless, Inc. on the motion to convert the case

9  from 7 to Chapter 11.  I guess the question is, when did

10  the corporation Board of Directors meet to authorize this,

11  because I had the hearing on the 9th.  This motion was filed

12  I believe on the 16th, if I'm not mistaken, Mr. Katz?

13          MR. KATZ: The motion to convert?

14          THE COURT: The motion to convert.

15          MR. KATZ: I think it was the 17th.

16          THE COURT: The 17th?

17          MR. KATZ: No, I'm sorry, it was Friday, the 18th.

18          THE COURT: Friday, so the motion was filed nine

19  days later, so my question is, when did the Board of

20  Directors meet to authorize this?

21          MR. COSTELLO: Your Honor, it was done by

22  unanimous consent, which is consistent with the

23  corporation's Articles of Incorporation and bylaws, and it

24  was effective and signed on the 17th.

25          THE COURT: Okay.  All right.  Mr. Nyberg, do you

1  have anything you wish to add?

2          MR. NYBERG: Obviously my client would like to

3  proceed with the attempt to purchase the assets.  We've

4  acted in good faith.  We're not a party to all the

5  shenanigans that have been going on in this case.  I can

6  represent to the Court and make an offer of proof that Mr.

7  Bigala would, you know, testify that he was contacted by

8  Mr. Manapragada and basically told, you know, that these

9  assets are worthless.  If you get them, you'll never get

10  anything.

11          THE COURT: I tell you what I'd like to do; I'd

12  like to have your client come forward.  We'll have him

13  sworn in and I'll allow you to elicit some testimony from

14  him --

15          MR. NYBERG: Okay.

16          THE COURT:  -- on that point.  Ms. Narcisse, if

17  you could swear the gentleman in.

18          MAHESH BIGALA, CEO OF SIGMA GROUP, SWORN

19          THE CLERK: Please remain seated -- standing, I'm

20  sorry.  Please remain standing and raise your right hand.

21  Do you solemnly swear or affirm that the testimony you are

22  about to give in the matter now pending before this Court

23  will be the truth, the whole truth, and nothing but the

24  truth, so help you God?

25          THE WITNESS: I do.

```
 1              THE CLERK: Thank you.  You may be seated.  Please
 2    state and spell your full name for the record.
 3              THE WITNESS: Mahesh Bigala.
 4              THE CLERK: Spell it.
 5              THE WITNESS: M-a-h-e-s-h, last name Bigala,
 6    B-i-g-a-l-a.
 7                         DIRECT EXAMINATION
 8    BY MR. NYBERG:
 9    Q    Mr. Bigala, by whom are you employed?
10    A    With the Sigma Group.
11    Q    And what is your capacity with Sigma Group?
12    A    I'm the CEO.
13    Q    Okay.  And you were here for the initial hearing on
14    the Trustee's motion to sell the assets in this case?
15    A    Yes.
16    Q    And that I believe was on --
17    A    Ninth of January.
18    Q    -- January 9th; is that correct?
19    A    Yes.
20    Q    Subsequent to January 9th, did you have any contact
21    with anyone from XStream Wireless?
22    A    Yes.
23    Q    And who contacted you?
24    A    One of their friends, Sai -- I'm sorry -- it's
25    Naidu -- there's a common friend -- they contacted my
```

1  common friend.  They wanted to have a conference call.  I

2  just went and opened the thing for a conference call, but

3  they were saying, but, you know, there is nothing; all

4  these patents are expired.  You can't do anything with the

5  patents.  What you are going to get if you buy is the two

6  T.V.'s, which is -- you might get better T.V.'s for $2,000

7  in the market.  And all those technologies with us, you're

8  going to lose it -- the new company you acquire you're not

9  going to get anything out of it.

10  Q    You said there was a conference call?

11  A    Yes.

12  Q    And who was on the conference call?

13  A    Sai Manapragada and Naidu who is their office friend

14  and colleague.  And my friend, Srini Kottu and also there

15  is one more gentleman.  I don't remember his name, but, you

16  know, from XStream; there was one more gentleman actually.

17  Q    And who initiated the contact for this conference

18  call?

19  A    Naidu initiated -- contacted my friend, Srini, to

20  have a conversation.

21  Q    Sigma Group did not reach out to XStream.  It was

22  XStream through your friend reached out to you to set this

23  up.

24  A    That's right.  Yeah.

25  Q    And do you recall what date that conference call took

1  place?

2  A    Maybe 14th or 15th.

3  Q    Okay.  And again, you were told that the patents and

4  the intellectual property would not be worth anything if

5  you purchased it?

6  A    Yes.

7  Q    Okay.

8        MR. NYBERG: I don't have anything further, unless

9  Your Honor has --

10        THE COURT: Mr. Costello?  What I'm going to do is

11  I'm going to take a five-minute break and then Mr.

12  Costello, if you want to ask any questions of the

13  gentleman, you may proceed.

14        MR. COSTELLO: Your Honor, I may defer to Mr.

15  Simon, if that's all right?

16        THE COURT: All right.  We're going to take a

17  five-minute recess.

18        MR. COSTELLO: Thank you.

19     (Whereupon, a recess is taken at 10:10 a.m., and the

20  court is reconvened at 10:26 a.m.)

21        THE COURT: All right.  Please be seated.

22        MR. KATZ: Your Honor?

23        THE COURT: Yes.

24        MR. KATZ: Before we begin, we would like to know

25  if Mr. Simon is permitted to practice in the State of

1  California?

2       THE COURT: I was going to ask that question.

3       MR. KATZ: I'm sorry.

4       THE COURT: All right.

5       MR. SIMON: I'm not, Your Honor.

6       THE COURT: All right.  Have you moved to be

7  admitted on a pro hac vice basis?

8       MR. SIMON: Not yet, Your Honor.

9       THE COURT: All right.  Mr. Katz, I'm going to

10 allow him for purposes of today to ask some questions of

11 the gentleman with the understanding that you're going to

12 move this afternoon to file the papers.  Okay?  All right.

13 Go ahead.

14       And before you start, Mr. Simon, I just want

15 to –- sir, you stated this conversation took place on what

16 date again?

17       THE WITNESS: Probably on the 14th or 15th of

18 January.

19       THE COURT: Of January.  And again, on the line

20 was Mr. Manapragada, yourself –-

21       THE WITNESS: My friend Srini Kottu.

22       THE COURT: How do you spell his last name?

23       THE WITNESS: K-o-t-t-u.

24       THE COURT: K-o-t-t-u.

25       THE WITNESS: And another friend, Naidu,

1   N-a-i-d-u.  I don't know his full name, but his last name
2   is Naidu.
3              THE COURT: Okay.
4              THE WITNESS: And one more gentleman from XStream.
5              THE COURT: And then there was a fifth person?
6              THE WITNESS: Yes.
7              THE COURT: And they initiated the call?
8              THE WITNESS: Naidu contacted my friend, Srini so
9   he initiated the call because he had the conference call
10  ready.
11             THE COURT: Okay.
12             THE WITNESS: And he accepted the call.
13             THE COURT: All right.  Go ahead, Mr. Simon.
14             MR. SIMON: Okay.
15                          CROSS-EXAMINATION
16  BY MR. SIMON:
17  Q    Good morning, Mr. Bigala.
18  A    Good morning.
19  Q    How are you?  My name is Robert Simon.  It's good
20  to see you this morning.
21  A    Thank you.
22  Q    Mr. Bigala, now the conversation that you say occurred
23  on January the 15th, that wasn't your first conversation
24  with Mr. Manapragada and with other people from XStream
25  Wireless; was it?

1   A    No.

2   Q    In fact, you had had a previous conversation on –- at

3   least there's e-mail correspondence back to at least

4   January the 3rd, correct?

5   A    Yes.

6   Q    Okay.  And on January the 5th, there was a conference

7   call, correct?

8   A    I don't know the date, but, yes, there was a

9   conference call.

10  Q    Okay.  And you were a participant on that call,

11  correct?

12  A    Yes.

13  Q    Okay.  And there was someone else named Srini Kottu?

14  A    Yes.

15  Q    Okay.  And would you tell the Court who Srinivas Kottu

16  is.

17  A    He is my friend, and also he is my technical advisor.

18  Q    Okay.  So he's someone associated with your business.

19  A    Not associated directly, but he advises me on the

20  technology.

21  Q    Okay.  So you were talking to the people at XStream

22  Wireless about this technology back to at least January the

23  5th, correct?

24  A    Yes.

25  Q    Okay.  And in one of those conversations, you said

1  that you were a potential investor or represented potential

2  investors in XStream Wireless, correct?

3  A    Basically the way it -- we were in the process of

4  acquiring Picongen during the end of the year, and when my

5  friend -- I asked my friend who is also a technology person

6  about the technology, he said he will contact two people

7  whom he knows.  And then when he contacted several of his

8  colleagues, and I think one of them happened to be Naidu,

9  and he proposed that, you know, we have the similar

10  technology, why don't you leave it to us first and do

11  something -- if it works for you, it's better you can join

12  us.  That's when he initiated the call.  Then when I asked,

13  they talked like they had the product ready and they're in

14  the launching; they were in that stage, but when I had a

15  call, they're saying it's not the stage.  We are getting

16  the product from the Court.  I said what is the company

17  name?  They said Picongen.  Okay.  That's why we are

18  looking -- we are already working on it.  So there's no

19  point in working --

20  Q    Someone said to the XStream Wireless people, we think

21  we might want to invest 2.5 million dollars for ten percent

22  of the equity, correct?

23  A    If the products that are needed to be produced, they

24  said several contracts have been signed with the companies

25  in India, and several -- not for the ten percent, only they

1   offer 2.5 million.  I said it's subject to the due

2   diligence and if they have -- they said they have a

3   contract with several companies in India, and the product

4   is ready to be launched, and they need the money to

5   manufacture the product.  But in the call, they said it's

6   nothing like that.  They denied to my friend that they need

7   2.5 million.  It's not that we have not agreed; we said

8   just discuss the proposal.

9   Q    Okay.  So but someone said let's discuss this

10  proposal, the 2.5 million dollar investment in XStream.

11  A    In XStream.

12  Q    Right.

13  A    But not knowing any details of the Picongen.

14  Q    Right.  And whoever that was would have acquired

15  equity in XStream in exchange for that 2.5 million,

16  correct?

17  A    It's subject to due diligence.

18  Q    Yes, subject to due diligence, yes.

19  A    No, not necessarily because it's what -- it could be

20  $100,000; it could be 10,000.  Unless we do the due

21  diligence, my company could be worth a hundred million, I

22  could say.  Can you invest 25 million in my company, but

23  unless I see -- I go through the documents, I have no

24  firsthand information of XStream at all, except the call.

25  Q    But the number 2.5 million dollars was mentioned in

1  the call, correct?

2  A    Yes.

3  Q    Okay.  And the 2.5 million, subject to due diligence,

4  would be in exchange for --

5  A    It's basically -- it's not mentioned what they need.

6  They are looking for 2.5 million investment.

7  Q    Okay.

8  A    It's not that we want to invest 2.5 million.

9  Q    Okay.

10 Q    But you said -- you said, I represent people who may

11 be willing to make an investment like this subject to due

12 diligence.

