JEREMY W. KATZ (SBN: 119418)
LINDA SORENSEN (SBN: 72753)
PINNACLE LAW GROUP LLP
425 California Street, Suite 1800
San Francisco, CA 94104
Email: jkatz@pinnaclelawgroup.com
Telephone:   (415) 394-5700
Facsimile:    (415) 394-5003

Attorneys for Trustee
PAUL J. MANSDORF

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>PICONGEN WIRELESS INC.,<br><br>Debtor. | Case No. 12-48131 RLE 7<br><br>Chapter 7<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER APPROVING COMPROMISE OF CONTROVERSY WITH SIGMA GROUP, INC.<br><br>Date:  May 6, 2013<br>Time:  1:00 p.m.<br>Room: 201, Judge Efremsky |

Paul J. Mansdorf, Trustee of the above-named Debtor's bankruptcy estate (the "Trustee"), submits this memorandum of points and authorities in support of his motion for an order authorizing him to enter into a compromise of controversy with Sigma Group, Inc. ("Sigma Group") resolving Adversary Proceeding No. 13-04064, *Mansdorf v. Sigma Group* (the "Action"), on the terms set forth herein and in the Settlement Agreement attached as Exhibit "A" to the Trustee's declaration in support hereof.  Sigma Group will pay the estate $150,000 for the assets it purchased at auction on January 22, 2013.  That sum is in the Trustee's trust account.  The proposed compromise ends litigation concerning the sale to and purchase by Sigma Group of substantially all of the assets of the bankruptcy estate.

## BACKGROUND OF THE PROPOSED SETTLEMENT

On October 3, 2012, an involuntary chapter 7 bankruptcy petition was filed against the

PINNACLE LAW GROUP  LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

1871.107

1

**COMPROMISE POINTS AND AUTHORITIES**

Case: 12-48131    Doc# 60-1    Filed: 04/15/13    Entered: 04/15/13 13:06:15    Page 1 of 8

Debtor by petitioning creditors Ronald Moeckel, Ankit Sahu, Max Lightfoot, and Sai Manapragada. ECF #1. Patrick Costello of Vectis Law Group represented the petitioning creditors. Dale Kluesing, signing as the Debtor's CEO, executed a stipulation for entry of an order for relief which was filed on October 26, 2012. ECF #5. An order for relief was entered that same day. ECF #6.

The assets of the Debtor consisted primarily of intellectual property. On November 30, 2012, the Trustee filed his motion to sell substantially all of the estate's assets free and clear of asserted liens to xStream Wireless Works, Inc. ("xStream Wireless") for $60,000 cash plus a waiver of certain claims against the estate. ECF #s 15, 16, and 17. (The original offer, which the Trustee rejected, was $30,000 for an expedited sale. Mr. Manapragada, one of the petitioning creditors, was also the principal of xStream Wireless and one of the founders of the Debtor. Prepetition, Mr. Manapragada had been open about the fact that he intended to put the Debtor into bankruptcy in order to acquire its assets.) The sale was subject to overbidding. The hearing on the sale and any overbids was scheduled for January 9, 2013.

On January 4, 2013, Robert Groover III, the Debtor's intellectual property counsel located in Texas, filed his opposition to the proposed sale. ECF #28. He alleged, among other things, that he had an attorney's lien against all of the intellectual property, that Mr. Manapragada had unclean hands, that some of the assets were in the possession of Mr. Manapragada, and that Mr. Manapragada had diverted estate assets for his own benefit. Mr. Groover also made his own offer to purchase the assets. ECF #27.

On January 7, 2013, the Trustee filed his reply to Mr. Groover's opposition to the sale. ECF #29. The Trustee pointed out that Mr. Groover's alleged attorney's lien was the subject of a bona fide dispute, that it was the Trustee's duty to liquidate assets of the estate for the benefit of creditors, that the sale was subject to overbidding, and that Mr. Groover's purchase offer was not acceptable to the Trustee.

On the morning of January 9, 2013, Patrick Costello of Vectis Law Group now representing xStream Wireless filed a declaration which included documents in support of the sale motion. ECF #30.

