JEREMY W. KATZ (SBN: 119418)
LINDA SORENSEN (SBN: 72753)
PINNACLE LAW GROUP LLP
425 California Street, Suite 1800
San Francisco, CA 94104
Email: jkatz@pinnaclelawgroup.com
Telephone: (415) 394-5700
Facsimile: (415) 394-5003

Attorneys for Trustee
PAUL J. MANSDORF

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>PICONGEN WIRELESS INC.,<br><br>Debtor. | Case No. 12-48131 RLE 7<br><br>Chapter 7<br><br>DECLARATION OF PAUL J. MANSDORF, TRUSTEE IN SUPPORT OF MOTION FOR ORDER APPROVING COMPROMISE OF CONTROVERSY WITH SIGMA GROUP, INC.<br><br>Date: May 6, 2013<br>Time: 1:00 p.m.<br>Room: 201, Judge Efremsky |

I, Paul J. Mansdorf, Trustee, declare:

1. I am the duly appointed, qualified, and acting trustee of this bankruptcy estate. I have personal knowledge of the facts contained in this declaration except for those I have learned and as for those I believe them to be true, and if called as a witness, could and would competently testify as to them. I make this declaration in support of my motion for order approving compromise of controversy with Sigma Group, Inc. ("Sigma Group") resolving Adversary Proceeding No. 13-04064, *Mansdorf v. Sigma Group* (the "Action"), on the terms set forth herein and in the Settlement Agreement attached hereto as Exhibit "A."

2. On October 3, 2012, an involuntary chapter 7 bankruptcy petition was filed against the Debtor by petitioning creditors Ronald Moeckel, Ankit Sahu, Max Lightfoot, and Sai Manapragada. ECF #1. Patrick Costello of Vectis Law Group represented the petitioning

1871.107                            1                    DECLARATION IN SUPPORT OF COMPROMISE

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

Case: 12-48131    Doc# 60-2    Filed: 04/15/13    Entered: 04/15/13 13:06:15    Page 1 of 14

creditors. Dale Kluesing, signing as the Debtor's CEO, executed a stipulation for entry of an order for relief which was filed on October 26, 2012. ECF #5. An order for relief was entered that same day. ECF #6.

3. The assets of the Debtor consisted primarily of intellectual property. On November 30, 2012, I filed a motion to sell substantially all of the estate's assets free and clear of asserted liens to xStream Wireless Works, Inc. ("xStream Wireless") for $60,000 cash plus a waiver of certain claims against the estate. ECF #s 15, 16, and 17. (The original offer, which I rejected, was $30,000 for an expedited sale. Mr. Manapragada, one of the petitioning creditors, was also the principal of xStream Wireless and one of the founders of the Debtor. Prepetition, Mr. Manapragada had been open about the fact that he intended to put the Debtor into bankruptcy in order to acquire its assets.) The sale was subject to overbidding. The hearing on the sale and any overbids was scheduled for January 9, 2013.

4. On January 4, 2013, Robert Groover III, the Debtor's intellectual property counsel located in Texas, filed his opposition to the proposed sale. ECF #28. He alleged, among other things, that he had an attorney's lien against all of the intellectual property, that Mr. Manapragada had unclean hands, that some of the assets were in the possession of Mr. Manapragada, and that Mr. Manapragada had diverted estate assets for his own benefit. Mr. Groover also made his own offer to purchase the assets. ECF #27.

5. On January 7, 2013, I filed a reply to Mr. Groover's opposition to the sale. ECF #29. I pointed out that Mr. Groover's alleged attorney's lien was the subject of a bona fide dispute, that it was my duty to liquidate assets of the estate for the benefit of creditors, that the sale was subject to overbidding, and that Mr. Groover's purchase offer was not acceptable.

6. On the morning of January 9, 2013, Patrick Costello of Vectis Law Group now representing xStream Wireless filed a declaration which included documents in support of the sale motion. ECF #30.

