UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ROGER L. EFREMSKY, JUDGE

| | | |
|---|---|---|
| In Re: | ) | Case No. 12-48131 |
| | ) | Chapter 7 |
| | ) | |
| PICONGEN WIRELESS INC., | ) | <u>TRUSTEE'S MOTION to SELL</u> |
| | ) | <u>PROPERTY FREE and CLEAR [15]</u> |
| | ) | (Portion of hearing only: |
| Debtors. | ) | testimony of two witnesses) |
| | ) | |
| | ) | Tuesday, January 22, 2013 |
| | ) | Oakland, California |

<u>Appearances</u>:

| | |
|---|---|
| Special Counsel<br>for the Debtor: | Patrick M. Costello, Esq.<br>Vectis Law Group<br>2225 E. Bayshore Road, Suite 200<br>Palo Alto, California  94303 |
| For the Debtor's<br>Equity Holders: | Robert A. Simon, Esq.<br>3815 Lisbon Street<br>Fort Worth, Texas  76107 |
| For Paul Mansdorf,<br>Chapter 7 Trustee: | Jeremy W. Katz, Esq.<br>Pinnacle Law Group<br>425 California Street, Suite 1800<br>San Francisco, California  94104 |
| | Paul J. Mansdorf, Esq.<br>1563 Solano Avenue, Suite 703<br>Berkeley, California  94707 |
| For Robert O.<br>Groover III: | Robert O. Groover III, Esq., *pro se*<br>14801 Quorum Drive, Suite 500<br>Dallas, Texas  75254-1449 |
| For the Sigma Group,<br>a prospective bidder: | Eric A. Nyberg, Esq.<br>Kornfield, Nyberg, Bendes & Kuhner<br>1907 Broadway, Suite 225<br>Oakland, California  9494612-2223 |
| Also present: | David E. Bartlett, Esq. |

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 1 of 35

Digital Court                    United States Bankruptcy Court
Recorder:                        Northern District of California
                                 Oakland Division, Office of the Clerk
                                 Erin Walters
                                 1300 Clay Street, Suite 300
                                 Oakland, California  94612
                                 (510) 879-3600

Certified Electronic             Palmer Reporting Services
Transcriber:                     1948 Diamond Oak Way
                                 Manteca, California  95336-9124


              Proceedings recorded by digital recording;
 transcript produced by federally-approved transcription service.

Case: 12-48131    Doc# 71    Filed: 07/19/13    Entered: 07/19/13 10:40:40    Page 2 of 35

<u>I N D E X</u>

Witnesses:

|  | Direct | Cross | Other |
|---|---|---|---|
| **Mahesh Bigala** |  |  |  |
| By Mr. Nyberg: | 4 |  |  |
| By the Court: |  |  | 6 |
| By Mr. Simon: |  | 7 |  |
|  |  |  |  |
| **Sai Manapragada:** |  |  |  |
| By Mr. Simon: | 23 |  |  |
| By the Court: |  |  | 29 |
| By Mr. Nyberg: |  | 31 |  |
| By the Court: |  |  | 31 |

1    Tuesday, January 22, 2013                    10:16:50 o'clock a.m.

2                      P R O C E E D I N G S

3        MAHESH BIGALA, SIGMA GROUP's WITNESS, SWORN/AFFIRMED

4              THE WITNESS:  I do.

5              THE CLERK:  Thank you.  You may be seated.

6              Please state and spell your full name for the record.

7              THE WITNESS:  Mahesh Bigala.

8              THE CLERK:  Spell it.

9              THE WITNESS:  M-a-h-e-s-h, last name Bigala,

10   B-i-g-a-l-a.

11                     DIRECT EXAMINATION

12   BY MR. NYBERG:

13   Q.  Mr. Bigala, by whom are you employed?

14   A.  With the Sigma Group.

15   Q.  And what is your capacity with Sigma Group?

16   A.  I'm the CEO.

17   Q.  Okay.  And you were here for the initial hearing on the

18   trustee's motion to sell the assets in this case?

19   A.  Yes.

20   Q.  And that I believe was on —

21   A.  9th January, yes.

22   Q.  — January 9th; is that correct?

23            Subsequent to January 9th were — did you have any

24   contact with anyone from xStream Wireless?

25   A.  Yes.

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 4 of 35

1   Q.   And who contacted you?

2   A.   One of the friends, si- — I'm sorry — it's Naidu.  There is

3   a common friend.  They contacted my common friend.  They wanted

4   to have a conference call.  I just rendered the whole thing for

5   a conference call, but they are — they were saying that, you

6   know, there is nothing.  All these patents are expired.  You

7   can't do anything with the patents.  What you are going to get

8   if you buy is the two TVs which is what less — even you might

9   get the better TVs for $2,000 in the market.  And all those

10  technologies with us, we're going to do with the new company,

11  better — you acquired are not — you are not going to get

12  anything out of it.

13  Q.   Do you — you said there was a conference call?

14  A.   Yes.

15  Q.   And who was on the conference call?

16  A.   Sai Manapragada and Naidu Zanader (phonetic), of his friend,

17  our colleague.  And from my — my friend Sri Nevas Kottu

18  (phonetic).  And also there is one more gentleman and I don't

19  remember his name.  But, you know, it's — in the — from xStream.