13 A    Yes.  I'm going to be the product if I like it.

14 Q    Okay.  And in the context of that call, someone

15 offered to send -- XStream offered to send a business plan

16 with information, correct?

17 A    Yes.

18 Q    Okay.

19       MR. SIMON: Your Honor, I have only one copy.  May

20 I ask the witness if he recognizes the document?

21       THE COURT: Mr. Katz, Mr. Nyberg, do you want to

22 take an opportunity to look at the document first?

23       MR. SIMON: I'm sorry, Your Honor.  I didn't know

24 I'd be cross-examining the witness or I would have brought

25 more copies.

1          THE COURT: Mr. Nyberg and Mr. Katz, if you want

2    an opportunity, I'll have Ms. Narcisse make some copies and

3    you can take an opportunity to review the same.

4          MR. NYBERG: Well, I think maybe there should be a

5    little foundation first of all as to whether or not this

6    document was actually sent to Sigma --

7          THE COURT: Well, I understand.  I'm just simply

8    saying if you wanted it ahead of time, all right?  We'll

9    let Mr. Katz finish.

10          MR. KATZ: We'll see what he has to say.

11          THE COURT: All right.  Mr. Simon, if you can lay

12    a foundation with regards to whether this gentleman has

13    ever seen the document, let alone whether it was sent.

14          MR. SIMON: Sure.  Sure.  May I approach him, Your

15    Honor?

16          THE COURT: You may.

17          MR. SIMON: Thank you.

18          THE COURT: All right.  Let the record reflect

19    that Mr. Simon has handed a copy of the alleged business

20    plan to the witness.

21    BY MR. SIMON:

22    Q    Okay.  Mr. Bigala, would you take a look at the

23    document in front of you, please?  Take as long as you

24    need.

25    A    Yes.

1  Q    Okay.  Do you recognize that?

2  A    Yes, in the e-mail, yes.

3  Q    Okay.  So that document was e-mailed to you, correct?

4  A    Yes.

5  Q    Okay.  And that document contains information about

6  the technology that XStream is trying to develop, correct?

7  A    I assume so because I have not gone through the whole

8  technology or the document at all.

9  Q    Okay.  But you understand that's the same technology

10  that Picongen was trying to develop, correct?

11  A    I don't know.

12  Q    You don't know.  Okay.  Now, when -- in exchange for

13  what you received -- I should say -- maybe I should ask --

14  in the back of that packet, I believe there is a draft of a

15  non-disclosure and confidentiality agreement.  Do you see

16  that?

17  A    I don't see that.  Actually, as I said, I didn't even

18  read through the document.  But the e-mail, after the call,

19  the e-mail was sent later on.

20  Q    Okay.

21  A    That was the initial call, and during the call -- If

22  he sent the information, I would have gone through the

23  thing or whatever it is, but basically, even -- when you're

24  saying -- that's what I'm looking at actually.

25  Q    Okay.  So but you've seen that document; it was e-

1  mailed to you.

2  A    He sent the e-mail, and I might have it in the e-mail;

3  I can see if it's there or not; I can look at it in the e-

4  mail as well.

5  Q    Okay.  But the e-mail had an attachment, and that was

6  part of the attachment to the document, to the e-mail,

7  right?

8  A    I don't recall.  I don't remember, that's what I'm

9  saying.  I'd have to check my e-mail --

10  Q    You have to check your e-mail, okay.

11  A    -- to see if it's there or not.

12  Q    Okay.  Would that have been on January the 5th?

13  A    As I said, it could be, but I don't really remember

14  the exact date.  It could be 5th, that week, I don't know.

15  Q    Okay.  But the first week of January after an e-mail

16  exchange, you had a conference call, correct?

17  A    Yes.

18  Q    All right.  And after the conference call, a further

19  e-mail was sent to you.

20  A    Yes.

21  Q    And the further e-mail had an attachment.

22  A    Yes.

23  Q    And the further attachment -- it looks like this

24  document, the business plan for XStream Wireless?

25  A    I think so, yeah.

1  Q    Okay.  Now if you look at the back of that, you'll see
2  there is a non-disclosure and confidentiality agreement.
3  Do you see that?
4  A    M-hm.
5  Q    Okay.  Was that non-disclosure and confidentiality
6  agreement ever signed and returned?
7  A    I was never asked.  I was never told about any non-
8  disclosure.  All this is after the call.  I was not
9  interested when they said actually they are in the process.
10 It's not –- when I asked about the business plan, I asked
11 them, do you have the client agreement already?  Why do you
12 need the money?  Send me why do you need the money, the
13 proposal.  And they said, oh, we don't have any contract
14 signed.  We are in the product development –- I said at
15 that stage, I'm not interested in any of that.  And then he
16 said, I will share the document with you.  If you are
17 interested, you can come back to me.  That's how the call
18 ended.  He said, why we need the funds; he said he was
19 going to send over the details, but he never sent any
20 details of why he needed the funds, but he sent the
21 document.  After that, I have no idea after that.
22 Q    Okay.  Did someone else, your technical advisor or
23 someone else associated with your business read this
24 attachment?
25 A    I don't think so.  I don't know.  I didn't even ask

1  him.

2  Q    You don't know.  Okay, you don't know.

3  A    I don't know.

4  Q    Okay.  But the non-disclosure and confidentiality

5  agreement was never signed as far as you know?

6  A    I never read it.  I don't even know that it was there

7  also.  I was not even told that there is a non-disclosure

8  that will be there as part of our call or anything to do

9  with that.  First of all, I was not sure; it's basically we

10 were trying to acquire Picongen, then the gentleman denied

11 actually that.  It's an opportunity which is already

12 existing in a similar technology of what you're looking

13 for.  Why don't you have a call.  Then that's when we said

14 yes, we will talk.

15 Q    Does the technology appear to be the same, as best as

16 you can tell?

17 A    What is that?

18 Q    The technology that you talked about with XStream, is

19 that the same technology that Picongen is trying to

20 develop?

21 A    It looked to be similar.

22 Q    Okay.  And after receiving this, this attachment, and

23 after the telephone conversations that you had had with

24 XStream, then you decided to go ahead and make a bid for

25 the assets of Picongen?

1  A    Not after receiving it, before that only.

2  Q    Before, you had decided maybe you would like to make

3  a bid?

4  A    I had decided to make a bid on that.  I was looking

5  for a California attorney, and meanwhile I was learning

6  more about the technology, what can be done.  That's how I

7  contacted several people who are in the wireless

8  technologies.  That's my friend who is into wireless

9  technology.  He contacted several other people, about what

10 can be done with this technology, and we entered the

11 process of acquiring this.

12 Q    Okay.  And among the people that they contacted, was

13 XStream?

14 A    One of them I think -- not XStream actually.  He

15 contacted one of his associates, his counterpart in his

16 company, and he happened to be associated with XStream.

17 Q    Okay.

18 A    He has not contacted XStream.  He has contacted all

19 his colleagues in his company where he works, and one of

20 the persons, Naidu, he said, okay, why are you buying

21 something else, related to some other company?  They are

22 far away and they have the better technology.  But when he

23 set up the call, it happened to be the same company they

24 were talking about.

25 Q    The same company.  All right.

1    MR. SIMON: Your Honor, if I may have a moment.  I
2 may be done, but I want to talk to Mr. Costello and briefly
3 to my clients, because I'm fairly new to this.
4    THE COURT: Please go ahead, Mr. Simon.
5    (Pause.)
6 BY MR. SIMON:
7 Q    Mr. Bigala, did the contacts start as early as
8 December the 28th, that is, on December the 28th, 2012, did
9 Mr. Srinivas Kottu contact Naidu about XStream Wireless?
10 A    I don't know when he contacted him, but that's when I
11 contacted Srinivas was to find out we are in the process of
12 acquiring this; just can you give me some input on the
13 technology.
14 Q    Okay.
15 A    It's actually he has contacted several other people
16 also, just not only Naidu and his colleagues.  He has
17 contacted several other people, because he works in the
18 wireless technology, so he contacted several other people
19 actually.
20 Q    Okay.  So, now, who is Naidu?  Would you clarify one
21 more time who Naidu is?
22 A    I don't know; he's Srinivas' friend.
23 Q    Okay.
24 A    And I think he works for some other company, but, you
25 know, they are their clients or something, and he talked to

1  them about the product, that this is what we are looking,

2  and then he introduced to XStream saying that there is an

3  investment opportunity.  Why are you acquiring it in the

4  court rather like, there is already a product available

5  which is -- I mean the contracts sent out.  Why don't you

6  have a conference call.

7  Q    Okay.  And the conference call took place on January

8  3rd, and you were part of that conference call, correct?

9  A    Yes.  And to object to one thing, Your Honor, I just

10 found one e-mail, and the confidentiality to what they're

11 talking about, just like go through browsing the e-mail,

12 this was not included, actually, just I'm going through

13 this -- they were included later on.

14         THE COURT: The non disclosure agreement was not

15 included -- not part of your e-mail.

16         THE WITNESS: Not included, and I think they

17 included it now.

18         THE COURT: All right.  Thank you.

19 BY MR. SIMON:

20 Q    Okay.  Was the non-disclosure agreement sent to you

21 separately on January the 3rd?

22 A    No.

23         MR. NYBERG: Your Honor, if I may just interject,

24 I'm not sure what the relevance of --

25         THE COURT: I'm just about -- I've given Mr. Simon

1  quite a bit of latitude.  Go ahead.

2          MR. SIMON: You have, Your Honor, which I

3  appreciate.

4          THE COURT: Mr. Simon, just a second.

5          MR. NYBERG: Because the witness has already

6  testified he didn't sign an NDA, so unless Mr. Simon wants

7  to produce a signed NDA, I think this is irrelevant.

8          THE COURT: Mr. Simon, do you have a signed NDA?

9          MR. SIMON: No, Your Honor, and that was the

10  point.  This information -- at least it's my client's

11  position; it's a little difficult to cross-examine looking

12  at e-mails on tablets -- but that the information was sent

13  on the condition that an NDA would be signed.

14          THE COURT: All right.  Well, Mr. Simon, the issue

15  I have before me today is whether Mr. Manapragada,

16  individually, and/or XStream contacted this gentleman

17  and/or his company to dissuade them from buying or

18  affecting their price.  That's what I'm most concerned

19  about.  I can see where this is going with respect to

20  XStream, and this gentleman, if he's successful in

21  acquiring the subject property here today.  I'm more

22  concerned about what was stated to this gentleman about

23  anything that might affect his willingness to bid or the

24  amount he was willing to bid.  That's what's germane today.

25          MR. SIMON: All right.  And, Your Honor, I don't

1  claim to know.

2          THE COURT: All right.  Well then I think we've

3  covered enough here.  If you want to call Mr. Manapragada

4  to the stand to either admit what he stated on the record

5  in this conference call or to deny it, that's fine.

6          MR. SIMON: Your Honor, there actually is a

7  relevant question.  There are a couple of relevant

8  questions, if I may, that directly relate to that issue.

9          THE COURT: With regards to what?

10          MR. SIMON: To the issue of whether the bidding is

11  affected in any way.