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

1871.107     2     **COMPROMISE POINTS AND AUTHORITIES**

Prior to the January 9, 2013, hearing on the sale motion, Jeremy W. Katz of Pinnacle Law Group LLP, the Trustee's general counsel, had been contacted by Mahesh Bigala of Sigma Group. Mr. Bigala informed Mr. Katz that Sigma Group was interested in making an overbid for the assets. Mr. Katz discussed with Mr. Bigala the procedures required for qualifying as an overbidder.

The sale motion was heard on January 9, 2013. Mr. Groover appeared personally to oppose the motion and promote his offer. Eric Nyberg appeared on behalf of Sigma Group. Mr. Bigala, Sigma Group's principal, flew in from New Jersey to attend the hearing and overbid on behalf of Sigma Group. Mr. Costello appeared for the stalking horse buyer, xStream Wireless. The Court overruled Mr. Groover's opposition to the sale, ordered that the sale was to be free and clear of liens, and continued the in-court auction to January 22, 2013. Minutes of January 9, 2013, and ECF #32.

On January 18, 2013, on the eve of conducting the Trustee's auction sale of Debtor's assets in court on January 22, 2013, on the last business day prior to a morning hearing, Mr. Costello of Vectis Law Group, now acting as proposed special bankruptcy counsel for the Debtor, filed a motion to convert the Chapter 7 case to Chapter 11, citing new management and claiming vaguely to have a plan of reorganization in mind, requested that the Trustee not proceed with the auction. ECF #34.

Later on January 18, 2013, the Trustee filed a pleading in further support of the auction sale and preliminarily objecting to the Debtor's motion to convert. ECF #37. The Trustee pointed out there was no evidence to support the Debtor's request to stop the auction sale and further pointed out that under the circumstances of this case, the Debtor's motion to convert appeared to have been made in bad faith.

The assets that were to be sold at auction (the "Auctioned Assets") were not in the Trustee's control except constructively, and the agreement with xStream Wireless did not require the Trustee to take any specific actions with respect to delivery of the Auctioned Assets. It appeared that Mr. Groover (the Debtor's intellectual property attorney in Texas) possessed substantial information about the patent applications and that some information regarding the

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

1871.107     3     COMPROMISE POINTS AND AUTHORITIES

intellectual property was public record.  The Trustee learned that Mr. Manapragada was in possession of certain tangible assets and some books and records in his garage.  The Trustee contacted David Bartlett, a former Debtor's attorney, as well as Mr. Kluesing about books and records in their respective possession, but they had less relevance to the Auctioned Assets.  The Trustee was not informed about details, such as whether any prototypes existed.

On January 22, 2013, the Court listened to live testimony, denied the request to delay the auction until after the conversion motion was heard, and conducted the auction.  (The motion to convert was later withdrawn, ECF #56, the Court having stated the likelihood that it would be denied and the Trustee having filed further opposition, ECF #s 46, 47, 48, 49, 50, and 51.)  The Court started the bidding at $135,000, the value placed by the Debtor in its Schedule B for the patent systems.  Sigma Group offered $135,000.  xStream Wireless, the only other bidder, continued the bidding and the auction ended with Sigma Group being the successful bidder at $351,000.  When the Court asked xStream Wireless if it wanted to make a back-up offer, xStream Wireless declined.

The Trustee's position is that when the Court announced Sigma Group to be the winning bidder at auction, the sale of the Auctioned Assets was complete, Sigma Group had purchased the Auctioned Assets, and Sigma Group was bound to perform by paying the purchase price.  There was no agreement that delayed effectiveness of the sale on any subsequent conditions, except entry of a court order.  On January 23, 2013, the Court entered its order authorizing the sale of the Auctioned Assets to Sigma Group free and clear of liens.  ECF #41.[1]

Sigma Group, however, did not pay the purchase price.  It contended that the Trustee had unperformed obligations to identify and deliver the Auctioned Assets to Sigma Group.  Sigma Group also contended that persons associated with the Debtor, xStream Wireless, and/or the Shareholder Group were interfering with Sigma Group's purchase of the Auctioned Assets, and were using the Auctioned Assets and frustrating the sale.