7. Prior to the January 9, 2013, hearing on the sale motion, I am informed that Jeremy W. Katz of Pinnacle Law Group LLP, my general counsel, had been contacted by Mahesh Bigala of Sigma Group. I am further informed that Mr. Bigala informed Mr. Katz that Sigma

1871.107     2     DECLARATION IN SUPPORT OF COMPROMISE

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

Case: 12-48131    Doc# 60-2    Filed: 04/15/13    Entered: 04/15/13 13:06:15    Page 2 of 14

Group was interested in making an overbid for the assets. I am further informed that Mr. Katz discussed with Mr. Bigala the procedures required for qualifying as an overbidder.

8. The sale motion was heard on January 9, 2013. Mr. Groover appeared personally to oppose the motion and promote his offer. Eric Nyberg appeared on behalf of Sigma Group. Mr. Bigala, Sigma Group's principal, flew in from New Jersey to attend the hearing and overbid on behalf of Sigma Group. Mr. Costello appeared for the stalking horse buyer, xStream Wireless. The Court overruled Mr. Groover's opposition to the sale, ordered that the sale was to be free and clear of liens, and continued the in-court auction to January 22, 2013. Minutes of January 9, 2013, and ECF #32.

9. On January 18, 2013, on the eve of conducting the auction sale of the Debtor's assets in court on January 22, 2013, on the last business day prior to a morning hearing, Mr. Costello of Vectis Law Group, now acting as proposed special bankruptcy counsel for the Debtor, filed a motion to convert the Chapter 7 case to Chapter 11, citing new management and claiming vaguely to have a plan of reorganization in mind, requested that I not proceed with the auction. ECF #34.

10. Later on January 18, 2013, I filed a pleading in further support of the auction sale and preliminarily objecting to the Debtor's motion to convert. ECF #37. I pointed out there was no evidence to support the Debtor's request to stop the auction sale and further pointed out that under the circumstances of this case, the Debtor's motion to convert appeared to have been made in bad faith.

11. The assets that were to be sold at auction (the "Auctioned Assets") were not in my control except constructively, and the agreement with xStream Wireless did not require me to take any specific actions with respect to delivery of the Auctioned Assets. It appeared that Mr. Groover (the Debtor's intellectual property attorney in Texas) possessed substantial information about the patent applications and that some information regarding the intellectual property was public record. I learned that Mr. Manapragada was in possession of certain tangible assets and some books and records in his garage. My counsel contacted David Bartlett, a former Debtor's attorney, as well as Mr. Kluesing about books and records in their respective possession, but they

1871.107    3    DECLARATION IN SUPPORT OF COMPROMISE

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

Case: 12-48131    Doc# 60-2    Filed: 04/15/13    Entered: 04/15/13 13:06:15    Page 3 of 14

had less relevance to the Auctioned Assets. I was not informed about details, such as whether any prototypes existed.

12. On January 22, 2013, the Court listened to live testimony, denied the request to delay the auction until after the conversion motion was heard, and conducted the auction. (The motion to convert was later withdrawn, ECF #56, the Court having stated the likelihood that it would be denied and my having filed further opposition, ECF #s 46, 47, 48, 49, 50, and 51.) The Court started the bidding at $135,000, the value placed by the Debtor in its Schedule B for the patent systems. Sigma Group offered $135,000. xStream Wireless, the only other bidder, continued the bidding and the auction ended with Sigma Group being the successful bidder at $351,000. When the Court asked xStream Wireless if it wanted to make a back-up offer, xStream Wireless declined.