20  There's one more gentleman actually.

21  Q.   And who initiated the contact for this conference call?

22  A.   Naidu initiate the contact through my friend, Sri Nevas, to

23  have a conversation.

24  Q.   Sigma Group did not reach out to xStream; it was xStream

25  through your friend reached out to you to set this up?

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 5 of 35

1  A.  That's right.  And — yeah.

2  Q.  And do you recall what date that conference call took place?

3  A.  Maybe 14th or 15th.

4  Q.  Okay.  And again you were told that the patents and the

5  intellectual property would not be worth anything if you

6  purchased it?

7  A.  Yes.

8       MR. NYBERG:  Okay.  I don't have anything further

9  unless Your Honor has any.

10      THE COURT:  No.  What I'm going to do is I'm going to

11 take a five-minute break.

12      And then, Mr. Costello, if you want to ask some

13 questions of the gentleman.

14      MR. COSTELLO:  Your Honor, I may defer to Mr. Simon,

15 if that's all right.

16      THE COURT:  All right.  We're going to take a

17 five-minute recess.

18   (Recess taken from 10:19 a.m. to 10:27 a.m.  Portion

19 ordered for transcription resumes at 10:27:48 a.m.:)

20                  EXAMINATION BY THE COURT

21 BY JUDGE EFREMSKY:

22 Q.  And before you start, Mr. Simon, I just want to — sir, you

23 stated this conversation took place on what date, again?

24 A.  Probably on the 14th or 15th of January.

25 Q.  January.  And again on the line was Mr. Manapragada,

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 6 of 35

1  yourself, —

2  A.  My friend, Sri Nevas Kottu.

3  Q.  How do you spell his last name?

4  A.  K-o-t-t-u.

5  Q.  K-o-t-t-u.

6  A.  And that's another friend.  I think he's called Naidu,

7  N-a-i-d-u.  I don't know his full name, but his last name is

8  Naidu.

9  Q.  Okay.

10 A.  And so one more gentleman from xStream.

11 Q.  And then there was a fifth person?

12 A.  Yeah.

13 Q.  And they initiated the call?

14 A.  It said they — Naidu contacted my friend, Sri Nevas, so he

15 initiated the call because he had the conference facility.

16 Q.  Okay.

17 A.  He set up the call.

18         THE COURT:  All right.  Go ahead, Mr. Nyberg.

19              CROSS-EXAMINATION

20 BY MR. SIMON:

21 Q.  Good morning, Mr. Bigala.  How are you?

22 A.  Good morning.

23 Q.  Yeah.  My name is Robert Simon.  It's good to you see you

24 this morning.

25         Mr. Bigala, now the conversation that you say occurred

1    on January the 15th, that wasn't your first conversation with

2    Mr. Manapragada and with other people from xStream Wireless, was

3    it?

4    A.   No.

5    Q.   In fact, you had had a previous conversation on — at least

6    there's email correspondence back to at least January the 3rd,

7    correct?

8    A.   Yes.

9    Q.   Okay.  And on January the 5th there was a conference call,

10   correct?

11   A.   I don't know the date but, yes, there was a conference —

12   Q.   Okay.  And you were a participant — a participant on that

13   call, correct?

14   A.   Yes.

15   Q.   Okay.  And there were — there was someone else named Sri —

16   Sri Nevas Kottu?

17   A.   Yes.

18   Q.   Okay.  And would you tell the Court who Sri Nevas Kottu is?

19   A.   He is my friend and also he is my technical advisor.

20   Q.   Okay.  So he's someone associated with your business?

21   A.   Not associated directly, but he advises me on the

22   technology.

23   Q.   Okay.  So you were talking to the people at xStream Wireless

24   about this technology back to at least January the 5th, correct?

25   A.   Yes.

Case: 12-48131    Doc# 71    Filed: 07/19/13    Entered: 07/19/13 10:40:40    Page 8 of 35

1   Q.   Okay.   And in one of those and in one of those conversations

2   you said that you were a potential investor or represented

3   potential investors in xStream Wireless, correct?

4   A.   Basically the way it — we were in the process of acquiring

5   Picongen when we heard during the end of the year and when my

6   friend, I asked my friend, who is also technology person, what

7   the technology, he said he will contact a few people whom he

8   knows.   And then when he contacted several of his colleagues, I

9   think one of them happened to be Naidu.   And he proposed that,

10  you know, we have the similar technology, why don't you listen

11  to us first and do some — if it works for you, it's better you

12  can join us.   That's when he initiated the call.

13           And then when I asked they thought like they have a

14  product ready and they are in launching, —

15  Q.   Um-hum.

16  A.   — they want the investment at that stage.   But when I had a

17  call they are saying:   It's not the stage.   We are getting the

18  product from the court.

19           I said what is the company name.

20           Then said Picongen.   Okay, that's what we are looking

21  — we are already working on it, so there is no point in working

22  with it.

23  Q.   Someone said to the xStream Wireless people, "We think we

24  might want to invest $2.5 million for ten percent of the

25  equity," correct?