12          THE COURT: My question is, I want to know -- I

13  want to confirm whether Mr. Manapragada contacted this

14  gentleman in that conference call that this gentleman has

15  referenced and basically said, don't bid on it; you're

16  wasting your time and your money; it's not worth it.

17  That's what I want to know.  That's what's germane.

18          MR. SIMON: Okay.

19          THE COURT: Whether it has any effect on this

20  gentleman or not, that's a whole other issue.  What I want

21  to know is, Mr. Manapragada contacted this gentleman in

22  this conference call and attempted to persuade him either

23  not to bid or to affect his bid to keep it down or lower

24  than what somebody else might bid.

25          MR. SIMON: Your Honor, this is the first time

1  I've heard about this.  Before I would ever call Mr.

2  Manapragada, I would want to talk to him, Your Honor.

3          THE COURT: All right.  Do you want an opportunity

4  to talk to him?

5          MR. SIMON: Absolutely.

6          THE COURT: All right.  All right, sir, you can

7  step down.  We'll take a ten-minute recess until 11:00

8  o'clock.

9          MR. SIMON: Thank you.

10     (Whereupon a recess is taken ag 10:47 a.m., and the

11  court is reconvened at 11:02 a.m.)

12          THE CLERK: Please come to order.  Court is back

13  in session.

14          THE COURT: Please be seated.  All right, Mr.

15  Simon.

16          MR. SIMON: Yes, Your Honor.  The equity holders

17  call Sai Manapragada.

18          THE COURT: All right.  If you could come forward,

19  sir.

20      SAI MANAPRAGADA, EQUITY HOLDERS' WITNESS, SWORN

21          THE CLERK: Please remain standing while I swear

22  you in.  Please raise your right hand.  Do you solemnly

23  swear or affirm that the testimony you are about to give in

24  the matter now pending before this Court will be the truth,

25  the whole truth, and nothing but the truth, so help you

1  God?

2         THE WITNESS: Yes.

3         THE CLERK: Thank you.  You may be seated.  Please

4  state and spell your full name for the record.

5         THE WITNESS: Sai Manapragada, S-a-i is the first

6  name, and last name is Manapragada, M-a-n-a-p-r-a-g-a-d-a.

7         THE CLERK: Thank you.

8                      DIRECT EXAMINATION

9  BY MR. SIMON:

10  Q    Good morning, Mr. Manapragada.  Are you one of the

11  equity holders of the Debtor, Picongen?

12  A    Yes.

13  Q    Okay.  And are you also a principal of XStream

14  Wireless?

15  A    Yes.

16  Q    Okay.  Mr. Manapragada, did you have a telephone

17  conversation that included Mr. Bigala on January the 15th?

18  A    Yes.

19  Q    All right.  Would you tell the Court how that

20  telephone conversation came about, not what happened, but

21  how the conversation came about?

22  A    When I talked to Suba Garlapati, who's the contact who

23  got me in touch with Naidu, who's the common friend of

24  Srini Kottu, who is the friend of Mahesh Bigala, Naidu said

25  this is not kosher.  We had given him –- him in the sense

1   Mahesh Bigala -- we have shared confidential information
2   and he said that he wants to confront him and he did so in
3   an e-mail, and there is a transcript of the e-mail.  If you
4   want me to, I can read that.
5   Q    Okay.  And I want to make sure we're clear on all
6   these pronouns.  Who wanted to confront whom?
7   A    Naidu wanted to confront Srini Kottu and Mahesh.
8   Q    Okay.  Mr. Bigala?
9   A    Mr. Bigala.
10  Q    And why did Naidu want to confront Mr. -- what is your
11  understanding of why Naidu wanted to confront Mr. Bigala
12  and Mr. Srini Kottu?
13  A    I think he felt that he was being taken advantage of
14  by getting him to give information under the assumption
15  that he would -- Mr. Bigala and Mr. Kottu would use the
16  information in a confidential manner and since he did not
17  do it, I think he sent an e-mail to Srini saying that I
18  would like to talk to you about XStream and Mahesh.
19  Q    Okay.  And did --
20         MR. NYBERG: Your Honor, I would move to strike
21  whatever comment about what the e-mail contained.  First of
22  all, there's no evidence of the e-mail.  Second, the e-mail
23  would be the best evidence of its contents, so I would move
24  to strike his testimony as to what was contained in the e-
25  mail.

1          MR. KATZ: And it's hearsay.

2          THE COURT: Yeah, Mr. Simon, I'm going to sustain

3 the objections.  What I would like to know --

4          MR. SIMON: We'll get there, Your Honor.

5          THE COURT: Okay, but what I'd like to get there

6 now -- we can go into the other aspects you want to

7 develop, but I want to know what this gentleman said to the

8 other prospective buyer on or about the 14th or 14th of

9 January, 2013.  That's what I'm focusing on, so let's stick

10 to that.

11          MR. SIMON: Absolutely, Your Honor.  That's the

12 next questions.

13 BY MR. SIMON:

14 Q    Did a telephone conversation take place on January the

15 15th?

16 A    Yes.

17 Q    And who was on the telephone conversation?

18 A    Mr. Bigala, Mr. Kottu, Mr. Naidu, Mr. Garlapati and

19 myself.

20 Q    Okay.  And in that telephone conversation, did you in

21 any way try to dissuade the Sigma Group or Mr. Bigala from

22 bidding on the assets of Picongen?

23 A    No, I did not.

24 Q    Okay.  All right.  What did you say in that telephone

25 conversation?

1   A    For the most part, I was quiet.  Naidu wanted me to

2 come on the phone and there was talk about whether –- I

3 mean that I am interested to work if this –- to develop

4 this technology, after the meeting happens, and when I

5 asked about what he actually means, Suba, one of the

6 persons on the conference call, said that he thought that

7 Mahesh wanted to offer me a job after he acquires the

8 assets, at which point, I was under clear instructions that

9 that phone call, I'm not supposed to be making any deals.

10 I told him very clearly that I am there only because Naidu

11 asked me, and Mahesh Bigala said okay, you guys can do

12 whatever you want.  We'll do whatever we want, and at which

13 point, I said, okay, this conversation is over.  The last

14 thing that Suba said was this is unethical, and then Mahesh

15 Bigala and he started having an argument, at which point, I

16 hung up the phone.

17   Q    Okay.  What did Mr. Bigala say, as best you recall,

18 before you hung up?

19   A    He was saying that when Suba alleged about his being

20 unethical, and he said, well, what XStream is doing is also

21 unethical and how can Picongen's assets be acquired by

22 XStream?  So that is unethical, and at which point, I

23 didn't want to have that conversation because –- the reason

24 I hung up is because there's no basis for him to know what

25 happened with the founders and the interested parties and

1  the creditors of the company, and I didn't want to be part

2  of that conversation anymore.

3  Q    Did you understand that you were not allowed to

4  attempt to dissuade Mr. Bigala or Sigma Group from bidding?

5  A    Yes, sir.

6  Q    And did you understand you were not allowed to try to

7  lower the bid price by giving incorrect information to Mr.

8  Bigala or to Sigma?

9  A    Yes.  I'm aware of that, and I have not done anything

10  to dissuade or said anything to dissuade him from going on

11  with the auction.

12  Q    Okay.  Did anyone in the conversation say that these

13  assets aren't very valuable?

14  A    There was an e-mail sent by Naidu, which I was

15  referring to, and I have a copy of that e-mail.  Everybody

16  was -- all five people were copied on that e-mail, and it

17  said -- I think I ought to read it, as it is, if it's okay.

18            THE COURT: Go ahead, please read it.

19            MR. SIMON: I have a copy.

20            THE WITNESS: We don't have it here.

21            MR. SIMON: Your Honor, I have a copy.  I'm happy

22  to let the witness take a look at it.

23            THE COURT: All right.  Mr. Katz, Mr. Nyberg, do

24  you want to take a look at it first?

25        (Pause.)

1          MR. SIMON: May I approach the witness, Your

2    Honor?

3          THE COURT: All right.  We ought to mark this.  Do

4    we have a copy of this document?  Let me do this.  Mr.

5    Simon, what I want -- if you could get the document from

6    the gentleman up there which is the business plan, we'll

7    make a copy of that.  With regards to the business plan,

8    I'm going to have that marked as –- I'm just going to

9    reference it as –-

10          MR. SIMON: Equity Holders' Exhibit 1.

11          THE COURT: That's fine, and then the e-mail

12   you're referring to we mark as Equity Exhibit No. 2.

13          MR. SIMON: Very well, Your Honor.

14          THE COURT: And as a housekeeping purpose, we'll

15   make copies at the end, so go ahead.

16          MR. SIMON: Okay.  Your Honor, may I approach the

17   witness?

18          THE COURT: You may.  Let the record reflect Mr.

19   Simon is approaching the witness with the subject e-mail.

20          THE WITNESS: Reading the e-mail –-

21   BY MR. SIMON:

22   Q    Would you start by reading to the Court the date, who

23   the e-mail is to, and who the e-mail is from, and the re:

24   line and then the subject of the e-mail, the text.

25   A    The e-mail is from Naidu Annamaneni, and it was sent

1  on Monday, January 14th, 2013 at 6:04 p.m. to Srini Kottu.

2  Subject: XStream Wireless and Mahesh.

3          "Srini: Do you have a minute to talk about

4          XStream Wireless and Mahesh?  It looks like

5          Mahesh is trying to do some back-door stuff of

6          getting the assets of Picongen based on the

7          information we shared.  Without Sai's involvement

8          in the product development on getting the

9          patents, it is going to be useless assets in case

10          if he is thinking of benefitting from it.  It

11          would be nice if we can talk ASAP.  Regards,

12          Naidu."

13  With a confidentiality notice on it.

14  Q    Okay.  Is that the e-mail that prompted the telephone

15  conversation on January the 15th?

16  A    Yes.

17  Q    Okay.  And that e-mail is not from you; is it?

18  A    It is not from me.

19  Q    Okay.  And at any time during the telephone

20  conversation on January the 15th, did you tell Mr. Bigala

21  that the assets aren't worth anything or that the assets

22  are not valuable?

23  A    No, I did not.

24  Q    Okay.  And did you attempt to dissuade him from

25  bidding?

1  A    No, sir.

2  Q    Okay.

3           MR. SIMON: Pass the witness, Your Honor.

4           THE COURT: All right.  Who is Mr. Naidu?

5           THE WITNESS: Mr. Naidu is a common friend.  He is

6  known to me by another close friend of mine, Suba

7  Garlapati, who has been helping me and our company,

8  Picongen Wireless, as a business development vice

9  president, and he has been instrumental in opening doors

10 for the VC's and angel investors (phonetic) since 2007, and

11 Naidu Annamaneni has been introduced to validate the

12 technology a few years ago -- I don't recall -- maybe it's

13 2008.  At that time, from that moment onwards, Naidu

14 Annamaneni has been on the board of advisors, technical

15 advisors, for Picongen Wireless, and when Naidu contacted

16 Suba to have a technical due diligence meeting with XStream

17 Wireless --

18           THE COURT: Who is Suba?

19           THE WITNESS: Suba is the person I just told you,

20 the vice president of business development that has been

21 helping me from 2007.