---

[1] On February 5, 2013, certain shareholders of the Debtor filed a notice of appeal from the sale order.  ECF #45.  Those certain shareholders were Mr. Manapragada, Ankit Sahu, Ronald Moeckel, Sharat Kuma Yempati, and Max Lightfoot (the "Shareholder Group").  All but Sharat Kuma Yempati were the petitioning creditors.  The Shareholder Group was represented by Robert Simon of Barlowe Garsek & Simon, LLP of Fort Worth, TX, and locally by Mr. Costello of Vectis Law Group.  ECF #45.

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

1871.107                    4                    COMPROMISE POINTS AND AUTHORITIES

The Trustee filed the Action against Sigma Group to collect the purchase price and to determine whether it was necessary and appropriate to amend the sale order to permit the Trustee to regain the Auctioned Assets and re-sell them to mitigate damages. [Adversary Proceeding 13-0464] Although the Shareholder Group (which had a pending appeal from the sale order), through its Texas counsel, indicated interest in acquiring the Auctioned Assets, they offered only $30,000 (which was less than the original xStream Wireless stalking horse bid of $60,000). The Trustee informed the Shareholder Group's Texas counsel that $30,000 was unacceptable. Texas counsel responded that it might go higher, but has never made a higher offer. Furthermore, the Trustee has been informed by Texas counsel that the assets are not worth much and that the third party backer who had pledged the money to back xStream Wireless's bid at the auction no longer was willing to do so. Based on this information, the Trustee believes that neither xStream Wireless nor the Shareholder Group has the resources to pay more than $150,000 for the Auctioned Assets. Furthermore, the Trustee believes that xStream Wireless may have bid up the Auctioned Assets on January 22, 2013, with the intention of creating a situation where the combination of Sigma Group's having bid so much and the difficulties in obtaining the benefits of the sale would cause the harm that the bankruptcy estate has experienced.

### THE PRINCIPAL SETTLEMENT TERMS

The Trustee entered into negotiations with Sigma Group to resolve the Action, the result of which is an agreement that Sigma Group will pay the estate $150,000 for the Auctioned Assets and the Trustee will have no further obligations to Sigma Group in connection with the sale. The Trustee has received the $150,000 from Sigma Group which is being held in his trust account pending court approval of the compromise. If the compromise is not approved, the money will be returned to Sigma Group. The concept of the compromise is that Sigma Group already owns the Auctioned Assets as-is and where-is, and in fact already has the benefit of much of the intellectual property, whereas the parties are compromising the Trustee's collection action and Sigma's claims that the Trustee breached sale obligations. The Trustee and Sigma Group will execute mutual general releases relating to the Action, including section 1542 releases. The Action will be dismissed with prejudice, each party bearing his or its own attorney fees. No overbidding is

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

1871.107

5

1  available.  The Trustee believes that all potential interested parties in the Auctioned Assets were

2  represented at the auction sale and had the opportunity to bid, and that no one was willing to

3  commit to a back-up bid to Sigma Group's successful bid.

4  **WHY THE SETTLEMENT IS IN THE BEST INTERESTS OF CREDITORS AND THE**

5  **BANKRUPTCY ESTATE**

6        Beginning in November 2012, xStream Wireless and now joined by the Shareholder

7  Group, has been insisting that the Auctioned Assets continue to lose value.  It is imperative that

8  the Action be settled and that the estate stop expending resources on the matter, so that it may

9  focus on resolving asserted secured claims against the estate.  Additionally, the Shareholder

10  Group's appeal of the sale order must be dealt with.  Settlement of the Action enables the estate to

11  focus on resolving the remaining issues in the bankruptcy case.  If the Action were instead to go

12  forward, the estate could incur significant additional expenses and it is uncertain that the estate

13  would recover any more money than it is receiving by way of settlement.

14        F.R.B.P. 9019(a) provides, "[o]n motion by the trustee and after notice and a hearing, the

15  court may approve a compromise or settlement.  Notice shall be given to creditors, the United

16  States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity

17  as the court may direct."

18        A bankruptcy court has great latitude in approving compromises, but they must be fair and

19  equitable.  When making its decision, a court should consider:  1) the probability of success on

20  the merits; 2) the difficulty in collecting a judgment; 3) the complexity of the litigation involved

21  and the expense, inconvenience, and delay associated with trial; and 4) the paramount interests of

22  creditors.  *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986);

23  *Woodson v. Firemen's Fund Insurance Company (In re Woodson)*, 839 F.2d 610, 620 (9th Cir.