13. My position is that when the Court announced Sigma Group to be the winning bidder at auction, the sale of the Auctioned Assets was complete, Sigma Group had purchased the Auctioned Assets, and Sigma Group was bound to perform by paying the purchase price. There was no agreement that delayed effectiveness of the sale on any subsequent conditions, except entry of a court order. On January 23, 2013, the Court entered its order authorizing the sale of the Auctioned Assets to Sigma Group free and clear of liens. ECF #41.[1]

14. Sigma Group, however, did not pay the purchase price. It contended that I had unperformed obligations to identify and deliver the Auctioned Assets to Sigma Group. Sigma Group also contended that persons associated with the Debtor, xStream Wireless, and/or the Shareholder Group were interfering with Sigma Group's purchase of the Auctioned Assets, and were using the Auctioned Assets and frustrating the sale.

15. I filed the Action against Sigma Group to collect the purchase price and to determine whether it was necessary and appropriate to amend the sale order to permit me to regain the Auctioned Assets and re-sell them to mitigate damages. [Adversary Proceeding 13-

---

[1] On February 5, 2013, certain shareholders of the Debtor filed a notice of appeal from the sale order. ECF #45. Those certain shareholders were Mr. Manapragada, Ankit Sahu, Ronald Moeckel, Sharat Kuma Yempati, and Max Lightfoot (the "Shareholder Group"). All but Sharat Kuma Yempati were the petitioning creditors. The Shareholder Group was represented by Robert Simon of Barlowe Garsek & Simon, LLP of Fort Worth, TX, and locally by Mr. Costello of Vectis Law Group. ECF #45.

0464] Although the Shareholder Group (which had a pending appeal from the sale order), through its Texas counsel, indicated interest in acquiring the Auctioned Assets, they offered only $30,000 (which was less than the original xStream Wireless stalking horse bid of $60,000). I, through my counsel, informed the Shareholder Group's Texas counsel that $30,000 was unacceptable. Texas counsel responded that it might go higher, but has never made a higher offer. Furthermore, I have been informed by Texas counsel that the assets are not worth much and that the third party backer who had pledged the money to back xStream Wireless's bid at the auction no longer was willing to do so. Based on this information, I believe that neither xStream Wireless nor the Shareholder Group has the resources to pay more than $150,000 for the Auctioned Assets. Furthermore, I believe that xStream Wireless may have bid up the Auctioned Assets on January 22, 2013, with the intention of creating a situation where the combination of Sigma Group's having bid so much and the difficulties in obtaining the benefits of the sale would cause the harm that the bankruptcy estate has experienced.

16. I entered into negotiations with Sigma Group to resolve the Action, the result of which is an agreement that Sigma Group will pay the estate $150,000 for the Auctioned Assets and the estate will have no further obligations to Sigma Group in connection with the sale. I have received the $150,000 from Sigma Group which is being held in my trust account pending court approval of the compromise. If the compromise is not approved, the money will be returned to Sigma Group. The concept of the compromise is that Sigma Group already owns the Auctioned Assets as-is and where-is, and in fact already has the benefit of much of the intellectual property, whereas the parties are compromising the collection action and Sigma's claims that the estate breached sale obligations. Sigma Group and I will execute mutual general releases relating to the Action, including section 1542 releases. The Action will be dismissed with prejudice, each party bearing his or its own attorney fees. No overbidding is available. I believe that all potential interested parties in the Auctioned Assets were represented at the auction sale and had the opportunity to bid, and that no one was willing to commit to a back-up bid to Sigma Group's successful bid.

17. Beginning in November 2012, xStream Wireless and now joined by the Shareholder Group, has been insisting that the Auctioned Assets continue to lose value. It is imperative that the Action be settled and that the estate stop expending resources on the matter, so that it may focus on resolving asserted secured claims against the estate. Additionally, the Shareholder Group's appeal of the sale order must be dealt with. Settlement of the Action enables the estate to focus on resolving the remaining issues in the bankruptcy case. If the Action were instead to go forward, the estate could incur significant additional expenses and it is uncertain that the estate would recover any more money than it is receiving by way of settlement.

18. In the exercise of my sound business judgment, I believe that the settlement is in the best interests of creditors and the estate and should be approved.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 15th day of April 2013, at Berkeley, California.