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 9 of 35

1    A.   If the product is that are need to be produced, they said

2    several contracts are being signed with the companies in India

3    and several — not for the ten percent, only they offer 25

4    percent for 2.5 million.  I said it's subject to due diligence.

5    And if they have, they said they have a contract with several

6    companies in India, and the product is ready to be launched, and

7    they need the money to manufacture the product.  But in the

8    call, they said it's nothing like that.  When I presented to my

9    friend that, you know, they need 2.5 million, it's not that we

10   have not agreed we have said just you discuss the proposal.

11   Q.   Okay.  So some — but someone said let's discuss this

12   proposal with the $2.5 million investment in xStream?

13   A.   In xStream.

14   Q.   Right.

15   A.   But not knowing any details of Picongen.

16   Q.   Right.  And whoever — whoever that was would have acquired

17   equity in xStream in exchange for that 2.5 million, correct?

18   A.   It's subject to due diligence.

19   Q.   But — yes, right.  Subject to due diligence, yes?

20   A.   No, not necessarily.  Because it's — it's what — it could be

21   $100,000, it could be 10,000.  Unless we do the due diligence,

22   it — my company could be worth 100 million, I could say, can you

23   invest 25 million in my company.  But unless I see, I go through

24   the documents, I have no firsthand information of xStream at all

25   except the call.

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 10 of
35

1  Q.  But the number $2.5 million was in the call, correct?

2  A.  Yes.

3  Q.  Okay.  And — and the 2.5 million, subject to due diligence,

4  would be in exchange for —

5  A.  It's — it's — basically it's not — the mention is what they

6  need.  They are looking for 2.5 million investment.

7  Q.  Okay.

8  A.  It's not that we want to invest 2.5 million.

9  Q.  Okay.  But you said — you said, "I represent people who may

10  be willing to make an investment like this subject to due

11  diligence"?

12  A.  It's — yes.

13  Q.  Yeah.

14  A.  I'm going to be the part of it if I like — if like the

15  property.

16  Q.  Okay.  And in the — and in the context of that call someone

17  offered to send — xStream offered to send a business plan with

18  information, correct?

19  A.  Yes.

20  Q.  Okay.

21        MR. SIMON:  Your Honor, I have only one copy.  May I

22  approach the witness if he recognizes the document?

23        THE COURT:  Mr. Katz, Mr.  Nyberg, do you want to take

24  an opportunity to look at the document first?

25        MR. SIMON:  I'm sorry, Your Honor.  I didn't know I

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 11 of
35

1    would be cross-examining witnesses.  I would have brought more

2    copies.

3            THE COURT:  Mr. Nyberg or Mr. Katz, if you want an

4    opportunity, I'll have Ms. Narcisse make some copies and you can

5    take an opportunity to review the same.

6            MR. NYBERG:  Well, I think maybe there should be a

7    little foundation, first of all, as to, first, whether or not

8    this document was actually sent to —

9            THE COURT:  Oh, I understand.

10           MR. NYBERG:  — the same —

11           THE COURT:  I'm just simply saying if you wanted to

12   meet ahead of time — all right.  I'll let Mr. Katz finish.

13           MR. KATZ:  We'll see what he has to say.

14           THE COURT:  All right.  Mr. Simon, if you could lay a

15   foundation with regard to as to whether this gentleman has ever

16   seen the document, let alone when it was sent.

17           MR. SIMON:  Sure, sure.  May I approach him, Your

18   Honor?

19           THE COURT:  You may.

20           MR. SIMON:  Thank you.

21           THE COURT:  All right.  Let the record reflect that

22   Mr. Simon's handed a copy of the — or the alleged business plan

23   to the witness.

24   BY MR. SIMON:

25   Q.  Okay.  Mr. Bigala, would you take a look at the document in

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 12 of
35

1   front of you, please.  Take as long as you need.

2            Okay.  Do you recognize that?

3   A.  Yes, in the note.  Yes.

4   Q.  Okay.  So that document was emailed to you, correct?

5   A.  Yes.

6   Q.  And that document contains information about the technology

7   that xStream was trying to develop, correct?

8   A.  I assume so because I have not gone through the whole

9   technology or whole document at all.

10  Q.  Okay.  But you understand that's the same technology that

11  Picongen was trying to develop, correct?

12  A.  I don't know.

13  Q.  You don't know, okay.  Now when in exchange for what you

14  received — I should say — maybe I should ask the question

15  differently.

16           In the back of that packet I believe there is a draft

17  of a nondisclosure and confidentiality agreement.  Do you see

18  that?

19  A.  I don't see that — actually, as I said, I didn't even read

20  through the document also.  The email after the call, the email

21  was sent later on.

22  Q.  Okay.

23  A.  That was the initial call and then during the call he sent

24  all the information.  Like I said — and I would have gone

25  through the thing, or whatever it is.  But basically even when

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 13 of
35

1   you are saying it was a noncon- — that's what I'm looking at,

2   actually.

3   Q.  Okay.  So — but you've seen that document, it was emailed to

4   you?

5   A.  He sent the email and even I — I might have it in the email.

6   I can see if that's there or not or else I can look at it into

7   the email as well.