22           THE COURT: Okay.

23           THE WITNESS: And --

24           THE COURT: Now, Suba -- is that the same -- Mr.

25 Naidu and Suba are two different people?

```
 1                THE WITNESS: Yes, sir.

 2                THE COURT: Okay.

 3                THE WITNESS: Suba is the vice president of

 4    business development.  Naidu Annamaneni is another person.

 5    He's the member of the board of technical advisors for

 6    Picongen and also for XStream, and he was approached by

 7    Srini, according to one of these e-mails, asking about

 8    XStream and saying that there is an investment offer, and

 9    he was doing the technical due diligence.  That's how I

10    came to know about this meeting.

11                THE COURT: And who is Srini?

12                THE WITNESS: Srini is a friend of Naidu, and as

13    far as I know, he is –- Naidu works in a company called E-

14    silicon (phonetic).  His customer, one of the other

15    companies I don't know which one, Srini is an employee of

16    that customer company of E-silicon.  That's how we met.

17                THE COURT: And then Kottu?

18                THE WITNESS: Srini Kottu is his full name.

19                THE COURT: That's a full name.  Okay.  All right.

20    Mr. Katz, Mr. Nyberg, do you have any questions?

21                MR. NYBERG: Just one clarifying thing.

22                          CROSS-EXAMINATION

23    BY MR. NYBERG:

24    Q    Good morning.

25    A    Good morning.
```

1  Q    I just want to make sure I was clear on something.

2  You indicated that -- and let's see if I got the names

3  correct, but Naidu is both a technical advisor, board of

4  technical advisors for Picongen; is that correct?

5  A    Correct.

6  Q    And I believe you also said he's a technical advisor

7  for XStream as well; is that correct?

8  A    We don't have a technical board of advisors for

9  XStream set up yet, but he is -- he is in one of the

10 references of the company.

11 Q    Okay.  So he's assisting XStream at least.

12 A    Yes.

13 Q    Okay.

14        THE COURT: And when was XStream -- do you know

15 when XStream was incorporated?

16        THE WITNESS: I think roughly the date for

17 application is in the last week of October, first week of

18 November.

19        THE COURT: October of last year.

20        THE WITNESS: October of 2012.

21        THE COURT: Okay.  And the purpose of XStream

22 being formed?

23        THE WITNESS: XStream Wireless is -- once the --

24 we wanted to develop the technology, the wireless

25 technology that I was working on.

```
 1              THE COURT: At Picongen?

 2              THE WITNESS: To Picongen, yes.

 3              THE COURT: Okay.  All right.  So the purpose was

 4  to basically pick up the technology from Picongen and

 5  develop it at XStream Wireless.

 6              THE WITNESS: Since the bankruptcy was filed, it

 7  was disclosed at the bankruptcy that XStream Wireless is a

 8  group that is formed to acquire the assets of Picongen.

 9              THE COURT: Okay.  And how much money went into

10  the capitalization of XStream Wireless when it was formed

11  in October or November of 2012?

12              THE WITNESS: A hundred thousand dollars.

13              THE COURT: Okay.  Has any additional funds come

14  into the company since?

15              THE WITNESS: No, sir.

16              THE COURT: All right.  How many employees does

17  XStream Wireless have?

18              THE WITNESS: Currently, one.

19              THE COURT: And who is that?

20              THE WITNESS: That is me.

21              THE COURT: All right.  Anything else?

22              MR. SIMON: Your Honor, there's actually quite a

23  bit depending upon what exactly the Court wants to hear.

24              THE COURT: I want to just find out -- hear both

25  sides of the story as to the conversation that took place
```

1 on or about the 14th or 15th of January.  That's what I was

2 concerned about.  So I have no further questions for Mr.

3 Manapragada at this juncture.

4        MR. SIMON: That was my understanding, Your Honor.

5 That was the issue we were talking about, not the broader

6 issue of, you know, should the sale go forward; should the

7 case be converted to 11.

8        THE COURT: Well, on the motion to convert, that's

9 not coming up until February and there's opposition that's

10 been filed already, so all I have before me today is the

11 sale.

12        MR. SIMON: Okay.

13        THE COURT: Okay.  All right.  Mr. Katz, let me

14 hear from you.

15        MR. KATZ: Thank you.

16        MR. SIMON: Will we get the opportunity to argue,

17 Your Honor?

18        THE COURT: Absolutely.  I just want to start with

19 Mr. Katz and hear from Mr. Nyberg and then hear from you,

20 sir.

21        MR. KATZ: I think it's helpful to go back through

22 the history that the Court began discussing.

23        MR. SIMON: Your Honor, if the witness is going to

24 testify --

25        THE COURT: Mr. Manapragada, you may step down.  I

1   apologize.  Thank you, sir.

2             THE WITNESS: Thank you, Your Honor.

3             THE COURT: And then do I have -- you can leave

4   those two exhibits there and we're going to make copies of

5   those.  Thank you.

6             MR. KATZ: An involuntary petition was filed

7   against Picongen on October 3rd.  The petitioning creditors

8   were represented by Mr. Costello.  In fact, Picongen

9   stipulated for an order -- to an order for relief in the

10  involuntary, so an order for relief was entered on October

11  26th.

12            Mr. Mansdorf was appointed trustee shortly

13  thereafter, and -- I mean within -- Mr. Mansdorf is here;

14  he can correct me if I'm wrong -- I mean within a day or

15  two, my understanding is.  Mr. Costello now purporting to

16  represent XStream Wireless contacted the trustee and told

17  him about the bankruptcy -- the patents, some of which had

18  expired, some of which were in jeopardy of expiring if they

19  were not renewed quickly and that XStream wanted to make an

20  offer to purchase the assets with a very short closing

21  date, and as a matter of fact, the initial closing date

22  proposed by XStream was November 30th.  And in order for the

23  estate to do some due diligence, because don't forget,

24  there were not any schedules or statement of affairs filed

25  yet, the estate didn't know what was going on.

1    So the estate was between a rock and a hard

2  place, you know, there's no money to protect the assets

3  which are in jeopardy of being lost and whatever value they

4  had would be lost, but there's also we are told persons, or

5  at least one person -- it turned out to be three entities

6  that had secured interests against potentially these

7  assets, so you don't know what they are; you don't know --

8  we didn't know what they were or if they were legitimate.

9    So eventually, a deal was struck where the assets

10  would be sold on proper notice and a motion to sell free

11  and clear had to be filed.  In the meantime, I was having

12  conversations with Mr. Groover about his alleged lien.  But

13  I want to point out that this was presented to the estate

14  by XStream, by Mr. Costello, you got to do this now or

15  you're going to lose everything.  Then of course we were

16  here on the 9th of January and the objections to the sale

17  free and clear were overruled and the sale was confirmed,

18  subject to an overbid today.

19    So then on the -- and as I mentioned, you know,

20  at the hearing on the 9th and in an e-mail subsequently, I

21  asked for information from XStream to provide the estate

22  with proof of ability to perform anything over a $60,000

23  bid as well as ascertaining how much they had spent in

24  renewing or extending these patents.  We already know from

25  Mr. Groover that he spent about $2,000 to maintain one of

the English patents, so what XStream has done, I have no idea -- if anything.

Then the Friday, last Friday, or perhaps the day before, approximately 5:30 p.m. on Thursday the 17th, I get an e-mail from Mr. Costello purportedly on behalf of the Debtor, saying there's been a change in circumstances. The Debtor wants to file a motion to convert to a Chapter 11. All the shareholders have sung "Kumbaya" and we want to put a plan together, and we want the trustee to cancel or at least continue the auction pending our -- the Debtor's motion to convert. In the morning, I contacted Mr. Nyberg with the information that there was this issue. Mr. Nyberg told me he would call his client and let me know if the client still wanted to go forward with the auction, and the answer to that was yes.

I sent an e-mail to Mr. Groover asking what his position was, and Mr. Groover sent me an e-mail saying he wanted the auction to be continued pending the motion to convert. At around 11:30 Friday morning, the 18th, the Debtor did file its motion, the perfunctory motion to convert, this time being represented by Mr. Costello as purported special counsel. So in this scenario, we have, as the Court noted, we have Mr. Costello representing Mr. Manapragada, several of the people either related to or associated with the Debtor, Picongen, then representing the

1  alleged bidder, then representing the alleged Debtor --

2  well, not the alleged Debtor, the Debtor.

3         And now we find out that between the 9th when the

4  sale was authorized subject to the auction today, that the

5  creditors that were there until at least the 9th, all of a

6  sudden had become shareholders, and there's no debt and

7  they want a Chapter 11 case which to me makes -- well, is

8  interesting because what the -- right now, the bid of

9  $85,000 from Sigma, I mean, I would think that a Chapter 11

10 alone would be more than that if they have to go through

11 the whole Plan process, but maybe it won't because now

12 everybody is on board allegedly.

13        What I do want to say -- I mean I've never seen

14 anything like this in my 25 years of doing bankruptcy work,

15 the facts of what's gone on in the last two weeks.  I mean

16 this was basically orchestrated -- the bankruptcy was

17 basically orchestrated by Mr. Manapragada, and the sale was

18 orchestrated by Mr. Manapragada, and when an unanticipated

19 bidder came in and it appears that Mr. Manapragada would

20 have to spend more money that he wanted to, to get the

21 assets, all of a sudden everything changes to what appears

22 to me to be an effort to chill a sale, they bring -- he, or

23 his proxy brings a motion to convert.

24        One thing -- well, another thing I will say is,

25 Mr. Manapragada and XStream have caused the estate to incur

a significant amount of money up to this point.  They filed
the involuntary; they contacted the trustee and told him
this sale had to take place immediately or be lost.  Then
we do a motion.  Mr. Groover requires a lot of work on
behalf of the estate to address his lien issue, and now on
the -- literally the eve of the auction, we've had to
respond to a motion to convert.  And when I say expenses, I
mean my firm alone as of yesterday was in the $25,000
range.

        The trustee believes that under the
circumstances, the auction should go forward.  The Debtor
can have a hearing on its motion on the 13th of February,
and at this point, unless the Court has questions, I don't
know if the trustee would like to make a statement.

        THE COURT: Mr. Mansdorf?

        MR. MANSDORF: Thank you, Your Honor.  Just a few
more points.  The timing of the formation of XStream is a
little suspect, I would add, but again, this is an
involuntary.  The Debtor agreed, stipulated for relief.
The parties were looking for what appears to be a quick
sale on the cheap as I think the evidence shows already.
Suddenly when it was going to cost more, they have some
kind of revelation.  Clearly, there's some value here.
Look at the Texas contingent that has come out to appear at
what might not even be an auction, and we have a bidder

1   from New Jersey who is out here.  Is this the second trip

2   out here?  He's made two trips out here.  He shouldn't have

3   to come out here again.

4        I don't know what a Chapter 11 is really going to

5   reorganize here.  If there truly aren't any creditors

6   anymore, why would this company want to be in Chapter 11.

7   Further, it would seem that the parties who want to buy

8   this and reorganize would be better off buying the assets

9   clean from a Chapter 7 estate and start all fresh without

10  any of the burdens of what might have gone wrong with

11  Picongen.  And the cost of a Chapter 11, as Mr. Katz

12  stated, would seem to be more than the assets might be

13  worth, especially -- they invited us to file claims in a

14  Chapter 11, which is probably not going to do us any good.

15  We've spent an awful lot of time and effort on this,

16  encouraged by the Debtor.