24  1988).  These factors favor the compromise as set forth above.

25        Factor 1:  The Trustee believes that Sigma Group purchased the Auction Assets, but

26  Sigma Group may have counterclaims against the estate that could result in a reduction of the

27  purchase price.  The question of whether the Trustee has made an adequate tender and/or must

28  obtain cooperation from persons whom the Trustee does not control, is a subject that not only

PINNACLE LAW GROUP  LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

1871.107                         6                **COMPROMISE POINTS AND AUTHORITIES**

creates risk in the result, but also tends to cause further expense to the bankruptcy estate in continuing demands for and attempts to effectuate cooperation with the buyer. There is no fee-shifting clause in the auction terms to compensate the bankruptcy estate for the cost of the litigation if the bankruptcy estate is successful. Furthermore, there is no present outstanding offer by any other entity for the purchase of the assets that approaches the $150,000 settlement amount (nor was selling to a substitute buyer an alternative that could have been accomplished without substantial expense and delays of proceedings to obtain the right to do so). And, in the expressed opinion of Mr. Manapragada and others, the Auction Assets continue to lose value. Even if the Trustee were to prevail at trial, Sigma Group could appeal. Consequently, this factor favors settlement.

Factor 2: The Trustee believes that much of Sigma Group's liquid assets is located outside of the United States. This would make collection on a judgment problematic. This factor favors settlement.

Factor 3: Although the litigation might not appear complex at first blush, it is. Not only does it involve whether a sale actually took place and if so, what the terms were, but it also involves whether third parties frustrated the sale. Continuing litigation and possibly holding another auction for the Auctioned Assets would delay administration of the estate and significantly increase administrative expenses. The trial and appeals could result in the case not being fully-administered for two or three more years, and the cost associated therewith would likely ensure that the estate was administratively insolvent. This factor favors settlement.

Factor 4: While it is true that one or more creditors may consider themselves aggrieved by the proposed compromise, the Trustee believes that it is not in their best interests to consume the bankruptcy estate by litigation investment, and that the compromise's result should be considered sufficient in view of the risks and the costs to the estate. Preserving some funds to distribute is in the best interests of creditors. This factor favors settlement. The likely objectors are the very same people who had they abided by the auction results, and wanted the Trustee to collect $150,000, their actions would have been far different than what the Trustee has observed them to be. The likely objectors are competing-bidders rather than estate constituents. The

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

1871.107                              7                    COMPROMISE POINTS AND AUTHORITIES

1 Shareholder Group, particularly, wants to acquire the assets for the $30,000 they originally

2 thought they could get away with after filing an involuntary case for that purpose.

3      It is not necessary that each factor be satisfied as long as the factors as a whole favor

4 approving the settlement. *In re WCI Cable, Inc.,* 282 B.R. 457, 473-74 (Bankr. D. Or. 2002).

5 Here, one or more creditors might consider the $150,000 as too low, given the $351,000 purchase

6 price, but no other party has offered more than $30,000 for the Auctioned Assets since the auction

7 was held. Furthermore, the additional expenses and costs that it will take to try the Action and

8 pursue or defend against appeals, and the time it will take to do so, more than outweigh any

9 prospect of improving upon the $150,000 settlement amount, which the Trustee believes is

10 reasonable under the circumstances.

11      WHEREFORE, the Trustee requests that the Court approve the proposed compromise

12 pursuant to the terms set forth in this Motion and the settlement agreement attached to the

13 declaration of the Trustee, and grant any additional relief that it deems appropriate.

14 Dated: April 15, 2013           PINNACLE LAW GROUP LLP

15           By: *Jeremy W. Katz*
               JEREMY W. KATZ
16                Attorneys for Trustee Paul J. Mansdorf

17

18

19

20

21

22

23

24

25

26

27

28

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

1871.107          8          COMPROMISE POINTS AND AUTHORITIES

Case: 12-48131   Doc# 60-1   Filed: 04/15/13   Entered: 04/15/13 13:06:15   Page 8 of 8