_____
PAUL J. MANSDORF, TRUSTEE

# EXHIBIT A

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of April 8, 2013, by and among Paul J. Mansdorf, chapter 7 Trustee (the "Trustee") of the bankruptcy estate of Picongen Wireless Inc., Debtor (the "Debtor"), on the one hand, and Sigma Group, Inc. ("Sigma Group"), on the other hand (each a "Party" and, collectively, the "Parties")

## RECITALS

WHEREAS, on October 3, 2012 (the "Petition Date"), an involuntary petition was filed against the Debtor under Chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court"), Inc. Case No. 12-48131 RLE 7 (the "Bankruptcy Case").

WHEREAS, on October 26, 2012, an order for relief was entered.

WHEREAS, at a hearing in open court on January 9, 2013, Sigma Group was qualified to bid on a lien-free auction sale pursuant to the Trustee's Motion for Order Approving Sale of Estate's Interest in Substantially All Assets of the Bankruptcy Estate Free and Clear of Certain Claims of Lien and Other Interests (the "Sale Motion"). The hearing on the Sale Motion was continued for the purposes of conducting an auction.

WHEREAS, Sigma Group appeared at the auction in open court on January 22, 2013, and was the successful bidder for the assets stated in the Sale Motion (the "Offered Assets") on the terms set forth in the Sale Motion.

WHEREAS, on January 23, 2013, the Court entered its Order Approving Sale of Estate's Interest in Substantially All Assets of the Bankruptcy Estate Fee and Clear of Certain Claims of lien and other Interests to Sigma Group, Inc. (the "Sale Order") pursuant to which the Trustee sold the Offered Assets to Sigma Group for $351,000 cash.

WHEREAS, on March 15, 2013, the Trustee filed his Complaint for Damages for Breach of Contract, to Require Payment of Winning Bid at Auction, and for Modification of Sale Order to Facilitate Mitigation of Damages, A.P. No. 13-04064 (the "Adversary Proceeding"), alleging

that the Trustee had performed all of his obligations and tendered to Sigma Group the Offered Assets, that Sigma Group had breached the contract by failing to pay any of the $351,000 purchase price for the Offered Assets, and that the Sale Order should be modified to permit the Trustee to sell the Offered Assets to a third party in order to mitigate damages.

WHEREAS, Sigma Group disputes the Trustee's allegations and asserts, among other things, that: 1) not all of the Offered Assets have been delivered or otherwise tendered to Sigma Group; 2) third parties are in possession of some of the Offered Assets and are refusing to turn them over; 3) third parties are wrongfully using some of the Offered Assets; and 4) Debtor/Sai Manapragada's intentional non co-operation in disclosing and delivering all assets listed as part of the sale.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which the Trustee and Sigma Group acknowledge, the Parties agree as follows:

## AGREEMENT

1. <u>Settlement Payment.</u> Subject to satisfaction of the approval condition set forth in paragraph 3 below, on the entry of a final order of the Bankruptcy Court in the Bankruptcy Case authorizing the Trustee to enter into this Agreement, Sigma Group shall pay to the Trustee the sum of $150,000.00 cash for the Offered Assets. Sigma Group has delivered the $150,000.00 to the Trustee, who is holding the money in his trust account. Upon entry of a final order authorizing the Trustee to enter into the Agreement, the $150,000.00 shall become property of the bankruptcy estate.

2. <u>Acknowledgement by Sigma Group.</u> As additional consideration for the reduction in the purchase price, Sigma Group acknowledges that the Trustee has performed any and all obligations of the Trustee and the bankruptcy estate required to be performed under the Sale Motion and Sale Order.

3. <u>Overbidding Excluded.</u> The Parties agree that there will be no overbidding for the Offered Assets as a condition of approval of this Settlement. There is good cause to exclude overbidding because all entities who might overbid were present at the auction, none bid higher

than Sigma Group, and none agreed to be bound by a back-up offer. In addition, it has been alleged that one or more of the entities who might overbid may be using some of the Offered Assets and/or may be withholding them from the estate. Furthermore, there are doubts about any overbidder's ability to perform.