8   Q.  Okay.  But the email had an attachment and that was part of

9   the attachment to the document — to the email, right?

10  A.  I don't recall.  I don't remember, that's what I'm saying.

11  I need to check my — my email.

12  Q.  To check your email, okay.

13  A.  To see if it is there or not also.

14  Q.  Okay.  Would that have been on January the 5th?

15  A.  As I said, it could be first week, but I don't remember

16  exact date.  It could be 5, 6th, I don't know.

17  Q.  Okay.  But the first week of January, after an email

18  exchange you had a conference call, correct?

19  A.  Yes.

20  Q.  All right.  And after the conference call a further email

21  was sent to you?

22  A.  Yes.

23  Q.  And the further email had an attachment?

24  A.  Yes.

25  Q.  And the further attachment looks like this document, a

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 14 of
35

1  business plan for xStream Wireless?

2  A.  I think so, yeah.

3  Q.  Okay.  Now if you look at the back of that you'll see there

4  is a nondisclosure and confidentiality agreement.  Do you see

5  that?

6  A.  Um-hum.

7  Q.  Okay.  Was that nondisclosure and confidentiality agreement

8  ever signed and returned?

9  A.  I was never asked, I was never told about any nondisclosure.

10  All I said is what after the call, I was not interested when

11  they said actually they are in the process.  It's not — they —

12  when I asked about the business plan, I asked them do you have

13  the client agreement already, why do you need the money.  Send

14  me, why do you need the money, the proposal.

15        And they said, oh, we don't — we don't have any

16  contracts signed.  We are in the product development.

17        I said at that stage I'm not interested in any of

18  that.

19        And then he said I will share the document to you.  If

20  you are interested, you can come back to me.

21        That's how the call ended.  He said what is the — why

22  do you need the funds.  He said he's going to send the details,

23  but he never sent on the details why we need the fund, but he

24  send the document.  After that, I have no idea after that.

25  Q.  Okay.  Did someone else — so your technical advisor or

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 15 of
35

1  someone else associated with your business read this attachment?

2  A.  I don't think so.

3  Q.  Oh, you — you —

4  A.  I don't know.  I don't know.  I didn't even ask him.

5  Q.  Okay.  You don't know?

6  A.  I don't know.

7  Q.  Okay.  But the nondisclosure, confidentiality agreement was

8  never signed as far as you know?

9  A.  I never read all so I don't even know that — if it was there

10  also.  I was not even told that there is a nondisclosure, will

11  be there a part of our call, or anything to do with that.

12          And, first of all, I was not sure it's basically we

13  were trying to acquire Picongen.  Then the gentleman, the —

14  Naidu said actually there is an investment opportunity which is

15  already existing in the similar technology what are you looking

16  for, why don't you have a call.  Then that's when he said, yes,

17  we will talk.

18  Q.  Does the technology appear to be the same as best you can

19  tell?

20  A.  What is that?

21  Q.  The technology that you talked about with xStream, is that

22  the same technology that Picongen is trying to develop?

23  A.  It looked to be similar.

24  Q.  Okay.  And after receiving this, this attachment, and after

25  the telephone conversations that you had had with xStream, then

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 16 of 35

1   you decided to go ahead and make a bid for the assets of

2   Picongen?

3   A.  Not after — well before that only.

4   Q.  Before you had — you had decided maybe you would like to

5   make a bid?

6   A.  It's I have decided to make the bid on that, I was looking

7   for the California attorney.  And meanwhile I was learning more

8   about the technology, what can be done.  That's how I contacted

9   several people who are in the net — wireless technologies.

10  That's how one of my friend who is into wireless technology, he

11  contacted several other people that what can be done with this

12  technology.  And we are in the process of acquiring this.

13  Q.  Okay.  And among the people they have contacted was xStream?

14  A.  One of them, I think — not xStream actually.  He contacted

15  one of his associate, his counterpart in his company, and he

16  happened to be associated with xStream.

17  Q.  Okay.

18  A.  He has not contacted xStream.  He has contacted all his

19  colleagues in his company where he works.  And he — one of the

20  person, Naidu, he said:  Okay, why are you buying something

21  else.  I will introduce to some other company.  They are far

22  away and they have the better technology, and all.

23          But when set up the call, it happened to be the same

24  company they —

25  Q.  All right.

Case: 12-48131    Doc# 71    Filed: 07/19/13    Entered: 07/19/13 10:40:40    Page 17 of
35

 1  A.  — were talking about.

 2          MR. SIMON:  All right.  Your Honor, if I may have a

 3  moment?  I may be done, but I want to talk to Mr. Costello and

 4  briefly to my clients because I'm —

 5          THE COURT:  Please go ahead, Mr. Simon.

 6          MR. SIMON:  — fairly new to this.

 7      (Pause in the proceedings.)

 8  BY MR. SIMON:

 9  Q.  Mr. — Mr. Bigala, did the contact start as early as December

10  the 28th?  That is, on December the 28th, 2012 did Mr. Sri Nevas

11  Kottu contact Naidu about xStream Wireless?

12  A.  I don't know when he contacted, but that's when I contacted

13  Sri Nevas, to find out we are in the process of acquiring this,

14  just can you give me some input on the technology.