17       Finally, there was an allusion to possible tax

18  creditors earlier in this hearing, right at the beginning,

19  and I don't recall the exact content.

20       THE COURT: State of Delaware, and it was in a

21  letter that Mr. Costello wrote which I make reference to

22  which is Mr. Costello's letter of June 19th, 2012

23  specifically in the section -- page 1 of the letter, the

24  financial condition and prospects of the company, it says:

25       "The company is further also seriously delinquent

1    on its tax obligations to the State of Delaware."

2    It's also my recollection the State of Delaware is listed

3    as a creditor in the bankruptcy.

4         MR. MANSDORF: We're also dealing with Debtor-

5    prepared schedules, and while they might be a hundred

6    percent accurate, I don't know that at this time, so I

7    really don't know who the entire creditor pool is in this

8    case, but we have a substantial Chapter 7 administrative

9    expense, and most likely, the estate is liable -- the

10   estate itself is liable for some kind of -- some tax

11   obligation as the estate has been open for some time.

12        THE COURT: All right.

13        MR. KATZ: I have one more fact I left out.  No

14   one from the Debtor appeared at the 341.

15        THE COURT: All right.  All right, Mr. Costello,

16   do you have anything you wish to add?

17        MR. COSTELLO: I'm going to defer to Mr. Simon.

18        THE COURT: All right.

19        MR. SIMON: Your Honor, may I approach with a copy

20   of the Debtor's schedules?

21        THE COURT: You may.  Thank you, sir.

22        MR. SIMON: Good morning again, Your Honor.  Your

23   Honor, if you will take a look at the Debtor's schedules,

24   if you look at Schedule D, which I have cleverly --

25        THE COURT: D as in David?

1          MR. SIMON: Yes, Your Honor, which I've marked

2    with a post-it note.  It's page 8 of 16 in the schedules.

3    You'll see the list of secured creditors, and there is Mr.

4    Groover and Mr. Kluesing and the Averett Family Trust.

5    Your Honor, I'm not here telling you they are secured

6    creditors.  They may be unsecured creditors, but they're

7    creditors.  Whether they're secured or unsecured, they're

8    creditors of that estate –- to this estate, and they're all

9    here today, and they're all supporting postponing the

10   auction and converting the Debtor's case to Chapter 11, and

11   if the Court will turn to Schedule F, here are the rest of

12   the creditors, and most of these people are now interest

13   holders.  Mr. Moeckel, who's a creditor for $225,000 has

14   converted his note to equity.  He's an equity holder.  Mr.

15   Ankit Sahu is also an equity holder, and Mr. Lightfoot is

16   an equity holder, and Mr. Bartlett is also now an equity

17   holder.

18          Mr. Manapragada has a claim in some amount.  It's

19   listed as disputed.  There's some argument about the amount

20   of the claim, but it's a claim.  It's a claim for purposes

21   of 101.5, and Mr. Kluesing also has a claim.  Now, no

22   objections to these claims have been filed.  The point is,

23   Your Honor, and we'll get to it, there are no outside

24   creditors.  This Debtor doesn't owe anybody any money

25   except its own shareholders, and the shareholders are all

1   here too, either directly here or here through

2   representatives, and they're all saying the same thing,

3   which is, don't sell this asset; it has substantial value,

4   if given a little opportunity to develop it.

5          THE COURT: So Mr. Simon, let me stop you there

6   and ask you, I've got a letter written by Mr. Costello,

7   June 19th, 2012, and it says:

8              "The company is further also seriously delinquent

9              on tax obligations to the State of Delaware."

10  What was the default or the amount owed to the State of

11  Delaware on June 19th, 2012 when this letter was written?

12         MR. SIMON: I do not know the amount.

13         THE COURT: Mr. Costello, how much was owed?

14         MR. COSTELLO: I don't recall, Your Honor.

15         THE COURT: Give me an approximation.

16         MR. COSTELLO: I really truly do not recall.

17         MR. SIMON: Someone will probably know, Your

18  Honor.  I think we can ask.

19         THE COURT: No, that's fine.  That just tells me

20  what I need to know.

21         MR. BARTLETT: Excuse me, I can answer that.

22         THE COURT: Mr. Simon, continue.  That answers my

23  question.

24         MR. SIMON: Your Honor --

25         THE COURT: Mr. Simon, I'm not interested in an

1  answer now because frankly, I have to say that on this

2  record, this stinks.  This is nothing but a manipulation of

3  the bankruptcy process.

4          MR. SIMON: Your Honor, we don't -- Bankruptcy

5  Courts don't run Chapter 11's for the benefit of

6  administrative creditors.  They don't run it for the

7  benefit of trustees or for attorneys.  They run it for the

8  benefit of the creditors of the estate.

9          THE COURT: Don't tell me what the Court does.

10  I'm talking about the integrity of the process here.  The

11  bankruptcy process has been manipulated by Mr. Manapragada.

12  This stinks.  On this record alone, without hearing

13  anything else, I could deny the motion to convert on bad

14  faith.  I am so disgusted about what I have found out here

15  today and what's gone on behind the scenes.  I don't think

16  there's -- I mean I'm willing to listen to you, but I don't

17  think there's anything -- to me this is just a gross

18  manipulation.  Mr. Costello wearing multiple hats -- first,

19  he comes in representing Mr. Manapragada individually; next

20  thing I know he's representing the four creditors who filed

21  the involuntary petition; now he comes in representing the

22  Debtor.  I find out that XStream gets formed in October or

23  November for the sole purpose of basically coming in and

24  cherry-picking this technology and to run it.  It has a

25  hundred thousand dollars; it has one employee.  Who's the

1   employee?  Mr. Manapragada, who testifies about coming here

2   to –- he learns about it on his own.  He says he gets a

3   phone call initiated by XStream or Mr. Manapragada or Mr.

4   Manapragada participates in it, and there's a dispute as to

5   what was said.  Whether there should have been any

6   communication at all, I would say the answer to that is a

7   resounding no.

8           So, do you have anything else you wish to add?

9           MR. SIMON: Other, Your Honor, than the fact that

10  all the creditors and all the interest holders in this

11  case, these people were -- they were developing a new

12  technology; they had a falling out, a dispute, as often

13  happens when people are investing; as it turns out,

14  actually, rather large amounts of money, trying to develop

15  technology.  After they got into a fight, they went their

16  separate ways and an involuntary petition was filed.  They

17  recognize that this asset is worth a great deal more than

18  $85,000.  It takes some time, and it takes a little bit of

19  money, but they're willing to do that.  They're willing to

20  commit their time and --

21          THE COURT: Well, wait a minute, Mr. Simon.  What

22  happened was is they filed -- put this into an involuntary.

23  There was no opposition.  Then they wanted to cherry-pick

24  the assets of the company.  Mr. Costello is pushing to

25  close this by November 30th.  They didn't want anybody to

1  know about it, and then lo and behold, some outside buyer

2  comes in who's not connected with XStream or with Picongen,

3  who's willing to pay earnest money to acquire it, and

4  they're screaming "foul," and saying, oh Gosh, now I've got

5  all of these purported creditors who are going to convert

6  to equity, which raises the question whether it was really

7  they were creditors in the first place, whether it was

8  really equity contributions.  It stinks.  It's a

9  manipulation.  It's an attempt to manipulate the bankruptcy

10  process.

11       MR. SIMON: Your Honor, I don't think so.

12       THE COURT: It certainly looks like it.  I mean it

13  walks like a duck; it quacks like a duck; it seems to fly

14  like a duck; it looks like a duck to me.

15       MR. SIMON: Your Honor, everyone in this process

16  is presumed to act in their own economic self interest, and

17  they were.  But I don't think anyone has been dishonest

18  with the Court, and I don't think anyone has been dishonest

19  with the creditors.

20       THE COURT: I don't have -- I don't share that

21  belief.

22       MR. SIMON: And no one is trying to do anything

23  that the Code does not allow.  I mean the Code allows

24  debtors in Chapter 7 one opportunity to convert to an 11,

25  and the reason it does that is Congress understood, you

1  will have changes in circumstances, and when you have a

2  change in circumstance or simply the parties perceive their

3  self interest differently, they have the opportunity to

4  convert the case.  Now, the Supreme Court has said that's

5  not an absolute right even though the statute says it's an

6  absolute right; the Supreme Court has said well, it's not

7  an absolute right, if you can show that conversion would

8  be -- is sought in bad faith.  But in this case, conversion

9  is sought for the purpose of maximizing assets.

10          THE COURT: That's not -- I don't have a

11  conversion motion before me right now.  What I have is, is

12  there any reason why this auction shouldn't go forward

13  today.

14          MR. SIMON: Yes, Your Honor, because it's not in

15  the best interest of the estate.

16          THE COURT: And why is that?

17          MR. SIMON: Because the asset is worth a great

18  deal more than $85,000, if the Debtor is given the

19  opportunity to get the patents issued which will take a

20  little bit of time and a little bit of money.

21          THE COURT: So the representations made by XStream

22  to the trustee that what they originally wanted to bid for,

23  you're basically telling me was total nonsense.

24          MR. SIMON: Your Honor, that was what XStream was

25  willing to bid for it, XStream acting in its own economic

1  self interest, trying to buy the asset as cheaply as it can
2  buy it, like any other bidder in a process.

3        THE COURT: And then when there was an overbidder,
4  a qualified overbidder, came in, they basically said, we
5  don't want to play by these rules anymore.

6        MR. SIMON: They said we think the asset is worth
7  more than -- all of the equity holders collectively, not
8  just XStream, said this asset is worth more than that.
9  We're willing to put up some more of our money and more of
10  our effort to try to develop an asset and develop it to the
11  point where it's worth a lot more money and sell it and pay
12  off the creditors such as they are, although, you know, Mr.
13  Groover is the largest creditor by far, and make a return
14  to the equity holders who put in, as I recall, four million
15  dollars over time to develop this asset.  That's what
16  they're trying to recover.

17        MR. COSTELLO: Your Honor, if I can make one
18  point.  I think --

19        THE COURT: No, you've deferred to Mr. Simon, Mr.
20  Costello.

21        MR. COSTELLO: Okay.  Thank you.

22        THE COURT: All right.  Anything else?

23        MR. SIMON: Your Honor, in terms of what a Chapter
24  11 would actually cost, this Debtor doesn't have employees;
25  it doesn't have utilities expenses; it doesn't have

1  mortgage payments.  It really doesn't have rent.  What it

2  has is a professional who needs to be paid for the purposes

3  of getting these patents issued.  And apparently there

4  are -- there are up to $25,000 in administrative claims

5  that they'll have the opportunity to seek for the

6  administrative claims through filing an application for

7  allowance and payment of administrative claims.

8       If these assets are worth what we think they're

9  worth, there will be ample money to pay administrative

10  claims; there will be ample money to pay Mr. Groover and

11  the rest of the creditors, and make return to the equity

12  holders.  If you just sell this asset, at least $25,000 of

13  the money is going to the lawyers; another $5,000 is going

14  to go to the trustee; and the creditors and equity holders

15  of this company -- the creditors will not be paid and the

16  equity holders will get nothing, despite all the effort,

17  all the time, and all the money that's been invested in

18  this process thus far.