4. <u>Dismissal of Adversary Proceeding.</u> Subject to the satisfaction of the approval condition set forth in paragraph 5 below, the Trustee will execute the appropriate pleading(s) and cause it to be filed, dismissing the Adversary Proceeding with prejudice, each party bearing his or its own costs and attorney fees, and Sigma Group agrees to execute any and all documents necessary or appropriate to effectuate such dismissal.

5. <u>Approval as Condition.</u> This Settlement is subject to approval by the Bankruptcy Court and the entry of a final order approving the Settlement. The Trustee will take all appropriate steps to obtain such approval. Time is of the essence. If the Court does not approve this Agreement or no final order is entered, the Agreement shall be null and void ab initio.

6. <u>Mutual Releases.</u> Conditioned on the approval of this Settlement by the Bankruptcy Court as set forth in paragraph 3 above, and except for the obligations created or recognized herein, the Parties agree as follows:

    a. Sigma Group, on behalf of itself and its legal successors and assigns, does hereby release, remise, and discharge the Trustee and the Bankruptcy Estate, and each of them, including but not limited to their respective officers, directors, shareholders, servants, employees, trustees, insurers, agents, representatives, attorneys, accountants, subsidiaries, affiliates, parent corporations, predecessors, successors and assigns, and each of them, from any and all claims, demands, debts, liens, liabilities, contracts, obligations, accounts, torts, causes of action, or claims for relief of whatever kind or nature, liquidated or unliquidated, contingent or non-contingent, whether known or unknown or suspected or unsuspected by the releasing party, which this same releasing party may have, claim to have, or have at anytime heretofore had or claimed to have had, or that may herafter

accrue against any of these released parties, arising out of or related to the filing, prosecution, defense or subject matter included or that could have been included in the Adversary Proceeding..

b.  Each of the Trustee and the Bankruptcy Estate, on behalf of himself or itself and his or its legal successors and assigns, does hereby release, remise, and discharge Sigma Group, including but not limited to, its respective officers, directors, shareholders, servants, employees, trustees, insurers, agents, representatives, attorneys, accountants, subsidiaries, affiliates, parent corporations, predecessors, successors and assigns, and each of them, from any and all claims, demands, debts, liens, liabilities, contracts, obligations, accounts, torts, causes of action, or claims for relief of whatever kind or nature, liquidated or unliquidated, contingent or non-contingent, whether known or unknown or suspected or unsuspected by the releasing party, which this same releasing party may have, claim to have, or have at anytime heretofore had or claimed to have had, or that may herafter accrue against any of these released parties, arising out of or related to the filing, prosecution, defense or subject matter included or that could have been included in the Adversary Proceeding.

7.  <u>Waiver of California Civil Code § 1542.</u>  With respect to the claims released above, each of Sigma Group, the Trustee, and the Bankruptcy Estate, on behalf of himself or itself and its legal successors and assigns, expressly, knowingly, and intentionally waives any benefit or right under Section 1542 of the California Civil Code, or any other statute or common law principles of similar effect, which Section provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Each of Sigma Group, the Trustee, and the Bankruptcy Estate acknowledges that he or it has received independent legal advice from his or its attorneys with respect to waiving the provisions of California Civil Code Section 1542 and any other statute or common law principles of similar effect, and acknowledges that this waiver is a material inducement to and consideration for each Party's execution of the Settlement.

8.  <u>Acknowledgment of Opportunity to Investigate.</u>  The Parites to this Settlement acknowledge that they have had an opportunity to undertake an investigation or discovery concerning the facts on which they base their decision to enter into this Settlement. The Parties each understand and accept the risk that the facts with respect to which this Settlement is executed may later turn out to be other than true or different from the facts they believe to be true. Subject to the satisfaction of the approval condition set forth in paragraph 3 above, the Settlement shall remain effective despite any such untruth or difference in such facts.