15  Q.  Okay.

16  A.  It's actually he has contacted several other people also,

17  just not only Naidu and his colleagues.  He has contacted

18  several of the people because he works on the wireless

19  technology.  So he contacted several other people, actually.

20  Q.  Okay.  So now who is Naidu?  Would you clarify one more time

21  who Naidu is?

22  A.  I don't know, it's Sri Nevas' friend.

23  Q.  Okay.

24  A.  I think he works for some other company but, you know, they

25  are their clients, or something.  And he talked about the

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 18 of 35

1   product, that this is what we are looking.  Then he introduced

2   to xStream, saying that there is an investment opportunity, why

3   are you acquiring in the court.  Rather like there is already

4   product available which is having the contract signed, why don't

5   you have a conference call.

6   Q.  Okay.  And now the conference call took place on January 3rd

7   and you were part of that conference call, correct?

8   A.  Yes.

9           THE WITNESS:  And to object one thing, Your Honor, I

10  just found what email and the confidential to what they are

11  talking.  Just I go through browsing through the email.  This

12  was not ever included, actually.  Just I'm going through this

13  and included later.

14          THE COURT:  The nondisclosure agreement was not

15  included — not part of your email —

16          THE WITNESS:  Not included.  And I think they included

17  it now.

18          THE COURT:  All right.  Thank you.

19          THE WITNESS:  It's not part of the agreement.

20  BY MR. SIMON:

21  Q.  Was the nondisclosure agreement sent to you separately —

22  A.  No.

23  Q.  — on January the 3rd?

24  A.  No.

25          MR. NYBERG:  Your Honor, if I may just interject?  I'm

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 19 of 35

1   not sure what the relevance of —

2           THE COURT:  I'm just about —

3           MR. NYBERG:  — this NDA —

4           THE COURT:  I've given Mr. Simon quite a bit of

5   latitude.

6           Go ahead.

7           MR. SIMON:  You have, Your Honor, which I appreciate —

8           MR. NYBERG:  Because — because just —

9           THE COURT:  Just a second.

10          MR. NYBERG:  Because the witness has already testified

11  he didn't sign an NDA, so unless Mr. Simon wants to produce a

12  signed NDA I think this is irrelevant.

13          THE COURT:  Mr. Simon, do you have a signed NDA?

14          MR. SIMON:  No, Your Honor.  And that was — that was

15  the point.  This information, at least it's my client's

16  position, and it's a little difficult to cross-examine looking

17  at emails on tablets, but that the information was sent on the

18  condition that an NDA would be signed.

19          THE COURT:  All right.  Well, Mr. Simon, the issue I

20  have before me today is whether Mr. Manapragada individually

21  and/or xStream contacted this gentleman and/or his company to

22  dissuade them from buying or affecting their price.  That's what

23  I'm most concerned about.  I can see where this is going with

24  respect to xStream and this gentleman, if he's successful in

25  acquiring the subject property here today.  I'm more concerned

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 20 of
35

1    about what was stated to this gentleman about anything that

2    might affect his willingness to bid or the amount he was willing

3    to bid.  That's what's germane today.

4            MR. SIMON:  All right.  And, Your Honor, I don't claim

5    to know.

6            THE COURT:  All right.  Well, then I think — I think

7    we've covered enough here.  If you want to call Mr. Manapragada

8    to the stand to either admit what he stated on the record in

9    this conference call or to deny it, that's fine.

10           MR. SIMON:  Your Honor, there actually is a relevant

11   question that — there are a couple of relevant questions, if I

12   may, that directly relate to that issue.

13           THE COURT:  With regards to what?

14           MR. SIMON:  To the issue of whether — whether the

15   bidding is affected in any way.

16           THE COURT:  My question is I want to know — I want to

17   confirm whether Mr. Manapragada contacted this gentleman in that

18   conference call that this gentleman's referenced and basically

19   said:  Don't bid on it, you're wasting your time and your money,

20   it's not worth it.  That's what I want to know.  That's what's

21   germane.

22           MR. SIMON:  Okay.

23           THE COURT:  Whether it has any effect on this

24   gentleman or not, that's a whole another issue.  What I want to

25   know is Mr. Manapragada contacted this gentleman in this

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 21 of
35

1 conference call and attempted to persuade him either not to bid

2 or to affect his bid to — to keep it down or lower than what

3 somebody else might bid —

4         MR. SIMON:  Yeah.  Your Honor, this is the first time

5 I've heard about this.  Before I would ever call Mr.

6 Manapragada, I would want to talk to him, Your Honor.

7         THE COURT:  All right.  Do you want an opportunity to

8 talk to him?

9         MR. SIMON:  Absolutely.

10         THE COURT:  All right.  All right, sir, you can step

11 down.  We'll take a ten-minute recess until eleven o'clock.

12    (Witness excused.  Recess taken from 10:47 to 11:02 a.m. )

13         THE CLERK:  Come to order.  Court's back in session.

14         THE COURT:  Please be seated.

15         All right, Mr. Simon.

16         MR. SIMON:  Yes, Your Honor.  The equity holders call

17 Sai Manapragada.

18         THE COURT:  All right.  If you could come forward,

19 sir.