19       Now, I understand, Your Honor, that not everybody

20  has played by Sunday school rules, but nobody has broken

21  the law here, and I don't believe anyone is lying to the

22  Court, and I don't believe anyone has lied.

23       THE COURT: Let's just say, Mr. Simon, you and I

24  would have to disagree upon that, and maybe no one has come

25  out of the box and made a statement that's patently false,

1  but there's also a problem with the failure to fully

2  disclose as to what went on in this process, which I find

3  extremely disturbing.

4          MR. SIMON: Your Honor --

5          THE COURT: You're new to this game, and I

6  appreciate that, and I wanted to hear what you had to say.

7  Anything else?

8          MR. SIMON: No, Your Honor.

9          THE COURT: All right.  Thank you.  All right, Mr.

10  Nyberg, do you have anything you wish to add?

11          MR. NYBERG: Just very briefly, Your Honor.  I

12  learned a long time ago when to shut up.  The only thing I

13  would point out, I was surprised when Mr. Simon said how

14  valuable the patents are now.  Schedule B, Personal

15  Property, response to Item No. 22, "Patents, Copyrights,

16  and Other Intellectual Property," Picongen System Patents -

17  Value: $135,000.  And if the patents are valuable, what

18  better way to realize the value of IP than through an

19  auction?  What are they scared of?  I mean if you really

20  want to, you know, monetize intellectual property which is

21  always difficult to value, the best way for a trustee to

22  monetize that is through the auction process, and I think

23  that's what should happen here, and I think the one thing

24  that we still don't -- you know, we don't know is, we've

25  heard how all the creditors now suddenly saying "Kumbaya"

1  and everyone is in agreement, but we still don't know about

2  the State of Delaware.  They may not be in agreement.  And

3  if this case converts to an 11, what guaranty is there that

4  this Plan will be successful; what guaranty do we have that

5  these patents won't end up with XStream.  I just think that

6  given all the circumstances in this case, the fairest thing

7  to everybody involved –- and it's a level playing field for

8  XStream and for my client –- is simply to proceed with the

9  auction and let the market determine the value of the

10  patents and I think that's fair to everybody.

11          THE COURT: Thank you, Mr. Nyberg.  Mr. Katz and

12  Mr. Mansdorf, with everything you've heard today, do you

13  still want to go forward with the auction, and one of the

14  thoughts I have is setting a minimum bid of 135,000, which

15  is the amount that was set forth in Question No. 22,

16  Schedule B.  Do you want to have a moment to think about

17  that?

18          MR. KATZ: Yes.

19          MR. MANSDORF: Yes, please.

20          THE COURT: All right.  We'll take a five-minute

21  recess.

22      (Whereupon, a recess is taken at 11:45 a.m., and the

23  court is reconvened at 12:02 p.m.)

24          THE CLERK: Please come to order.  The court is

25  back in session.

1          THE COURT: Please be seated.  All right.  Mr.
2   Groover, you've been standing up in the courtroom.  Why
3   don't you come forward.  If you could state your
4   appearance.

5          MR. GROOVER: Thank you, Your Honor.  Robert
6   Groover, pro se.

7          THE COURT: Good afternoon, sir.

8          MR. GROOVER: If the Court permits, I'm well aware
9   of the time, and would like to run through some points very
10  quickly.

11          THE COURT: That would be fine, sir.  You've come
12  all the way out from Texas for your second trip.  I'd be
13  interested in hearing what you have to say, but if you
14  could be brief, I'd appreciate it.

15          MR. GROOVER: Thank you, sir.  The first is that I
16  understand that the motion to convert is not before the
17  Court today, but I would point out that if the crucial
18  assets are sold out from under the Debtor, that's going to
19  make nonsense of the motion to convert.  So basically a
20  sale today would preempt that, and I would urge the Court
21  not to allow the sale today.

22          Second, I am the largest creditor.  It is not
23  correct as was stated that there are no creditors.  I
24  support the conversion, and as I stated to trustee's
25  counsel, my request was that the sale should be canceled or

1 alternatively postponed.  We have had a lot of activity in

2 this case quite recently, and some surprising facts popped

3 up, and I would suggest that all these surprises are reason

4 for the Court to go slower rather than faster and make sure

5 that all the relevant facts and considerations are before

6 the Court.

7 　　　　　Second point, the Court previously ruled that

8 there was a bona fide dispute regarding my lien.  I would

9 point out that there's -- I would suggest that there is no

10 evidence to support that, and that that ruling should be

11 reconsidered.  I have provided some evidence for the

12 existence of my lien.  The trustee's counsel has provided

13 no evidence against the existence of this lien.

14 　　　　　THE COURT: Nor do I have any evidence that there

15 is in fact one, so I'm going to -- the motion to reconsider

16 is denied.

17 　　　　　MR. GROOVER: Your Honor, may I have leave to put

18 in a written exhibit?  There is an e-mail to the trustee --

19 　　　　　THE COURT: Not at this juncture, because

20 that's -- I've already ruled on that.

21 　　　　　MR. GROOVER: Yes, Your Honor.  The third point

22 is, I would suggest that protection under 363(e) has not

23 been shown.  363(e) specifically says notwithstanding any

24 other provision -- I'm not sure if it's the statute or that

25 section, Your Honor, but I would suggest that I'm entitled

1   to protection under 363(e), and I have not gotten it.

2           Fourth, a very important point here, I'm going to

3   pick up on something that the trustee's attorney said in

4   the previous argument or it may have been a statement by

5   the Court.  I was talking about the time frame to get the

6   real value from these patents, and the comment was that

7   that time frame is not compatible with a Chapter 7

8   proceeding where we want to collect the money and wrap

9   things up.  I would suggest, Your Honor, that that is an

10  excellent reason why conversion to a Chapter 11 proceeding

11  is entirely appropriate if only on the basis of completing

12  the work on the patents and getting them to the point where

13  there are the large amounts of money which I hope are

14  there.

15          Your Honor, I'm not going to talk about patent

16  technicalities unless the Court wants to hear it.  I would

17  comment in general that these patents are damaged

18  properties.  The analogy that comes to my mind is, it's a

19  little bit like finding a car that's upside down in a

20  river.  I happen to know –- I happen to know since I worked

21  on the car –- that there's a Ferrari engine inside it.  So

22  it's far more valuable than might appear.  So these damaged

23  properties have a fairly low cash value right now.  If I

24  went out and shopped them around, I could not get very much

25  for them right now.  I expect, and I am a 33-year patent

1  attorney with a lot of experience in patent licensing and

2  litigation, as well as prosecution, I would expect that I

3  should be able to raise very substantial money from them if

4  I can get six months to a year to work on them and finish,

5  basically repair and finish their prosecution.

6       If the Court has further questions about patent

7  details or if the Court would like a written summary of the

8  patent properties and their prospects, I'll be happy to do

9  that.

10       The next point.  363(m), I would submit that even

11  before today and especially in view of the testimony this

12  Court has heard today, it would be impossible or the Court

13  properly should not make a 363(m) finding in favor of

14  either of the cash bids which are on the table, and I would

15  respectfully object to both of those bids under 363(m).

16       Sixth point.  The effect of such a sale would be

17  to destroy the value of my lien.  My lien could certainly

18  be paid off in cash if somebody wants to do that, but I

19  would suggest that this action to quickly –- essentially

20  destroys my expectation, destroys my property right when I

21  have not had a notice and opportunity to be heard.  If it

22  is a crucial issue to cancel my lien, then I deserve an

23  opportunity to present evidence and briefing in favor of

24  that.

25       Seven, in terms of maximizing the value for the

estate, it seems like a fairly easy calculation to me, Your
Honor. I would hope that these patent portfolios could
eventually realize three million dollars or more. I would
target at least a million dollars, but it's going to take
six to twelve months. Six months would be a very fast
schedule. Twelve is more likely. I do have a network of
patent brokering and patent monetization contacts. I've
got my strategy in mind. I would prefer not to name names,
but I can assure the Court that I've played this game and I
know what my first four phone calls are going to be.

Eight, if the Court is going to rule against us
and conduct an auction sale today, then I would request an
emergency stay of any such confirmation, and

Nine, a very important point, this has become a
rather heated proceeding. The trustee is now arguing
against the first cash bidder, but I would point out that
this is a complete change of position. In my objections to
the sale, I was making many of the points which the trustee
is now making and I would suggest that this reversal is yet
another reason to show that this is a complex picture.
There are multiple stake holders, and the Court should
consider moving more carefully as opposed to faster.

Thank you, Your Honor. Any questions?

THE COURT: All right. Thank you. No, sir, thank
you very much. All right, Mr. Katz?

1    MR. KATZ: Most of the points that Mr. Groover

2  raises were raised at the last hearing and decided by the

3  Court when it overruled the objections and issued the order

4  authorizing sale free and clear of Mr. Groover's and/or his

5  firm's alleged lien.  So I don't need to go over them

6  again.  As far as 363(e) protection, his lien, to the

7  extent he has one, attaches to the proceeds of sale to the

8  same extent and the same validity of priority as they

9  attached, if they ever did, to the assets being sold.

10    Well, as to a good faith finding, we'll deal with

11  that when we find out what happens today, but I would

12  submit based on this record and what has transpired, there

13  is clearly a basis to make a good faith finding so we can

14  put this sale to bed.  In anticipation of his request for a

15  stay, there's no basis to issue a stay.  If Mr. Groover

16  really thought these assets were so valuable, and I can

17  tell you from conversations I had with him in the past, he

18  didn't think that at all.  There's plenty of investors who

19  will come up with money, you know, in the three months

20  since he first contacted me.

21    The other interesting thing that Mr. Groover says

22  is, you know, with the disclosures that came out in court

23  today, it's more reason for the Court to postpone the sale.

24  Well, the interesting thing is, at the last hearing, Mr.

25  Groover was alleging that the petitioning creditors -- he

1   was alleging hanky-panky.  But now he appears to be on

2   their side.  So I'm not quite sure what if anything has

3   gone on there.  I mean now he's supporting the petitioning

4   creditors who he was alleging two weeks ago of hanky-panky.

5               Unless the Court has any other questions --

6               MR. MANSDORF: But does Mr. Groover have standing

7   anymore if the minimum bid is more than his alleged lien?

8               THE COURT: What I said at the last hearing, I

9   overruled his objections to the auction, but specifically

10  allowed him to bid here today, subject to the trustee's

11  approval that he's a qualified bidder.  So he can have that

12  opportunity to bid on his own or to assist somebody else in

13  bidding and basically assume that there might be three

14  potential bidders here today, the original stalking horse

15  bidder, that of Sigma, and then Mr. Groover if he wanted to

16  bid today.  So what we have -- what I've based -- I've

17  heard everything here today, reviewing all of the papers, I

18  guess the question I have for you, Mr. Mansdorf, do you

19  wish to proceed with the auction, and that in your belief,

20  that this is in the proper exercise of the trustee's

21  business judgment?  Is there anything that leads you to

22  believe that it would be more appropriate to continue the

23  sale for purposes of exposing it to the market further, or

24  do you wish to proceed with the auction here today?

25              MR. MANSDORF: I wish to proceed with the auction

1 | here today.