9.  <u>Jurisdiction.</u>  Any Party hereto may assert or plead this Settlement as a bar, release, accord and satisfaction, or other defense to any claim however denominated that has been released by this Settlement and asserted by any other Party in any action or proceeding in any court or tribunal with jurisdiction over such claim or the Party and such other Party, and subject to such jurisdiction. Except for the foregoing, the Bankruptcy Court shall have exclusive jurisdiction over all claims and disputes that may arise out of this Settlement.

10. <u>Dispute/Attorney Fees.</u>  In the event of an action to enforce or interpret the terms of this Settlement, the prevailing party (as determined by the court or other comparable authority in any such action) shall be entitled to reasonable attorney fees and costs in addition to any other relief to which the Party may be entitled.

11. <u>Construction.</u>  The Settlement shall be governed and construed in accordance with the internal laws, other than choice of law, of the State of California and, when applicable, title 11 of the United States Code, and the decisions construing it.

12. <u>Independent Legal Advice.</u>  Each Party represents that he or it has received independent advice from legal counsel of his or its own choosing with respect to the advisibility

of entereing into this Settlement.

13. <u>Fees and Costs.</u>  Each Party shall bear his or its own expenses, including legal fees and costs, incurred in connection with the Adversary Proceeding and the negotiation, preparation, execution, and approval of this Settlement.

14. <u>No Admission.</u>  The Parties agree that this Settlement is a compromise of disputed claims.  Nothing contained in this Settlement shall constitute or be treated or characterized as an admission by any Party of any fact or liability or as evidence of any allegation of any Party.

15. <u>Authority to Execute.</u>  Each person who signs this Settlement represents and warrants that he or she has the authority and capacity to act on behalf of the Party for whom he or she is signing and to bind the Party and all who might claim through it to the terms of this Settlement.

16. <u>No Assignment or Transfer.</u>  The Parties represent and warrant that they have not assigned, transferred, or purported to assign or transfer, in whole or in part, any interest in any of the rights and claims that are the subject of the Settlement.

17. <u>No Oral Amendment or Modification.</u>  This Settlement cannot be amended or modified in any respect, except by a written instrument executed by all Parties that is approved by the Bankruptcy Court.

18. <u>Entire Agreement.</u>  This Settlement contains the entire agreement between the Parties.  All prior oral and written agreements, if any, are expressly superseded hereby and are of no further force and effect.  The recitals section of this Agreement is for informtional purposes only and does not constitute an admission by any of the Parties to this Agreement.

19. <u>Cooperative Drafting.</u>  All Parties shall be deemed to have participated in drafting this Settlement and it shall not be construed against any of them.

20. <u>Counterparts.</u>  This Settlement may be executed in counterparts and copies and/or facsimile transmittal signature pages may be used instead of originals.  The executed counterparts shall be construed as and constitute one Settlement that will be binding on the Parties hereto.

21. **Cooperation.** The Parties agree to and will cooperate fully with each other in the performance of the Settlement, and will execute such additional agreements, documents, or other instruments, and provide all necessary seals and/or certifications, as may reasonably be required to carry out the terms and intent of the Settlement. All Parties shall use their best efforts to obtain all necessary orders of the Bankruptcy Court to approve the Settlement and to dismiss the Adversary Proceeding.

IN WITNESS WHEREOF, the Parties hereto have entered into the Settlement, to become effective upon the entry of a final order authorizing it by the Bankruptcy Court in the Bankruptcy Case.

Dated: April 9, 2013

Paul J. Mansdorf, Trustee, on behalf of the Trustee and the Bankruptcy Estate

Dated: April 08, 2013

SIGMA GROUP, INC.

By: _____

Its: CEO (MAHESH RJGALA)

Case: 12-48131   Doc# 60-2   Filed: 04/15/13   Entered: 04/15/13 13:06:15   Page 14 of 14