20    SAI MANAPRAGADA, EQUITY HOLDERS' WITNESS, SWORN/AFFIRMED

21         THE WITNESS:  Yes.

22         THE CLERK:  Thank you.  You may be seated.  Please

23 state and spell your full name for the record.

24         THE WITNESS:  Sai Manapragada.  S-a-i is the first

25 name.  And last name is Manapragada, M-a-n-a-p-r-a-g-a-d-a.

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 22 of 35

1            THE CLERK:  Thank you.

2                    DIRECT EXAMINATION

3    BY MR. SIMON:

4    Q.  Good morning, Mr. Manapragada.  Are you one of the equity

5    holders of the debtor Picongen?

6    A.  Yes.

7    Q.  Okay.  And are you also a principal of xStream Wireless?

8    A.  Yes.

9    Q.  Okay.  Mr. Manapragada, did you have a telephone

10   conversation that included Mr. Bigala on January the 15th?

11   A.  Yes.

12   Q.  All right.  Would you tell the Court how that telephone

13   conversation came about?  Not what happened but how the

14   conversation came about.

15   A.  When I talked to Subba Galapardi (phonetic), who is the

16   contact who got me in touch with Naidu, who is the common friend

17   of Sri Nee Kottu (phonetic), who is the friend of Mahesh Bigala,

18   Naidu said this is not kosher.  We had given him — him in the

19   sense, Mahesh Bigala, we have shared confidential information.

20   And he said that he wants to confront him.  And he did so in an

21   email.  And there is a transcript of the email.  If you want me,

22   I can read that.

23   Q.  Okay.  And I want to make sure we're clear on all these

24   pronouns.  Who — who wanted to confront whom?

25   A.  Naidu wanted to confront Sri Nee Kottu and Mahesh.

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 23 of
35

1    Q.  Okay.  Mr. Bigala?

2    A.  Mr. Bigala.

3    Q.  And why did Naidu want to confront Mr. — what is your

4    understanding of why Mr. — of why Naidu wanted to confront Mr.

5    Bigala and Mr. Sri Nee Kottu?

6    A.  I think he felt that he was being taken advantage of by

7    getting him to give information under the assumption that he

8    would — Mr. Bigala and Mr. Kottu would use the information in a

9    confidential manner.  And since he did not do it, I think he

10   sent an email to Sri Nee saying that 'I would like to talk to

11   you about xStream and Mahesh.'

12   Q.  Okay.  And did —

13          MR. NYBERG:  Your Honor, — Your Honor, I would move to

14   strike the — whatever comment about what the email contained.

15   If — first of all, there's no evidence of the email.  Second,

16   the email would be the best con- — no evidence of its contents,

17   so move to strike his testimony as to what was conveyed in the —

18          MR. KATZ:  Then it's hearsay.

19          THE COURT:  Yeah.  Mr. Simon, I'm going to sustain the

20   objections.  What I would like to know —

21          MR. SIMON:  We'll get there, Your Honor.

22          THE COURT:  Okay.  But — I'd like to get there now.

23   And we can go into the other aspects you want to develop, but I

24   want to know what this gentleman said to the other perspective

25   buyer on or about the 14th or 15th of January 2013.  That's what

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 24 of
35

1    I'm focusing on.  So let's stick to that.

2              MR. SIMON:  Actually, Your Honor, it's the next

3    question.

4    BY MR. SIMON:

5    Q.  Did a telephone conversation take place on January the 15th?

6    A.  Yes.

7    Q.  And who was on the telephone conversation?

8    A.  Mr. Bigala, Mr. Kottu, Mr. Naidu, Mr. Galapardi, and myself.

9    Q.  Okay.  And at that tele- — in that telephone conversation

10   did you in any way try to dissuade the Sigma Group or Mr. Bigala

11   from bidding on the assets of Picongen?

12   A.  No, I did not.

13   Q.  Okay.  All right.  What did you — what did you say in that

14   telephone conversation?

15   A.  For the most part, I was quiet.  Naidu wanted me to come on

16   the phone.  And there was talk about whether — I mean that I am

17   interested to work if this — to develop this technology after

18   the bidding happens.  And when I asked about what he actually

19   means, Subba (phonetic), one of the persons on the conference

20   call, said that, you know, that he thought that Mahesh wanted to

21   offer me a job after he acquires the assets.  At which point I

22   was under clear instructions that that phone call, I'm not sure

23   supposed to be making any deals.  I told him very clearly that I

24   am there only because Naidu asked me.  And he told me — Mahesh

25   Bigala said, "Okay, you guys can do whatever you want.  We'll do

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 25 of
35

1    whatever we want." And at which point, I — I said, "Okay, this

2    conversation is over."

3            The last thing that Subba said was, "This is

4    unethical." And then Mahesh Bigala and he started having an

5    argument, at which point I hung up the phone.

6    Q. Okay. What did Mr. Bigala say, as best you recall before

7    you hung up?