2 | THE COURT: All right.  Okay.  All right, based on
3 | that, no one has put forth any evidence, other than a
4 | willingness to delay the auction for purposes of first
5 | considering the motion to convert the case to Chapter 11.
6 | For the reasons previously stated on the record by the
7 | Court, I have serious concerns with that motion, but what's
8 | before me today is whether there's any basis to delay or
9 | cancel the auction and I've heard nothing on this record
10 | that would make me –- lead me to believe that.  Even Mr.
11 | Groover, who's come again from Texas has indicated that the
12 | as-is value of these patents is nowhere near what he thinks
13 | it might be worth in six to twelve months.  Mr. Manapragada
14 | and others, Mr. Simon, have said there's basically no
15 | business to reorganize here.  All we have are the patents.
16 | We have an auction to dispose of the subject patents, and
17 | as Mr. Nyberg said, what better way to maximize the value
18 | of the estate than having an auction.

19 | No one has objected, or to the extent they have
20 | and it hasn't already been overruled, that this was
21 | properly marketed, we have an overbidder who's come in with
22 | an initial bid to purchase the assets of the business,
23 | carving out any tort claims and the collection of the two
24 | notes against Mr. Manapragada for the sum of $85,000, and
25 | that is the prevailing bid.  Now, is there anybody else

1  that wishes to bid?

2          MR. KATZ: Can I ask the Court -- you suggested

3  $135,000.

4          THE COURT: Well, that was the initial bid --

5          MR. KATZ: I'm sorry?

6          THE COURT: What's the status of that?

7          MR. KATZ: Well, we believe that that's an

8  appropriate number.  A couple things that the trustee would

9  suggest is, at that number, the bidder should have the

10 opportunity to buy everything that the initial sale motion

11 contemplated, so not just the patents and the intellectual

12 property, but any inventory and equipment and all notes and

13 rights to payment available by Mr. Manapragada, that the

14 assets would not include cash on hand, accounts receivable,

15 or notes, other than Mr. Manapragada's tax refunds and

16 avoidance actions.

17         THE COURT: All right.  So basically what the

18 initial offer from -- I'll refer it to the XStream group,

19 is on the table, but the minimum bid is 131,000.  Mr.

20 Nyberg, is your client willing to make that bid?

21         MR. KATZ: 135,000.

22         MR. NYBERG: 135.

23         THE COURT: I have 135, which is out from Schedule

24 B, which is the -- I'm taking that was the amount of the

25 Picongen system patents, which is the number there, which

1  is almost twice as much as the original stalking horse bid.

2         MR. NYBERG: Sigma Group would be prepared to bid

3  $135,000 for all of the assets we've just discussed,

4  including the notes, business tort claims, everything

5  except the excluded assets that Mr. Katz just announced.

6         THE COURT: Basically it's the original offer that

7  was --

8         MR. NYBERG: Yes.

9         THE COURT: Okay.  Does any party in the courtroom

10  wish to overbid?  Mr. Groover?

11         MR. GROOVER: Your Honor, I would just like to

12  note that my original offer is still of record, and that I

13  am asserting that both of the cash offers should be

14  disqualified.

15         THE COURT: And your offer is?

16         MR. GROOVER: Ten thousand dollars cash now,

17  $25,000 cash at the end of 2013 plus my claim, plus both of

18  the other secured claims.  That is a larger face value

19  amount though less total cash.

20         THE COURT: So it's 10,000 cash now, 25,000 in a

21  year?

22         MR. GROOVER: Yes.

23         THE COURT: Waiver of your claim?

24         MR. GROOVER: Yes, and of the Averett Family Trust

25  claim and of Mr. Kluesing's claim.

1          THE COURT: And the Averett claim is how much?

2          MR. GROOVER: Thirty-one thousand, I believe.

3          THE COURT: And the Kluesing claim is?

4          MR. GROOVER: That is twenty-five hundred.

5          THE COURT: Okay.  And your claim is roughly again

6    how much?

7          MR. GROOVER: Hundred and six thousand, Your

8    Honor.  The Debtor listed it as 103,000.  I have submitted

9    invoices and a spreadsheet showing computation of the

10   interest at California prejudgment --

11         MR. SIMON: There's a Proof of Claim on file, Your

12   Honor.

13         THE COURT: All right.  So I have roughly -- it's

14   a waiver of 139,500 in claims, an initial cash of 10,000,

15   and possibly 25,000 in a year from now versus an all-cash

16   offer of 135,000 now.  All right.  Does anybody else wish

17   to bid?

18         MR. COSTELLO: Your Honor, just one minute.

19         Your Honor, we'll go to 136 on the same terms as

20   our original offer.

21         THE COURT: And my recollection, Mr. Katz, the

22   bidding is to go up in increments of a thousand?

23         MR. KATZ: Correct.

24         THE COURT: All right.  All right, so I have an

25   overbid from -- I'll refer to -- Mr. Costello is the

1 XStream Group?

2         MR. COSTELLO: XStream Wireless works, Your Honor.

3         THE COURT: Okay, very good.  So I have 136.  Let

4 me ask you this, from the trustee's perspective, what is

5 the trustee's position on Mr. Groover's offer for 10,000

6 now, 25,000 in a year, and a waiver of $139,500?

7         MR. MANSFORD: My business judgment rejects that

8 offer and doesn't -- it's not on an equivalent standing

9 with cash to the estate, now.

10         THE COURT: Okay.  Mr. Groover, did I fairly

11 identify what you just offered?

12         MR. GROOVER: Your Honor, one slight correction, I

13 said just now on the record 25,000 at the end of 2013.

14         THE COURT: Okay.

15         MR. GROOVER: That's still not cash today, but

16 it's less than a year.

17         THE COURT: All right.  Thank you.  So the trustee

18 has rejected that, and we have now an overbidder from the

19 Wireless Group of 136,000?

20         MR. COSTELLO: Your Honor, and to be clear, there

21 is additional consideration.  The notes by the investors

22 and Mr. Moeckel have been converted, but the claims of Mr.

23 Manapragada for his compensation have not been subject to

24 conversion, and those are also being waived as part of the

25 consideration.

1          THE COURT: All right.  That's the amount of

2  $1,104,000 that's disputed?

3          MR. COSTELLO: I'm sorry, Your Honor?

4          THE COURT: It's listed -- I haven't seen the

5  claim, but I've got the amount listed as disputed at

6  1,104,000.

7          MR. COSTELLO: Correct.  Correct.

8          THE COURT: Okay.  Mr. Nyberg?

9          MR. NYBERG: Sigma Group bids 137,000.

10          THE COURT: All right.  Is the trustee prepared to

11  try to quantify the waiver of the claim for the 1,104,000?

12          MR. MANSFORD: Not at this time.

13          THE COURT: Okay.  All right.

14          MR. COSTELLO: Your Honor, XStream bids 150 cash

15  and the same terms.

16          THE COURT: Okay.  All right.  Mr. Nyberg?

17          MR. NYBERG: Sigma Group bids 151, 151,000.

18          THE COURT: 151,000, all right.

19          MR. COSTELLO: XStream bids 175 on the same terms,

20  on the same prior terms.

21          THE COURT: Same prior terms, thank you, Mr.

22  Costello.

23          MR. NYBERG: Sigma Group bids 176,000.

24          THE COURT: All right.

25          MR. COSTELLO: XStream bids 250,000 with the same

1  terms as its prior bid.

2           THE COURT: Two hundred and --

3           MR. COSTELLO: Fifty thousand.

4           THE COURT: Two hundred and fifty thousand.

5           MR. NYBERG: Sigma Group bids 251,000.

6           MR. COSTELLO: One moment, Your Honor.

7      (Pause.)

8           Your Honor, XStream Wireless bids 350, same

9  terms.

10          THE COURT: Okay.  350,000 plus the waiver of Mr.

11 Manapragada's claim.

12          MR. NYBERG: Sigma Group bids 351,000, Your Honor.

13          THE COURT: All right.

14          MR. COSTELLO: Your Honor, XStream remains at 350

15 plus the waiver of the claim.  We've requested some

16 indication from the trustee how he would value that non-

17 cash component.

18          THE COURT: All right.

19          MR. MANSDORF: Your Honor, I do need to analyze,

20 to the extent that this would then be a case that would --

21 and it may or may not be surplus, but for the equity

22 security holders, some of that claim waiver may be going

23 right back to the same party as an equity security holder.

24          THE COURT: Well, I have Dale Kluesing at one

25 point -- but Mr. Kluesing's claim as I understand it came

1    in only at twenty-five hundred?

2            MR. COSTELLO: I think that there's another claim

3    out there.  I think that there's another million dollar

4    claim, and I believe Mr. Bartlett also has a significant

5    claim.

6            THE COURT: Well, I'm looking at the schedules.

7    I've got Moeckel, Sahu, Lightfoot, and Bartlett have all

8    converted their claims to equity.  Mr. Manapragada's one

9    point, one hundred and four thousand claim is being waived,

10   which is marked as disputed, and then the only creditor

11   left in Schedule F is the 1.3 by Mr. Kluesing.

12           MR. BARTLETT: Your Honor?

13           THE COURT: Sir, if you can come forward and state

14   your name.

15           MR. BARTLETT: David Bartlett and --

16           THE COURT: Good afternoon.

17           MR. BARTLETT:  -- I was co-founder of the company

18   and general counsel for a while til last November.  But I

19   have not -- I have equity in the company as a founder, and

20   I have a $519,000 claim for legal work over the course of

21   the --

22           THE COURT: Well, it's been represented

23   previously, Mr. --

24           MR. BARTLETT: That was -- that's incorrect.  I'm

25   telling you firsthand, I have not converted.

1      THE COURT: So what was previously represented to
2  the Court that all equity or --

3      MR. BARTLETT: I'm not sure who said that or what
4  that was about, but that is incorrect.

5      THE COURT: That was Mr. Simon who made that
6  representation.

7      MR. SIMON: Your Honor, I don't represent him.  I
8  did not mean that his equity had been converted.  He's not
9  my client.

10     THE COURT: We specifically went through it, and
11 you went through that and said that the amount of the claim
12 was five hundred -- that Bartlett had converted to equity.
13 So I'm just saying --

14     MR. SMITH: If I did I misspoke.

15     THE COURT: I'm not pinning any blame on anybody.
16 I'm just simply saying is that that's what was represented
17 to the Court.  Mr. Bartlett is now saying that his claim of
18 519,000 has not been converted.  You haven't converted any
19 of your debt.

20     MR. BARTLETT: No, Your Honor.

21     THE COURT: Have you filed a claim?

22     MR. BARTLETT: I haven't filed a Proof of Claim,
23 but I have prepared a Proof of Claim, but I'm on the
24 original schedule.

25     THE COURT: Right, at $519,069.60.

1          MR. BARTLETT: Yes.

2          THE COURT: Okay.

3          MR. COSTELLO: And then Mr. Kluesing is on at 1.3.

4          THE COURT: Right.

5          MR. COSTELLO: Okay.

6          MR. MANSDORF: Your Honor, I think at this point,

7    given the fluidity of the claim situation, and what may be

8    a shifting back and forth by other creditors from equity to

9    debt, I don't know.  I think from the estate's liability

10   perspective, I have to look at how much cash is coming into

11   the estate now and not give credit for --

12         THE COURT: A disputed claim?

13         MR. MANSDORF:  -- any disputed claims at this

14   point.