8    A. He was saying that what — when Subba, you know, alleged

9    about his being unethical, he said, "Well, what xStream is doing

10   is also unethical and how can Picongen assets be acquired by

11   xStream, so that is unethical," and at which point I didn't want

12   have that conversation because the reason I hang up is because

13   there is no basis for him to know what happened with the

14   founders and the interest parties — interested parties and the

15   creditors of the company. And I didn't want to be a part of

16   that conversation anymore.

17   Q. Did you understand that you were not allowed to attempt to

18   dissuade —

19   A. Yes, sir.

20   Q. — Mr. Bigala or Sigma Group from bidding?

21   A. Yes, sir.

22   Q. And did you understand you were not allowed to try to lower

23   the bid price by giving incorrect information to — to Mr. Bigala

24   or to Sigma?

25   A. Yes. I'm — I'm aware of that. And I have not done anything

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 26 of
35

1   to dis- — said anything to dissuade him from going on with the

2   auction.

3   Q.   Okay.   Did anyone in the conversation say that these assets

4   aren't very valuable?

5   A.   There was an email sent by Naidu, which I was referring to.

6   And I have a copy of that email.   Everybody, all five people

7   were copied on that email, and it said — I think I want to read

8   it.

9           THE COURT:   Go ahead.   Please read it.

10          MR. SIMON:   That copy.

11          THE WITNESS:   We don't have it here.

12          MR. SIMON:   Your Honor, I have a copy.   I'm happy to

13  let the witness take a look at it.

14          THE COURT:   All right.   Mr. Katz, Mr. Nyberg, do you

15  want to take a look at it first?

16          All right.   We're going to mark this —

17          MR. SIMON:   May I approach the witness, Your Honor?

18          THE COURT:   Do we have a copy of this document?

19          Let me do this, Mr. Simon, what I want, if you could

20  get the document from the gentleman up there, which is the

21  business plan, we'll make a copy of that.   With regards to the

22  business plan, I'm going to have that marked as — I'm just going

23  to reference it as...

24          MR. SIMON:   Equity Holder's Exhibit 1?

25          THE COURT:   That's fine.   And then the email you're

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 27 of 35

1   referring to will be marked as Equity Exhibit Number 2.

2           MR. SIMON:  Very well, Your Honor.

3           THE COURT:  And we'll — as a housekeeping purpose,

4   we'll make copies at the end, so go ahead.

5           MR. SIMON:  Okay.  Your Honor, may I approach?

6           THE COURT:  You may.

7           Let the record reflect Mr. Simon is approaching the

8   witness with the subject email.

9           THE WITNESS:  Reading the email.

10  BY MR. SIMON:

11  Q.  Would you start by reading to the Court the date, who the

12  email is to, and who the email is from, and the re line, and

13  then that the subject at the — the — the text —

14  A.  The email is from Naidu Amnuneni (phonetic).  It was sent on

15  Monday, January 14th, 2013 at 6:04 p.m. to Sri Nee Kottu.

16  Subject:  xStream Wireless and Mahesh.

17          "Sri Nee, do you have a minute to talk about xStream

18  Wireless and Mahesh?  Looks like Mahesh is trying to do some

19  backdoor stuff of getting the assets of Picongen based on the

20  information we shared.  Without citing all in the product

21  development on getting the patents, it is going to be useless

22  assets, in case if he is thinking of benefitting from it.  It

23  would be nice if we can talk ASAP.  Regards, Naidu," with the

24  confidentiality notice on it.

25  Q.  Okay.  Is that the email that prompted the telephone

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 28 of
35

1  conversation on January the 15th?

2  A.  Yes.

3  Q.  Okay.  And in — that email is not from you, is it?

4  A.  It is not from me.

5  Q.  Okay.  And at any time during the telephone conversation on

6  January the 15th, did you tell Mr. Bigala that the assets aren't

7  worth anything or that the assets are not valued?

8  A.  No, I did not.

9  Q.  Okay.  And did you attempt to dissuade him from bidding?

10  A.  No, sir.

11        MR. SIMON:  Pass the witness, Your Honor.

12              EXAMINATION BY THE COURT

13  BY JUDGE EFREMSKY:

14  Q.  Who is Mr. Naidu?

15  A.  Mr. Naidu is a common friend.  He is known to me by another

16  close friend of mine, Subba Galapardi, who has been helping me

17  and our company, Picongen Wireless, as a business development

18  vice president.  And he has been instrumental in opening doors

19  for the VCs and Angel Investors and for — since 2007.  And Naidu

20  Amnuneni has been introduced to validate the technology a few

21  years ago, I don't really recall, maybe it's 2008.  At that

22  time, from that moment onwards, Naidu Amnuneni has been on the

23  board of advisors, technology advisors for Picongen Wireless.

24  And when — when Naidu contacted Subba to have a technology due

25  diligence meeting with xStream Wireless —

Case: 12-48131    Doc# 71    Filed: 07/19/13    Entered: 07/19/13 10:40:40    Page 29 of
35

1   Q.   Who is Subba?

2   A.   Subba is the person I just told you, the vice president of

3   business development, that has been helping me from 2007.  And —

4   Q.   Now Subba, is that the same — Mr. Naidu and Mr. Subba are

5   two different people or —

6   A.   Yes, sir.

7   Q.   Okay.

8   A.   Subba is the vice president of business development.  Naidu

9   Amnuneni is another person.  He is — he is the member of the

10  board of technology advisors for Picongen and also for xStream.