15         MR. BARTLETT: Your Honor, I didn't shift my --

16         THE COURT: No, Mr. Bartlett, we're not referring

17   to you.

18         MR. BARTLETT: Okay.

19         THE COURT: We're referring to Mr. Manapragada.

20   XStream's offer was to waive his disputed claim of

21   1,104,000, which was scheduled in Schedule F, and what the

22   trustee is saying is that based on the timing and

23   everything, he is not willing to concede -- I guess at a

24   minimum, there might be some value as to claims litigation,

25   even if it's disputed.  I'm suggesting that as a

1    possibility.  If not and if you're still of the opinion
2    that you think it's just spurious, then I don't know how
3    you'd make that representation if you haven't looked into
4    this at this juncture.

5              MR. MANSDORF: It's premature in this case, and I
6    certainly don't want to chill the bidding process at this
7    point.

8              THE COURT: Okay.  So your position right now is
9    that the Sigma offer of 351,000 -- you're looking at this
10   based on the facts as they exist right now, you can't
11   quantify that.

12             MR. MANSDORF: Correct.

13             THE COURT: All right.  I just want to take two
14   minutes and I want to just -- I want to check a cite on the
15   something.  I'll be right back.

16        (Whereupon, a recess is taken at 12:29 p.m., and the
17   court is reconvened at 12:32 p.m.)

18             THE COURT: Please be seated.

19             MR. COSTELLO: Your Honor, if I might --

20             THE COURT: Yeah, go ahead, Mr. Costello.

21             All right.  So Mr. Mansdorf, your position is
22   that you're doing -- you're comparing the cash only offers
23   and not considering the waiver.  You considered the waiver
24   of Mr. Manapragada's disputed claim in the amount of
25   $1,104,000, but because you have no information at this

1 juncture to review any documents supporting a claim if one

2 were filed or how he came up with that matter, you're not

3 willing to speculate nor are you willing to give any

4 benefit for potentially having to -- if it is a spurious

5 claim -- litigation costs, because on the other hand,

6 under -- applying Rule 9011, if it is a spurious claim, no

7 one would want to pursue it, so your position here today,

8 if I'm correct in summarizing your position, is that you're

9 not willing to give any value to that, any dollar value

10 fixed to it.

11          MR. MANSDORF: That's correct, Your Honor.

12          THE COURT: Okay.  So at this time, I have a bid

13 of 351,000 and 350,000 from XStream, Mr. Costello, so he's

14 comparing cash to cash only.

15          MR. COSTELLO: I understand.

16          THE COURT: Okay.

17          MR. COSTELLO: We have no further increase.

18          THE COURT: Okay.  All right.  So the final offer

19 I have is 351,000 cash from Sigma.  Does anybody else wish

20 to match and overbid?  Mr. Groover?  Anyone?   No?  Okay.

21          MR. KATZ: Your Honor, could we find out how much

22 XStream has spent since they're going to be reimbursed if

23 they spent any money to maintain these patents?

24          THE COURT: I thought you previously asked for

25 that information, and they refused or failed to provide you

1  the same.

2         MR. KATZ: That is true.

3         THE COURT: All right.  And the bidding, is my

4  understanding, is that there was a dollar amount of --

5         MR. COSTELLO: It was estimated that it might be

6  as high as 14,000.  Your Honor, we need to get that

7  information from patent counsel, and that's ongoing.  We'll

8  submit it to the trustee as soon as we have it from patent

9  counsel.

10        THE COURT: All right.  Now we do have modified

11 bids from what was originally in the initial bid.  It did

12 call for a waiver of that, but I'm taking --

13        MR. KATZ: If XStream was the successful bidder.

14        THE COURT: Right.  But as far as giving any

15 credit for that, you have no information, and Mr. Groover

16 provided information disputing whether there was any money

17 spent by XStream or anyone else.

18        MR. GROOVER: Your Honor, I actually provided the

19 records, the official records, which show definitively that

20 as of January 9th, no patent office payments had been made.

21        THE COURT: By?

22        MR. GROOVER: Anyone, other than me and long ago,

23 Mr. Kluesing.

24        THE COURT: All right.  All right, Mr. Katz?

25        MR. COSTELLO: Just a clarification, Your Honor,

1   we don't have enough information that we could provide to

2   the trustee right now so that they could evaluate it for

3   purposes of the bid, so I think our bid still is the same.

4            THE COURT: 350,000 and the waiver of the

5   Manapragada disputed claim.

6            MR. COSTELLO: Correst.

7            THE COURT: And the trustee has -- based on the

8   record, and what information he has, he's not willing to

9   give any value to a waiver of that claim.  All right.

10  Anything else, Mr. Katz?

11           MR. KATZ: May I have just a minute?

12           THE COURT: Yes.

13      (Pause.)

14           MR. KATZ: The high bidder for the auction

15  purposes is Sigma Group.

16           THE COURT: At 351,000 cash.

17           MR. KATZ: At 351,000 cash.  We have no

18  information from XStream about any monies it spent, so I

19  would --

20           THE COURT: For preserving the patents?

21           MR. KATZ: For preserving the patents, I'm sorry.

22           THE COURT: And the trustee did request that

23  information?

24           MR. KATZ: The trustee did request that

25  information.

1          THE COURT: When was that?

2          MR. KATZ: First at the hearing on the 9th, and

3   then in an e-mail probably around the -- I'm going to

4   speculate, around the 16th of January, because we hadn't

5   heard anything.

6          THE COURT: Right.

7          MR. KATZ: And the sale was coming up.  So I would

8   suggest --

9          THE COURT: And Mr. Groover, who was the prior

10  patent counsel for Picongen has indicated that based on his

11  review, there were no payments made on behalf of XStream

12  for preserving the patents.

13         MR. KATZ: Right.  So I mean at this point, it's

14  hard to take that into consideration.  They should be --

15         THE COURT: Right.  No, I understand.  I just

16  wanted to -- for preserving the record on what they were

17  proposing what was a waiver of those fees, so what I have

18  is, right now, is that their offer is the 351,000 and the

19  waiver of the Manapragada disputed claim of 1,104,000.

20         MR. COSTELLO: Your Honor, I'm sorry, correction,

21  350.

22         THE COURT: Excuse me, 350,000.

23         MR. COSTELLO: Yes.

24         MR. KATZ: So for purposes of the auction, the

25  trustee accepts the bid of Sigma.  I think that XStream

1   should have a limited amount of time, whether it's seven or

2   ten days, to provide invoices or proof of any payments they

3   made to patent agencies to maintain the patents, and if

4   they don't, then they won't be entitled to any refund of

5   that amount.

6        THE COURT: Well, I'm not going to give a

7   limitation on that.  My biggest concern is for purposes of

8   what the original offer was, but they have provided you

9   with no documentation to support a waiver of that --

10  whatever they paid, if they paid anything at all, can be

11  dealt with in a claims process.

12       MR. KATZ: Okay.

13       THE COURT: My point is to deal with the offers

14  here today.  Does XStream wish to make a back-up offer?

15       MR. COSTELLO: No, Your Honor.  If that bid

16  doesn't go through, presumably we would go forward with the

17  conversion.

18       THE COURT: All right.  Very good.  Okay.  Then

19  the Court will approve the auction final bidding price to

20  Sigma in the sum of 351,000 cash.  All right.  Anything

21  else?

22       MR. KATZ: Yes.  We would like to ask the Court to

23  make a good faith finding under 363(m).

24       THE COURT: At this juncture, I'm unwilling to do

25  that because of the prior communications between Sigma and

1  XStream.  I think that's going to warrant a separate

2  hearing if anybody wants to oppose that, but at this

3  juncture, I just don't have enough information, and I don't

4  think it's warranted.  It's not that I won't fully consider

5  it, but because the parties had communicated, and this is

6  the first the Court has learned about any prior

7  communication between the parties, going back possibly as

8  early as December 2012, not just the January -- I believe

9  it was the January 5th date and the January 14th or 15th

10  hearing date, I think it would be appropriate to delay

11  that.  Mr. Nyberg?

12          MR. NYBERG: Your Honor, if I may.  We didn't

13  address the issues surrounding the good faith findings

14  earlier.  I mean the testimony from Mr. Bigala was simply

15  related to a conversation about perhaps trying to, what

16  might be perceived as to chill the bidding.  We have and

17  can, by either, again, by way of offer of proof or putting

18  Mr. Bigala back on the witness stand, because he is here,

19  can provide the Court with testimony as to Sigma's non-

20  relationships -- which I think actually came out in the

21  testimony -- non-relationships with XStream, no

22  relationship with Mr. Manapragada, and no relationship,

23  which you don't have yet, but with the trustee, that there

24  were no deals made between any of the -- on behalf of Sigma

25  Group, trying to buy off any bidders, and that this was

just an opportunity that arose and they chose to make a
bid, which they did, and they prosecuted that bid in good
faith.  And I believe that the Court could easily make a
good faith finding.  We can -- like I said, I can make a
formal offer of proof.  I can put Mr. Bigala back on the
witness stand.

THE COURT: Mr. Katz, Mr. Mansford, do you have a
position on this?

MR. KATZ: I think that would be appropriate.

THE COURT: All right.  Mr. Nyberg, you can go
ahead and call your client.

MR. SIMON: Your Honor, Robert Simon.  As I recall
and Mr. Costello has the same recollection, I don't think a
good faith finding is in the motion.

MR. NYBERG: It's not in the motion, Your Honor.

MR. SIMON: There was no request made for a good
faith finding.

MR. KATZ: Well, that is apparently true, because
we didn't know there was a need to.  But I would ask that
it be made now.

MR. COSTELLO: I don't think that's appropriate.

THE COURT: It's not set forth in the motion, or
there was not a request there.  I'm just looking at the --
I'm seeing if the binding term sheet for purchase had
included that, which was attached to the motion.

1          MR. NYBERG: It doesn't, Your Honor.

2          THE COURT: Mr. Nyberg, it's not in the binding

3  term sheet nor is it in the motion, so it's not properly

4  before this Court.  So unfortunately, I'm not in a position

5  to do that.  All right?

6          MR. KATZ: I did ask for a waiver of the 14-day

7  stay, however.  That is in the motion.

8          THE COURT: Right.  That is, and I have no reason

9  not to grant that, but as far as the good faith finding,

10  unfortunately, I'm not in a position to rule on that.

11  Okay?

12          ALL COUNSEL: Thank you, Your Honor.

13          THE COURT: Mr. Costello, thank you for pointing

14  that out.  All right.  Anything else, gentlemen?

15          THE COURT: All right.  That concludes the matter.

16          ALL COUNSEL: Thank you, Your Honor.

17      (Whereupon, the proceedings are concluded at 12:44

18  p.m.)

19

20

21

22

23

24

25

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6

7          I certify that the foregoing is a correct

8   transcript from the digital sound recording of the

9   proceedings in the above-entitled matter.

10

11  DATED: April 12, 2013

12

13                      By:   /s/ Jo McCall

14

15

16

17

18

19

20

21

22

23

24

25