11  And he was approached by Sri Nee, according to one of these

12  emails, asking about xStream and saying that there is an

13  investment offer.  And he was doing the technology due

14  diligence.  That's how I came to know about this meeting.

15  Q.   Okay.  And who is Sri Nee?

16  A.   Sri Nee is a friend of Naidu.  And, as far as I know, he is

17  — so Naidu works at a company called eSilicon.  His customer,

18  one of the other companies, I don't know which one, Sri Nee is

19  an employee of that customer company of eSilicon.  That's how he

20  knows.

21  Q.   And then Kottu?

22  A.   Sri Nee Kottu is his —

23  Q.   That's a full name, okay.

24          THE COURT:  All right.  Mr. Katz, Mr. Nyberg, do you

25  have any questions?

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 30 of 35

1        MR. NYBERG:  Just one clarifying thing.

2                    CROSS-EXAMINATION

3   BY MR. NYBERG:

4   Q.  Good morning.

5   A.  Good morning.

6   Q.  I just wanted to make sure I was clear on something.  You

7   indicated that — let's see if I got the names correct.  But

8   Naidu is both a technical advisor, board of technical advisors

9   for Picongen; is that correct?

10  A.  Correct.

11  Q.  And I believe you also said he's a technical advisor for

12  xStream as well; is that correct?

13  A.  We don't have a technical board of advisory for xStream set

14  up yet, but he is — he is in one of the references of the

15  company.

16  Q.  Okay.  So he is assisting xStream at least?

17  A.  Yes.

18       MR. NYBERG:  Okay.

19                 FURTHER EXAMINATION BY THE COURT

20  BY JUDGE EFREMSKY:

21  Q.  And when was xStream — do you know when xStream was

22  incorporated?

23  A.  I think roughly the date for application is in the last week

24  of October, first week of November.

25  Q.  October of last year?

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 31 of 35

1   A.   October of 2012.

2   Q.   Okay.  And the purpose of xStream being formed?

3   A.   xStream Wireless is — once the — we wanted to develop the

4   technology, the wireless technology that I was working on.

5   Q.   At Picongen?

6   A.   Through Picongen, yes.

7   Q.   Okay.  All right.  So the purpose was to basically pick up

8   the technology from Picongen and develop it at xStream Wireless?

9   A.   Since the bankruptcy was filed, it — it was disclosed at the

10  bankruptcy that we — xStream Wireless is a group that is formed

11  to acquire the assets of Picongen.

12  Q.   Okay.  And how much money went into the capitalization of

13  xStream Wireless when it was formed in October-November of 2012?

14  A.   A hundred thousand dollars.

15  Q.   Okay.  Has any additional funds come into the company since?

16  A.   No, sir.

17  Q.   All right.  How many employees does xStream Wireless have?

18  A.   Currently, one.

19  Q.   And who is that?

20  A.   That is me.

21         THE COURT:  All right.  Anything else?

22         MR. SIMON:  Your Honor, there's actually quite a bit

23  depending upon what exactly the Court wants to hear.

24         THE COURT:  I want to just find out, to hear both

25  sides of the story as the conversation that took place on or

1    about the 14th or 15th of January.  That's what I was concerned

2    about.  So I have no further questions for Mr. Manapragada at

3    this juncture.

4            MR. SIMON:  That was my understanding, Your Honor.

5    That was — that was the issue we were talking about, not the

6    broader issue of should the sale go forward, should the case be

7    converted to — to —

8            THE COURT:  On the motion to convert, that's not

9    coming up until February, and there's opposition that's been

10   filed already.  So all I have before me today is the — the sale.

11           MR. SIMON:  Okay.

12           THE COURT:  Okay.  All right.

13           All right.  Mr. Katz, let me hear from you.

14           MR. KATZ:  Thank you.

15           MR. SIMON:  Will we get the opportunity to argue, Your

16   Honor?

17           THE COURT:  Absolutely.  I just want to start with Mr.

18   Katz, hear from Mr. Nyberg, and then hear from you, sir.

19           MR. KATZ:  I think it's helpful to go back through the

20   history that the Court began discussing —

21           MR. SIMON:  Your Honor, if the witness is finished

22   testifying, —

23           THE COURT:  Mr. Manapragada, you may step down.  I

24   apologize.  Thank you, sir.

25           THE WITNESS:  Thank you, Your Honor.

Case: 12-48131   Doc# 71   Filed: 07/19/13   Entered: 07/19/13 10:40:40   Page 33 of 35

1        (Witness excused and portion ordered for transcription ends

2    at 11:18 o'clock a.m.)

3                                —o0o—

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 12-48131    Doc# 71    Filed: 07/19/13    Entered: 07/19/13 10:40:40    Page 34 of
35

State of California                )
                                   )      SS.
County of San Joaquin             )


        I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

        I further certify I am not a party to nor in any way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate No. 00124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.


                                   Susan Palmer
                                   Palmer Reporting Services

                                   Dated July 16, 2013